Zach Cowan, City Attorney, SBN 96372
Lynne S. Bourgault, Deputy City Attorney, SBN 180416
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6998
Facsimile: (510) 981-6960
Email: LBourgault@cityofberkeley.info

Attorneys for Defendants CITY OF BERKELEY, OFFICER
BROWN, OFFICER TU, OFFICER B. SMITH, OFFICER
MATHIS, OFFICER GARDNER, OFFICER KASTMILER, SGT.
PHILIPS, and SGT. CARDOZA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR MOORE, individually and as successor in interest of XAVIER MOORE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, *et al.*,<br><br>Defendants. | No. 3:14-cv-00669-CRB<br><br>DEFENDANTS' AMENDED NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT<br><br>Date: August 5, 2016<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor |

**NOTICE IS HEREBY GIVEN** that on August 5, 2016, at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, Courtroom 6, 17th floor, San Francisco, California, defendants will and hereby do move the Court to grant summary judgment and/or partial summary judgment of plaintiff's claims.

Defendants make this motion on the grounds that there is no genuine issue of material fact as to plaintiff's claims against defendants, plaintiff lacks the evidence needed to raise a genuine issue of material fact as to said claims, certain immunities bar said claims, and/or plaintiff has failed to state a claim. Therefore, as a matter of law, the defendants are entitled to summary judgment.

1    This motion is based upon this Notice of Motion, the below Memorandum of Points and

2  Authorities, the Declaration of Officer Gwendolyn Brown and Exhibits thereto, the Declaration

3  of Lynne S. Bourgault and Request for Judicial Notice and Exhibits thereto, and other matters as

4  may be presented to the Court at the time of the hearing.


6  Dated:  June 20, 2016                          Zach Cowan, Acting City Attorney
                                                  Lynne S. Bourgault, Deputy City Attorney

                                          By:  _____/s/_____
8                                                LYNNE S. BOURGAULT
                                                 Attorneys for Defendants

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

INTRODUCTION ......................................................................................................................... 1

ISSUES/CLAIMS TO BE DECIDED ........................................................................................ 2

UNDISPUTED FACTS ............................................................................................................... 2

    A. Officer Brown responded to a disturbance call from John Hayes involving a potential "5150" and Officer Tu and Officer Smith responded as cover officers ...................... 2

    B. Officer Brown then gathered additional information from Mr. Hayes about Mr. Moore's condition and the reasons for the 911 call ......................................................... 3

    C. Officer Brown's prior knowledge of Mr. Moore ........................................................ 3

    D. Officer Brown talked to Mr. Moore for 15 to 20 minutes, during which time Mr. Moore was paranoid, delusional, and agitated ............................................................. 4

    E. Officer Brown determined Mr. Moore met the criteria of Welf. & Inst. Code § 5150 5

    F. Mr. Moore physically resisted the officers' efforts to handcuff him ........................ 6

    G. Officers Smith responds to the request for additional cover ..................................... 7

    H. Officers Mathis, Gardner, and Kastmiler respond to the request for additional cover 8

    I. Sgt. Phillips and Sgt. Cardoza were the last to arrive; an ankle strap was applied ...... 9

    J. Mr. Moore continued breathing normally until after he was restrained .................... 10

    K. No officer ever placed any body weight on Mr. Moore's back, chest, or neck ......... 12

ARGUMENT ............................................................................................................................... 12

    I. LEGAL STANDARD FOR SUMMARY JUDGMENT ................................................. 12

    II. THE 1st CAUSE OF ACTION FAILS BECAUSE OFFICER BROWN HAD REASONABLE SUSPICION TO DETAIN MR. MOORE, AND PROBABLE CAUSE TO (A) TAKE HIM INTO CUSTODY UNDER WELFARE & INSTITUTIONS CODE § 5150, (B) ARREST HIM UNDER THE WARRANT, AND (C) ARREST HIM FOR A VIOLATION OF PENAL CODE SECTION 148 .......................................................... 13

    III. THE 1st CAUSE OF ACTION ALSO FAILS BECAUSE OFFICERS BROWN, TU, AND SMITH HAVE QUALIFIED IMMUNITY ON THE DETENTION AND ARREST CLAIMS ......................................................................................................... 14

    IV. THE 2ND CAUSE OF ACTION FAILS BECAUSE THE OFFICERS USED ONLY MINIMAL FORCE TO OVERCOME MR. MOORE'S RESISTANCE ........................ 16

    V. QUALIFIED IMMUNITY ALSO SHIELDS THE OFFICERS FROM THE EXCESSIVE FORCE CLAIM ........................................................................................ 19

    VI. THE 3RD CAUSE OF ACTION UNDER THE SUBSTANTIVE DUE PROCESS CLAUSE FAILS BECAUSE THERE IS NO EVIDENCE ANY OFFICER PURPOSEFULLY INTENDED TO HARM MR. MOORE ........................................... 19

i

VII. PLAINTIFF'S 4TH CAUSE OF ACTION AGAINST THE CITY UNDER *MONELL* FAILS FOR LACK OF AN UNDERLYING ACTIONABLE CLAIM AND LACK OF EVIDENCE ................................................................................................ 20

VIII. THE 6th CAUSE OF ACTION FOR A WRONGFUL DEATH FAILS BECAUSE THERE IS NO EVIDENCE OF NEGLIGENCE, and THE OFFICERS HAVE IMMUNITY UNDER PENAL CODE SECTION 835A AND 847(B), AND WELFARE AND INSTITUTIONS CODE SECTION 5278 ............................................. 21

IX. THE 7TH CAUSE OF ACTION UNDER CIVIL CODE SECTION 51.7 FAILS FOR LACK OF EVIDENCE OF VIOLENCE ARISING FROM DISCRIMINATION ......... 22

X. PLAINTIFF'S 8TH CAUSE OF ACTION UNDER CIVIL CODE SECTION 52.1 FAILS FOR LACK OF EVIDENCE OF A CONSTITUTIONAL VIOLATION AND LACK OF COERCION .................................................................................................. 22

XI. PLAINTIFF'S 10TH CAUSE OF ACTION FOR BATTERY FAILS FOR THE SAME REASONS AS HIS EXCESSIVE FORCE CLAIM FAILS ............................................. 23

XII. PLAINTIFF'S 11TH CAUSE OF ACTION UNDER THE ADA CLAIM FAILS FOR FOUR REASONS ..................................................................................................... 23

CONCLUSION ...................................................................................................... 25

ii

Defs' Notice of Motion and MPA in Support of Motion for Summary Judgment and/or Adjudication
USDC Action No. 3:14-cv-00669-CRB

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Act Up!/Portland v. Bagley,*
    988 F.2d 868 (9th Cir. 1993) ...................................................................................15

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ...............................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...............................................................................................13

*Ashcroft v. al-Kidd,*
    - U.S. -, 131 S. Ct. 2074 (2011) ...........................................................................19

*Bates v. Chesterfield County,*
    216 F.3d 367 (4th Cir. 2000) ...................................................................................25

*Bender v. County of Los Angeles,*
    217 Cal. App. 4th 968 (2013) .................................................................................23

*Bias v. Moynihan,*
    508 F.3d 1212 (9th Cir. 2007) .................................................................................13

*Blankenhorn v. City of Orange,*
    485 F.3d 463 (9th Cir. 2007) ...................................................................................21

*Board of the County Commissioners of Bryan County, Oklahoma v. Brown,*
    520 U.S. 397 (1997) ...............................................................................................20

*Brown v. City and County of San Francisco,*
    2014 WL 1364931 (N.D. Cal. April 7, 2014) ........................................................17

*Cameron v. Craig,*
    713 F.3d 1012 (9th Cir. 2013) .................................................................................23

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ...............................................................................................13

*City and County of San Francisco, Cal. v. Sheehan*
    (2014) 135 S.Ct. 702 ..............................................................................................16

*City and County of San Francisco, Calif. v. Sheehan*
    (2015) 135 S.Ct. 1765 ............................................................................................16

*City of Los Angeles v. Heller,*
    475 U.S. 796 (1986) ...............................................................................................20

i

Defs' Notice of Motion and MPA in Support of Motion for Summary Judgment and/or Adjudication
USDC Action No. 3:14-cv-00669-CRB

*Deorle v. Rutherford*,
    272 F.3d 1272 (9th Cir. 2001)..................................................................16

*Devenpeck v. Alford*,
    543 U.S. 146 (2004) ..........................................................................14

*Donovan v. Phillips*,
    2015 WL 993324 (March 4, 2015) ..........................................................16

*Edson v. City of Anaheim*,
    63 Cal.App.4th 1269 (1998) ..................................................................23

*Gonzalez v. City of Anaheim*,
    747 F.3d 789 (9th Cir. 2014) ...........................................................19, 20

*Graham v. Connor*,
    490 U.S. 386 (1989) ......................................................................16, 17

*Green v. County of Riverside*,
    238 Cal.App.4th 1363 (2015) ................................................................19

*In re Gregory S.*,
    112 Cal.App.3d 764 (1980) ..............................................................15, 22

*Hainze v. Richards*,
    207 F.3d 795 (5th Cir. 2000) ...........................................................24, 25

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ..........................................................................15

*Henry v. Bank of Am. Corp.*,
    522 Fed.Appx 406 (9th Cir. 2013) ..........................................................21

*Hunter v. Bryant*,
    502 U.S. 224 (1991) ..........................................................................15

*Illinois v. Gates*,
    462 U.S. 213 (1983) ..........................................................................13

*Jackson v. City of Bremerton*,
    268 F.3d 646 (9th Cir. 2001) ................................................................17

*Jones v. Kmart Corp.*,
    17 Cal. 4th 329 (1994) ........................................................................22

*Knapps v. City of Oakland*,
    647 F.Supp.2d 1129 (N.D. Cal. 2009) ......................................................21

*Luchtel v. Hagemann*,
    623 F.3d 975 (9th Cir. 2010) ...............................................16, 17, 18, 19

*Luong v. City and County of San Francisco*,
  2012 WL 5869561 (N.D. Cal. 2012) ................................................................... 23

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................................................. 13

*Mattos v. Agarano*,
  661 F.3d 433 (9th Cir. 2011) ............................................................................... 19

*Metcalf v. County of San Joaquin*,
  42 Cal.4th 1121 (2008) ........................................................................................ 21

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985) .............................................................................................. 15

*O'Guinn v. Lovelock Corr. Ctr.*,
  502 F.3d 1056 (9th Cir. 2007) ............................................................................. 23

*People v. Souza*,
  9 Cal.4th 224 (1991) ............................................................................................. 13

*People v. Triplett*,
  144 Cal. App. 3d 283 (1983) ................................................................................ 14

*Porter v. Osborn*,
  546 F.3d 1131 (9th Cir. 2008) ............................................................................. 19

*Reynolds v. County of San Diego*,
  858 F. Supp. 1064 (S.D. Cal. 1994) .................................................................... 23

*Saman v. Robbins*,
  173 F.3d 1150 (9th Cir. 1999) ............................................................................. 23

*Sanders v. City of Minneapolis*,
  474 F.3d 523 (8th Cir. 2007) ............................................................................... 25

*Saucier v. Katz*,
  533 U.S. 194 (2001) ....................................................................................... 15, 18

*Scott v. Harris*,
  550 U.S. 372 (2007) .............................................................................................. 13

*Scott v. Henrich*,
  39 F.3d 912 (9th Cir. 1994) ................................................................................. 17

*Sheehan v. City and County of San Francisco*,
  793 F.3d 1211 (9th Cir. 2015) ............................................................................. 24

*Sheehan v. City and County of San Francisco*
  (9th Cir. 2014) 743 F.3d 1211 ...................................................................... 16, 21

iii

*Sturgeon v. Bratton*,
    174 Cal.App.4th 1407 (2009) ..................................................................................14

*Terry v. Ohio*,
    392 U.S. 1 (1968) ..................................................................................................13

*Texas v. Brown*,
    460 U.S. 730 (1983) ..............................................................................................13

*United States v. Cortez*,
    449 U.S. 411 (1981), overruled on other grounds by *United States v. Little,* 18
    F.3d 1499 (10th Cir. 1994) (en banc) ...................................................................13

*United States v. Fouche*,
    776 F.2d 1398 (9th Cir. 1985) ..............................................................................13

**U.S. Constitution**

U.S. Const. Amend. IV, § 1 ..............................................................................2, 25

U.S. Const. Amend. XIV, § 2 ...........................................................................2, 19

**Statutes and Rules**

42 U.S.C. § 12210 ..................................................................................................24

42 U.S.C. 12132 .......................................................................................................2

Fed. R. Civ. P. 56(c) ..............................................................................................12

**California Codes**

Civ. Code § 51.7 ................................................................................................2, 22

Civ. Code § 52.1 ..........................................................................................2, 22, 23

Penal Code §148 ..............................................................................................13, 15

Penal Code § 835a ....................................................................................16, 21, 22

Penal Code § 847(B) ........................................................................................21, 22

Welf. & Inst. § 5150 ......................................................................................*passim*

Welf. & Inst. § 5378 ...............................................................................................21

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendants City of Berkeley, Sgts. Benjamin Cardoza and Amber Phillips, and Officers Gwendolyn Brown, Kenneth Tu, Brandon Smith, Brian Mathis, Timothy Gardner, and Nikos Kastmiler ("defendants") move for summary judgment on all claims brought by plaintiff, Arthur Moore ("plaintiff"). Plaintiff is suing for the death of his adult son, Xavier Moore ("Mr. Moore").[1] It is undisputed that on February 12, 2013, Mr. Moore was "clearly in the midst of a paranoid schizophrenic mental health crisis" when officers were called to detain him under Welfare & Institutions Code § 5150. Second Amended Complaint ("SAC") ¶ 21.

Officer Gwendolyn Brown, the lead officer in this case, correctly believed Mr. Moore should be taken into protective custody for a medical/psych evaluation due to his paranoid, delusional, and agitated behavior. Officer Brown spent 15 to 20 minutes with Mr. Moore trying to convince him to submit to police custody voluntarily, but Mr. Moore refused. When Officer Brown and Officer Tu finally grasped Mr. Moore's wrists to take him into protective custody, Mr. Moore struggled with the officers. The officers never struck Mr. Moore in any manner and only held him down to handcuff and restrain him so that he could be safely transported. However, due to a combination of drugs and a diseased and damaged heart, Mr. Moore went into cardiac arrest and expired a few minutes after being handcuffed while awaiting transport. The officers immediately provided CPR and performed chest compressions, and the paramedics arrived just minutes later, but it was too late to save Mr. Moore. He was pronounced dead at the hospital.

The coroner determined that the cause of Mr. Moore's death was "acute combined drug intoxication" (methamphetamine and codeine) combined with the following three heart conditions leading to cardiac arrest: (1) "cardiomegaly" (grossly enlarged heart weighing 800 grams), (2) "moderate left ventricular dilatation and hypertrophy" (thickening and enlargement

---

[1] Although Xavier Moore was transgendered and sometimes went by the name "Kayla," plaintiff refers to him as "Xavier" in this lawsuit and plaintiff and his family referred to him as "Xavier" during his life. Bourgault Decl. Ex. L (A. Moore Depo. 44:20-45:2). For clarity and consistency, defendants will refer to Xavier Moore as "Mr. Moore" without intending any disrespect.

of the left coronary ventricle), and (3) "intramuscular left anterior descending coronary artery (embedded coronary artery within the wall of the heart). Bourgault Decl. Ex. A (Coroner's Report).[2] Dr. Gary Vilke, a top expert in sudden in-custody deaths, similarly concluded the officers restraining Mr. Moore did not cause his sudden cardiac arrest; rather, it was most likely caused by Mr. Moore's enlarged heart, deformed intramuscular coronary artery, and the amount of methamphetamine in his system. Ex. B (Dr. Vilke's Report).

Plaintiff sued the officers for wrongful death, alleging various constitutional and tort claims. However, the material facts are undisputed, and summary judgment should be granted.

## ISSUES/CLAIMS TO BE DECIDED

1st Cause of Action for unlawful detention and/or arrest under the Fourth Amendment.

2nd Cause of Action for excessive force under the Fourth Amendment.

3rd Cause of Action for a violation of the Substantive Due Process Clause.

4th Cause of Action against City of Berkeley pursuant to *Monell*.

(There is no 5th Cause of Action.)

6th Cause of Action for wrongful death caused by negligence.

7th Cause of Action under Civil Code § 51.7 (violence motivated by discrimination).

8th Cause of Action under of Civil Code § 52.1 (intentional violation of civil rights by coercion)

(There is no 9th Cause of Action.)

10th Cause of Action for battery.

11th Cause of Action under 42 U.S.C. 12132 against City of Berkeley for violation of the ADA.

## UNDISPUTED FACTS

**A. Officer Brown responded to a disturbance call from John Hayes involving a potential "5150" and Officer Tu and Officer Smith responded as cover officers**

Near midnight on February 12, 2013, defendant Officer Gwendolyn Brown was dispatched to a call at 2116 Allston Way, Apartment 514. Ex. C (Brown Depo. 19:24-20:3). Officers Kenneth Tu and Brandon Smith responded as cover officers, arriving at the apartment building around the same time as Officer Brown. Ex. C (Brown Depo. 22:17-19, 28:15-17); Ex.

---

[2] Unless otherwise specified, all Exhibits are attached to the Bourgault Declaration.

D (Tu Depo. 26:10-15, 27:24-28:1, 41:5-9); Ex. E (Smith Depo. 18:23-25; 20:4-9).

The call for service came from John Hayes,[3] who told the dispatcher his roommate, Xavier Moore, had kicked him out of their apartment, had been drinking and doing drugs all day, was schizophrenic, off his medication, and needed to be "5150'd." Ex. C (Brown Depo. 20:20-21:3; 67:25-68:9); Brown Decl. Ex. A (Call for Service Report). Mr. Hayes also reported that Mr. Moore had access to kitchen knives. Ex. C (Brown Depo. 21:11-18). All of this information was relayed to the officers either over the radio or via their patrol car computer before they arrived at Mr. Moore's apartment building. Ex. D (Tu Depo. 21:19-22:1, 34:5-16, 35:10-13).

**B. Officer Brown then gathered additional information from Mr. Hayes about Mr. Moore's condition and the reasons for the 911 call**

Upon arrival, Officer Brown met with Mr. Hayes on the sidewalk in front of the building. Ex. C (Brown Depo. 23:23 - 24:6); Ex. D (Tu Depo. 30:13-17; 31:5-11); Ex. E (Smith Depo. 28:4-10). Mr. Hayes explained he lived with Mr. Moore in an apartment on the 5th floor. Ex. C (Brown Depo. 22:14-16); Ex. K (E. Moore Depo. 102:17-22; 103:7-9; 113:24-24); Brown Decl. Ex. B (Police Report). Mr. Hayes reported Mr. Moore had thrown him out of the apartment because he would not give Mr. Moore money to buy more drugs and alcohol. Mr. Hayes also said he left the apartment because he thought Mr. Moore was going to attack him and that he feared for his safety. Ex. C (Brown Depo. 24:23-25:5, 32:16-19); Ex. D (Tu Depo. 31:1-16; 31-18-24); Ex. E (Smith Depo. 28:11-29:1); Brown Decl. Ex. B at COB 17, 23.

**C. Officer Brown's prior knowledge of Mr. Moore**

A month prior, Mr. Moore's stepmother, Elysse Moore, requested officers conduct a welfare check on Mr. Moore at the same apartment. Although Officer Brown had no contact with Mr. Moore during that incident, she learned from Elysse Moore at that time that Mr. Moore

---

[3] Elysse Paige Moore, Xavier's stepmother and plaintiff's wife, testified Mr. Hayes was a "known drug dealer and user" who was "brain damaged" and she believed him to be "pivotal" in Mr. Moore's demise. Ex. K (E. Moore Depo. 93:11-15; 115:5-16). She also testified: "We saw it all coming to this" because the relationship between Mr. Moore and Mr. Hayes "had become very unhealthy." *Id*. at 101:19-6. For two months, plaintiff and his wife were unable to go inside the apartment after Mr. Hayes moved in, and plaintiff testified he was only inside the apartment once, when he helped his son move in. *Id*. 116:10-15; Ex. L (A. Moore Depo. 16:11-25).

had repeatedly been detained under Welfare and Institutions Code § 5150 and regularly abused drugs and alcohol. Ex. C (Brown Depo. 53:10-55:6). Officer Brown also learned from Elysse Moore that Mr. Moore had recently moved from San Francisco, where he had been arrested numerous times and had a lot of contacts with San Francisco police.[4] Brown Decl. ¶ 4.[5]

While still outside the building, Officer Smith advised Officer Brown there was an arrest warrant for a Xavier Moore out of San Francisco. Ex. C (Brown Depo. 43:1-44:24, 46:15-17); Ex. E (Smith Depo. 23:7-12, 24:20-25:8); Brown Decl. Ex. B at COB 17. Officer Brown believed the arrest warrant was for this Mr. Moore because "Xavier Moore" is an uncommon name, and she knew from her recent conversation with Elysse Moore that he had had numerous contacts with San Francisco police.[6] Ex. C (Brown Depo. 77:11-16); Brown Decl. ¶ 4.

**D. Officer Brown talked to Mr. Moore for 15 to 20 minutes, during which time Mr. Moore was paranoid, delusional, and agitated**

Mr. Hayes used his key to let Officers Brown, Tu, and Smith in to the front door of the apartment building, took them upstairs on the elevator, and then used his key to open the door to Apartment # 514, the apartment he shared with Mr. Moore. Ex. C (Brown Depo. 27:23-28:6, 30:9-17, 33:14-18); Ex. D (Tu Depo. 37:23-38:4; 38:13-24); Brown Decl. Ex. B at COB 17, 21. None of the officers went inside Mr. Moore's apartment; they remained outside on the 5th floor open air landing above the apartment courtyard. Ex. C (Brown Depo. 33:19-21; 37:3-11). Officer Tu and Officer Smith stood four to six feet away from the doorway with Mr. Hayes, while Officer Brown called out for Mr. Moore. Ex. C (Brown Depo. 37:17-21; 38:21-39:1); Ex. D (Tu Depo. 39:5-21, 40:8-14); Ex. E (Smith Depo. 31:23-32:11). None of the officers had their firearms or any other weapons drawn. Ex. C (Brown Depo. 51:18-20).

---

[4] Plaintiff testified Mr. Moore got "picked up" by police a lot when he was in San Francisco. Ex. L (A. Moore Depo. 89:9-11).
[5] During this prior "welfare check," Officer Brown had gone to 2116 Allston Way, Apt. # 514 to check on Mr. Moore, but he did not answer. Ex. C (Brown Depo. 55:22-56:9).
[6] Officer Smith never had the opportunity to compare identifying information about Mr. Moore with the identifying information on the arrest warrant. Ex. E (Smith Depo. 40:10-21). However, the officers later learned that the arrest warrant in the AWS computer system was an active warrant for the decedent. Brown Decl. ¶7 and Ex. C thereto.

4

When Mr. Moore came to the door, Officer Brown calmly explained that his roommate had called, and asked him to tell her what was going on. Ex. C (Brown Depo. 57:21-25; 58:5-9). Mr. Moore was unable to respond to any of her questions, and instead spoke about being followed by the "FBI," "dinosaurs," said that he "feared for his safety," that he "didn't feel safe," and he did not believe the officers were "real police officers," although all three officers were in their full uniforms. Ex. C (Brown Depo. 58:13-59:9); Ex. D (Tu Depo: 53:18-54:6, 55:7-56:2); Ex. E (Smith Depo. 32:16-18); Brown Decl. Ex. B at COB 17, 21. Mr. Moore also called Officer Brown by different names (Michelle, Carol, Wanda) and told her he saw Michelle, Carol and Wanda behind her, although no other female was present. Ex. C (Brown Depo. 58:15-59:6). Officer Brown tried repeatedly to get Mr. Moore "back on track," but he continued to make paranoid and delusional statements.[7] Ex. C (Brown Depo. 60:22-61:3); Ex. D (Tu Depo. 55:7-56:2). During the interaction, Mr. Moore became increasingly angry. Brown Decl. Ex. B at COB 17, 21. Occasionally, Mr. Moore got very loud. Ex. E (Smith Depo. 32:20-6). Officer Brown believed Mr. Moore was on drugs because his demeanor was "constantly switching" from being bubbly, to paranoid and fearful. Ex. C (Brown Depo. 103:5-12).

As Officer Brown was speaking with Mr. Moore, Officer Smith determined Mr. Hayes also had an outstanding arrest warrant. Accordingly, Officer Smith placed Mr. Hayes under arrest and walked him down to his patrol car in the street. Ex. E (Smith Depo. 35:5-17, 37:2-9, 39:12-40:9, 41:12-20); Ex. C (Brown Depo. 63:10-15, 65:16-19, 65:25-66:14).

**E. Officer Brown determined Mr. Moore met the criteria of Welf. & Inst. Code § 5150**

Officer Brown interacted with Mr. Moore for 15 to 20 minutes as she evaluated his condition.[8] Ex. C (Brown Depo. 59:8-9); Ex. E (Smith Depo. 31:5-17). Officer Brown determined Mr. Moore was "delusional and becoming even more delusional" and was unable to formulate a plan to care for himself, and therefore, he met the criteria for being "gravely

---

[7] Plaintiff's SAC admits that Mr. Moore "was a 41-year-old, 347-pound . . . man with a well-documented history of paranoid schizophrenia and numerous prior Berkeley Police Department contacts related to his mental illness." SAC at ¶19. Plaintiff further admits that on the night in question, Mr. Moore was "speaking irrationally and making overtly paranoid comments about his belief that uniformed officers were not really police officers" and that he was "clearly in the midst of a paranoid schizophrenic mental health crisis." *Id.* ¶ 21.

[8] Plaintiff testified he had no information to support the allegation in Paragraph 22 of the SAC that the officers did not question or evaluate Mr. Moore to determine his condition. Ex. L (A. Moore Depo. 39:9-18).

disabled" under Section 5150. Ex. C (Brown Depo. 58:13-59:9, 102:1-14). Officer Brown also (correctly) believed Mr. Moore was high on illegal drugs. Ex. C (Brown Depo. 102:23-103:3). She decided to take him into protective custody under Welfare and Institutions Code § 5150 in order to take him to the hospital for evaluation. Ex. C (Brown Depo. 101:14-21; 80:1-80:22).

Although Officer Brown believed the arrest warrant was for Mr. Moore, Officer Brown had no intention of taking him to the police station on the warrant at that time.[9] Ex. C (Brown Depo. 80:14-22). The immediate issue was to get Mr. Moore to the hospital for an evaluation. Ex. C (Brown Depo. 80:14-22). However, Officer Brown decided to tell Mr. Moore that he had an arrest warrant, because, based on her past experience with Section 5150 cases, she believed he would be more likely to cooperate and agree to go with her over a possible warrant issue, rather than face a possible 72-hour psychiatric hold. Brown Decl. ¶12.

When Officer Brown told Mr. Moore he had an outstanding warrant, however, he said he would not go with her, and would instead go inside to call the FBI. Ex. C (Brown Depo. 123:9-11, 123:16-20). Officer Brown then offered to let him call the FBI from the station. Ex. C (Brown Depo. 125:12-126:5). Officer Brown then spent several minutes trying to reassure Mr. Moore about the warrant, telling him, "[I]t's not a big deal. Let's just get this (warrant) taken care of." Ex. C (Brown Depo. 125:6-11, 126:1-4); Ex. B (Tu Depo. 61:20 – 62:4). Mr. Moore became increasingly agitated and unresponsive to her verbal directions. Ex. C (Brown Depo. 125:25); Brown Decl. Ex. B at COB 18. At this point, Officer Brown decided to place Mr. Moore in handcuffs in order to require him to go "in for a 5150 evaluation" and "to be transported to John George Hospital." Ex. C (Brown Depo. 88:21-89:23, 100:17-101:8).

**F. Mr. Moore physically resisted the officers' efforts to handcuff him**

It is routine police practice to place adults taken into custody under Section 5150 in handcuffs.[10] Brown Decl. ¶ 13. Here, given Mr. Moore's unstable mental state, his increasing

---

[9] Officer Brown also knew that due to Mr. Moore's condition, he would not have been accepted at the Berkeley city jail, which lacks medical facilities and does not accept arrestees who are delusional, under the influence of drugs, or undergoing a 5150 detention. Brown Decl. ¶ 6.

[10] Officer Brown's intention was to take Mr. Moore into protective custody for a 5150 evaluation, included calling the fire department paramedics to do a medical evaluation in order to "clear" him, and then have the paramedics transport him to John George Hospital where he

1 agitation, and the fact they were standing on an open landing five stories above an open

2 courtyard with only a railing for safety, Officer Brown needed to handcuff Mr. Moore during

3 transport for his safety and for officer safety. Brown Decl. ¶ 13.

4          Accordingly, Officer Brown non-verbally signaled to Officer Tu it was time to place Mr.

5 Moore in handcuffs. Ex. C (Brown Depo. 80:24-81:24, 100:17- 23, 130:2-17); Ex. D (Tu Depo:

6 58:17-22, 61:7-11). Officer Brown grasped Mr. Moore's right wrist as Officer Tu grasped Mr.

7 Moore's left wrist. Ex. D (Tu Depo: 65:2-11); Brown Decl. Ex. B at COB 18, 23. Mr. Moore

8 resisted, pulling both arms up toward his chest while the two officers continued to hold onto his

9 wrists. Ex. C (Brown Depo. 130:21-131:11); Ex. D (Tu Depo. 65:24-66:3; 68:8-11); Brown

10 Decl. Ex. B at COB 23. Mr. Moore, who weighed nearly 350 pounds, then pulled both officers

11 several feet into the apartment where Officer Brown and Mr. Moore fell onto a mattress on the

12 floor. Ex. C (Brown Depo. 128:17-23, 131:15-22); Ex. D (Tu Depo. 68:12-19). Mr. Moore fell

13 partially on his side and partially on his stomach. Ex. C (Brown Depo. 131:18-22, 132:4-7); Ex.

14 D (Tu Depo. 70:3-7). Officer Brown fell forward, next to Mr. Moore, in a kneeling position.

15 Ex. C (Brown Depo. 131:21-22, 133:16-22). Officer Tu was at the foot of the mattress and Mr.

16 Moore began kicking. Ex. D (Tu Depo. 70:12-18). Officer Brown radioed for additional

17 officers to help. Ex. C (Brown Depo. 132:20-22; 139:25-140:6; 140:25-141:7).

18 **G. Officers Smith responds to the request for additional cover**

19          Officer Smith was still in front of the apartment building with Mr. Hayes when he heard

20 Officer Brown's radio call for cover, and he quickly went back up to the 5th floor while leaving

21 Mr. Hayes in the patrol car. Ex. E (Smith Depo. 45:17-46:13); Brown Decl. Ex. B at COB 21.

22 Officer Tu had placed his sternum on Mr. Moore's right hip and straddled his legs in an attempt

23 to prevent him from kicking. Ex. D (Tu Depo. 71:16-72:15, 73:9-17); Ex. E (Smith Depo.

24 53:17-22); Brown Decl. Ex. B at COB 23. Mr. Moore continued to struggle with the officers and

25 yell at them. Ex. E (Smith Depo. 47:6-21); Ex. D (Tu Depo. 72:23-73:3).

26

27          would be evaluated further. Ex. C (Brown Depo. 88:21-89:18; 101:5-8). Officer Tu thought

28 Officer Brown was taking Mr. Moore into custody on the warrant (Ex. D (Tu Depo. 62:7-14)),
but that is irrelevant as to whether Officer Brown had probable cause under Section 5150.

While Mr. Moore resisted, Officer Brown placed her hands on his shoulder blades while kneeling next to him, and then she and Officer Tu were able to get his right wrist in a handcuff. Ex. C (Brown Depo. 132:14-19); Brown Decl. ¶ 14. Mr. Moore, however, rolled onto his stomach and tucked his left arm up under his torso while Officer Brown attempted to grasp it by placing her arm through Mr. Moore's elbow area. Ex. C (Brown Depo. 132:19-21; 139:5-20; 140:12-21); Ex. D (Tu Depo. 75:11-76:2). Officer Tu held on to Mr. Moore's right hand that had already been handcuffed. Ex. C (Brown Depo. 140:22-24); Ex. D (Tu Depo. 65:5-66:12; 68:8-11).[11] Officer Smith went to Mr. Moore's left side and helped Officer Brown pull Mr. Moore's left arm out from under his body. Ex. E (Smith Depo. 56:1-13); Brown Decl. Ex. B COB 21; Ex. D (Tu Depo. 73:18-74:10; 75:2-9).

**H. Officers Mathis, Gardner, and Kastmiler respond to the request for additional cover**

Officer Mathis, Officer Gardner, and Officer Kastmiler then arrived in response to Officer Brown's call for additional officers. Ex. F (Mathis Depo. 19:1-12); Ex. G (Gardner Depo. 22:2-12); Ex. H (Kastmiler Depo. 17:20-18:1). Within 20 seconds of arriving, Officer Gardner helped Officers Smith, Tu, and Brown place Mr. Moore's left wrist into a handcuff using a second set of handcuffs. Ex. G (Gardner Depo. 26:25-27:5; 25:3-10; 29:16-23). The officers then linked two sets of handcuffs together, linked end-to-end due to Mr. Moore's large size in order to give him more room and not strain his arms. Brown Decl. Ex. B at COB 18, 23.

When he arrived, Officer Mathis saw Officer Tu with his legs on the lower portion of Mr. Moore's body while Mr. Moore was struggling and trying to kick the officers. Ex. F (Mathis Depo. 22: 21-23:19). While still struggling, Mr. Moore was on his stomach with his head turned

---

[11] While Officer Brown and Officer Tu were struggling with Mr. Moore, Officer Brown noticed a man, later identified as Edward Sterling, inside a room near the struggle. Ex. C (Brown Depo. 134:4-10; 136:1-4). Officer Brown told Mr. Sterling to leave and he immediately complied. Ex. C (Brown Depo. 136:10-21). At the time, Mr. Moore was actively resisting the officers, and neither Officer Brown nor Officer Tu had any information about Mr. Sterling allegedly being Mr. Moore's "caretaker." Brown Dec. ¶ 15. Although the SAC ¶¶ 19 and 22 alleges Mr. Sterling was Mr. Moore's "caretaker," plaintiff testified he had no information about Mr. Sterling at all and had never heard his name. Ex. L (A. Moore Depo. 18:13-20; 21:19-21; 36:12-20). Elysse Moore testified that no one was Mr. Moore's caregiver, and that she had no information Mr. Sterling was allegedly Mr. Moore's caretaker. Ex. K (E. Moore Depo. 144:10-14; 148:8-149:4).

toward the wall.  Ex. D (Tu Depo. 79:21-25).  Once handcuffed, Officer Tu "switched to kneeling next to Mr. Moore."  Ex. D (Tu Depo. 75:16-23).   Officer Tu then stood up and moved back because additional officers were now there to cover him.  Ex. D (Tu Depo. 80:24-81:24); Ex. E (Smith Depo. 58:3-15).  Officer Brown was no longer touching Mr. Moore either, but stood close by.  Ex. E (Smith Depo. 58:8-15).  Even while handcuffed, Mr. Moore continued to struggle on the mattress, and he was still breathing strongly as he was yelling at this time.  Ex. C (Brown Depo. 147:23-148:3, 149:16-18); Ex. D (Tu Depo. 80: 4-9); Ex. E (Smith Depo. 56:14-22).  Because Officers Kastmiler, Mathis, and Gardner were there to assist, Officer Smith then left the apartment and went back outside to check on Mr. Hayes who he had left in his patrol car.  Ex. E (Smith Depo. 57:2-8); Brown Decl. Ex. B at COB 21.

**I.  Sgt. Phillips and Sgt. Cardoza were the last to arrive; an ankle strap was applied**

Sgt. Phillips and Sgt. Cardoza were the last to respond to Officer Brown's call for additional officers.  Ex. J (Phillips Depo. 34:2-3); Brown Decl. Ex. B at COB 25.  They knew the initial request for service involved a disturbance with a possibly mentally unstable person and the call for more officers indicated a struggle, so they brought a restraint device called the "WRAP." Ex. I (Cardoza Depo. 16:18-23); Ex. J (Phillips Depo. 33:25-34:3).  Sgt. Phillips did not touch Mr. Moore and stayed about eight to 10 feet away from him.  Ex. J (Phillips Depo. 49:1-13).  Sgt. Cardoza also stood back, near the threshold of the doorway.  Ex. I (Cardoza 23:22-24:2).

When Sgt. Phillips arrived, Mr. Moore was laying stomach down with his face to the side, facing the wall, but still "kicking and bucking rapidly."  Ex. J (Phillips Depo. 37:25-38:3; 39:8-19); Ex. C (Smith Depo. 57: 9-14); Ex. G (Gardner Depo. 28:22-29:4); Ex. H (Kastmiler Depo. 29:13-18).  Mr. Moore also was trying to move the upper portion of his body around.  Ex. H (Kastmiler Depo. 29:5-9); Brown Decl. Ex. B at COB 25.  Mr. Moore was yelling, and the officers were telling Mr. Moore to "stop resisting" and to "calm down."  Ex. F (Mathis Depo. 23:20-24:5); Ex. H (Kastmiler Depo. 24:3-7); Ex. I (Cardoza Depo. 25:17-23); Ex. C (Brown Depo. 150:1-2).  Mr. Moore yelled, "I'm not going to go, I'm not going to go" and "fuck you." Ex. E (Smith Depo. 56:14-20); Ex. F (Mathis Depo. 23:20-24).  Other officers also recall Mr. Moore yelling at this time, but do not recall any specific words that he said.  Ex. D (Tu Depo.

72:23-73:3, 80:4-12); Ex. I (Cardoza Depo. 25:17-23); Ex. G (Gardner Depo. 28:22-29:4); Ex. H (Kastmiler Depo. 29:13-18); Ex. J (Phillips Depo. 48:11-14, 49:21-24). In any event, Mr. Moore yelling establishes his lungs were working quite well at this time.

Sgt. Phillips called dispatch on the radio and requested the Berkeley Fire Department bring a gurney to transport Mr. Moore due to his large size, his continued agitation, and the 5th floor location. Brown Decl. Ex. B at COB 25.

Officer Mathis saw that Mr. Moore's legs were unrestrained, allowing him to try to kick the officers, so he knelt on the floor at Mr. Moore's feet trying to hold Mr. Moore's legs down with his hands, but with no success. Ex. J (Phillips Depo. 37:12-19); Ex. F (Mathis Depo. 25:4-12); Ex. G (Cardoza Depo. 42:2-22); Brown Decl. Ex. B at COB 25, 32. Officer Kastmiler used his shin and knee on the back of one of Mr. Moore's legs to attempt to stop Mr. Moore from kicking. Ex. H (Kastmiler Depo. 27:3-7). Officer Mathis then asked for a Velcro ankle strap, which is part of the WRAP device. Ex. F (Mathis Depo. 25:17-20, 26:20-27:8); Ex. C (Brown Depo. 152:25-153:2). Sgt. Phillips handed him the ankle strap and Officer Gardner helped Officer Mathis wrap the ankle strap around Mr. Moore's ankles to stop him from continuing to kick at the officers.[12] Ex. F (Mathis Depo. 27:19-22); Ex. G (Gardner Depo. 28:19-30:9); Brown Decl. Ex. B at COB 25, 32. Even with the ankle strap applied, however, Mr. Moore continued to struggle for a brief time before he finally started to calm down. Ex. G (Gardner Depo. 31:5-8, 32:23-33:20); Ex. J (Phillips Depo. 50:24-51:3); Brown Decl. Ex. B at COB 18. The officers then rolled Mr. Moore onto his side and into a recovery position. Ex. D (Tu Depo. 81:25-82:3); Ex. G (Gardner Depo. 32:18-22); Ex. H (Phillips Depo. 52:4-9). Mr. Moore was not overly restrained from the handcuffs because the officers had used two sets of handcuffs linked together.

Officer Mathis and Sgt. Cardoza then left the apartment and waited outside for the fire department to arrive. Ex. F (Mathis Depo. 32:1-9); Ex. I (Cardoza Depo. 29:9-15).

**J. Mr. Moore continued breathing normally until after he was restrained**

As the officers waited for the Fire Department to arrive with a gurney to transport Mr.

---

[12] No other part of the WRAP device was applied to Mr. Moore. Ex. G (Gardner Depo. 30:15-25); Ex. F (Mathis Depo. 26:20-27:13); Ex. D (Tu Depo. 78:16-79:4).

1  Moore, Officer Brown knelt next to his face to monitor his condition and noted he was still

2  breathing.  Ex. B (Tu Depo. 82:11-83:1).  Officer Gardner had his hands "lightly" on Mr. Moore

3  in case he started struggling again.  Ex. E (Gardner Depo. 33:22-34:6).  Officer Kastmiler may

4  still have had his shin on Mr. Moore's leg.  Ex. F (Kastmiler Depo. 32:6-11).

5       Approximately one minute after the ankle strap was applied and Mr. Moore had

6  completely stopped struggling, Officer Brown observed Mr. Moore appeared to have stopped

7  breathing.[13]  Ex. C (Brown Depo. 154:9-20; 167:3-11); Ex. D (Tu Depo. 82:11-18); Ex. G

8  (Gardner Depo. 33:15-20); Ex. J (Phillips Depo. 50:24-51:3).  Officer Brown called this out to the

9  other officers and checked Mr. Moore's carotid artery and found he had a pulse.  Ex. C (Brown

10  Depo. 157:10-20; 158:10-20); Brown Decl. Ex. B at COB 18 and 25.  Officer Brown asked Mr.

11  Moore if he was okay and got no response.  Ex. H (Phillips Depo. 56:12-20).  However, Officer

12  Brown then saw Mr. Moore's chest move up and down and his head move such that he appeared

13  to be breathing again.  Ex. C (Brown Depo. 160:1-5); Brown Decl. Ex. B at COB 18.

14       Sgt. Phillips got on the radio to alert the Fire Department, which was already en route

15  with the gurney.  Sgt. Phillips reported Mr. Moore was having difficulty breathing and that they

16  would also need paramedics.  Ex. J (Phillips Depo. 56:25-57:5); Brown Decl. Ex. B at COB 25.

17  Officer Brown continued to monitor Mr. Moore, but after another minute passed, his chest

18  stopped moving again.  Ex. C (Brown Depo. 162:20-163:6).  She again checked his pulse, but this

19  time she could not find one.  *Id*.  Sgt. Phillips immediately got back on the radio to update

20  paramedics that they were starting CPR.  Ex. C (Brown Depo. 160: 22- 161:10, 162:20-163:6,

21  163:20-1); Ex. J (Phillips Depo. 57:90-17); Brown Decl. Ex. B at COB 18, 23.[14]  The officers

22  immediately took the handcuffs off of Mr. Moore, rolled him onto his back and on to the floor,

23  and Officer Tu began administering chest compressions.  Ex. C (Brown Depo. 164:1-14); Ex. G

24  (Gardner Depo. 35:5-11, 35:19-21, 37:4-19); Ex. J (Phillips Depo. 58:1-8).  Officer Gardner went

25

26  [13] Officer Brown recalls that Mr. Moore was "partially on his side" at this point, and that she
   moved him completely on to his side once she saw his chest appeared to not be moving.  Ex. C
27  (Brown Depo. 157:19-158:12).
   [14] Officer Kastmiler also checked Mr. Moore for a pulse and did not find one.  Ex. H (Kastmiler
28  Depo. 36:7-37:7); Brown Decl. Ex. B at COB 20.

outside onto the landing to direct the paramedics to the correct apartment.  Ex. G (Gardner Depo. 37:20-38:12).  Officer Brown repositioned Moore's head to open his airway and yelled out for a breathing mask, but just then paramedics arrived and took over CPR.  Ex. C (Brown Depo. 165:18-167:1); Ex. J (Phillips Depo. 58:5-8).

**K.  No officer ever placed any body weight on Mr. Moore's back, chest, or neck**

No officer ever placed his or her full body weight on Mr. Moore's back in any manner that could have obstructed his breathing.[15]  Ex. C (Brown Depo. 151:16-21); Ex. J (Phillips Depo. 47:7-17).  Officer Brown, who weighed only 127 to 130 pounds, briefly placed her hands on Mr. Moore's shoulder blades during the struggle.  Brown Dec. ¶ 14.  No officer made any contact with Mr. Moore's head, chest, or neck during the struggle.  Ex. C (Brown Depo. 151:16-152:7).  Sgt. Phillips and Sgt. Cardoza never touched Mr. Moore, except that Sgt. Phillips removed the ankle strap for the paramedics.  Ex. J (Phillips Depo. 60:11-13); Ex. I (Cardozo Depo. 23:15-18).

Although Mr. Moore was at times on his stomach, he himself "rolled onto his stomach to try to get his arm away from" Officer Tu and Officer Brown.  Ex. D (Tu Depo. 75:25-76:2).  Mr. Moore was not "left" handcuffed on his stomach; he was continuously struggling and moving around.  Ex. C (Brown Depo. 144:24-145:21); Ex. I (Cardoza Depo. 20:1-15, 33:21-34:1, 42:2-22); Ex. H (Kastmiler Depo. 27:20-24, 29:5-9); Ex. J (Phillips Depo. 39:2-7).  Officer Brown estimated Mr. Moore struggled with the officers for three to four minutes.  Ex. C (Brown Depo. 152:13-20).[16]  Thereafter, Mr. Moore was on his side and was being monitored closely, in part, due to the prior struggle and attempts to kick the officers.

**ARGUMENT**

**I.    LEGAL STANDARD FOR SUMMARY JUDGMENT**

---

[15] Plaintiff testified that he has no information to support the allegation in Paragraph 28 of the SAC that six officers put their body weight on Mr. Moore at the same time.  (A. Moore Depo. 94:1-19).  Plaintiff further testified that "six people squash[ed] the life out of" his son, Mr. Moore, and said the officers "murdered" him.  Ex. L (A. Moore Depo. 168:19-22.).  Plaintiff bases his conclusion that Mr. Moore was "murdered" solely on the fact that when the officers arrived "he was alive; and when they left, he was dead."  Ex. L (A. Moore Depo. 168:23-169:3).
[16] Plaintiff testified he has no information from any source that officers "beat" his son the night in question, contrary to the allegations in the SAC.  Ex. L (A. Moore Depo. 40:17-22).

Federal Rule of Civil Procedure 56(c) provides a motion for summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Where plaintiff has the burden of proof at trial, summary judgment is appropriate if plaintiff fails to come forward with evidence supporting a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The court determines what facts are "material" and whether there is a "genuine" issue of fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A mere "scintilla" of evidence is insufficient to prevent summary judgment. *Id.* at 248 and 252. Additionally, "the issue of fact must be 'genuine.'" *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Id.* at 587. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. THE 1ST CAUSE OF ACTION FAILS BECAUSE OFFICER BROWN HAD REASONABLE SUSPICION TO DETAIN MR. MOORE, AND PROBABLE CAUSE TO (A) TAKE HIM INTO CUSTODY UNDER WELFARE & INSTITUTIONS CODE § 5150, (B) ARREST HIM UNDER THE WARRANT, AND (C) ARREST HIM FOR A VIOLATION OF PENAL CODE SECTION 148

Plaintiff's First Cause of Action is a survival action for unlawful detention and arrest against Officers Brown, Tu, and Smith. A police officer is authorized to detain a person when there is reasonable suspicion of a crime. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), overruled on other grounds by *United States v. Little,* 18 F.3d 1499 (10th Cir. 1994) (en banc); *Terry v. Ohio*, 392 U.S. 1 (1968); *People v. Souza*, 9 Cal.4th 224, 231 (1991). An officer may make an arrest when there is probable cause under the "totality of the circumstances" the person committed a crime, and only requires the officer to have a "fair probability." *Illinois v. Gates*, 462 U.S. 213 (1983); *Texas v. Brown*, 460 U.S. 730 (1983). In evaluating whether an officer has probable cause, the facts must be evaluated through the eyes of the officer, not the subject. *United States v. Fouche*, 776 F.2d 1398, 1403 (9th Cir. 1985).

The same tests apply in Section 5150 cases. "Probable cause exists under section 5150 if

facts are known to the officer 'that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or herself" or "gravely disabled." *Bias v. Moynihan*, 508 F.3d 1212, 1220 (9th Cir. 2007) (*quoting People v. Triplett*, 144 Cal. App. 3d 283, 288 (1983)); Welf. & Inst. Code § 5150. A police officer "is not required to make a medical diagnosis of mental disorder." *Triplett, supra,* 144 Cal.App.3d at 288. "It is sufficient if the officer, as a lay person, can articulate behavioral symptoms of mental disorder, either temporary or prolonged." *Id.* A "mental disorder might be exhibited if a person's thought processes as evidenced by words or actions or emotional affect, are bizarre or inappropriate under the circumstances." *Id.*

Here, plaintiff admits in the SAC that Mr. Moore was "mentally disordered," "was speaking irrationally and making overtly paranoid comments about his belief the uniformed officers were not really police officers," and "was clearly in the midst of a paranoid schizophrenic mental health crisis." SAC ¶ 21. Officer Brown also observed over the course of 15 to 20 minutes that Mr. Moore was increasingly delusional, paranoid, and agitated, and appeared to be high on drugs. Therefore, Officer Brown had reasonable suspicion to detain Mr. Moore to evaluate whether he should be taken into protective custody under Section 5150.

Additionally, it is undisputed Mr. Hayes reported to Officer Brown that he lived with Mr. Moore, Mr. Moore was schizophrenic and off his medication, Mr. Moore had been doing drugs all day, Mr. Moore had kicked him out of the apartment over an argument about obtaining even more drugs, he feared Mr. Moore would attack him, he "feared for his safety," and that Mr. Moore had access to knives. Given these facts, Officer Brown had a fair probability Mr. Moore was either a danger to himself or others, or gravely disabled. For these reasons, Officer Brown had probable cause to take Mr. Moore into protective custody under Section 5150.

An arrest is lawful if the officer had probable cause for *any* crime, even if the officer at the time believes a different charge is more appropriate. *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004); *Sturgeon v. Bratton*, 174 Cal.App.4[th] 1407, 1413 (2009). Here, Officer Brown had an alternative basis to detain and arrest Mr. Moore because she had a reasonable belief there was an arrest warrant for him out of San Francisco based on what Officer Smith had told her before she

made contact with Mr. Moore. She knew that Mr. Moore had recently moved to Berkeley from San Francisco and had a lot of contacts with police in San Francisco, and Xavier Moore is an uncommon name. Therefore, Officer Brown also had probable cause to arrest Mr. Moore.

Finally, grasping a person's arm during a detention is authorized for officer safety and, if the person pulls away, the person has committed a violation of Penal Code section 148, which prohibits obstructing or delaying an officer. *In re Gregory S.*, 112 Cal.App.3d 764, 771, 778 (1980). The undisputed facts establish the detention was valid, and Mr. Moore pulled away when Officer Brown grasped his arm. Therefore, Officer Brown also had probable cause to arrest Mr. Moore for a violation of Penal Code section 148. For all these reasons, the First Cause of Action for unlawful detention and arrest against Officers Brown, Tu, and Smith fails as a matter of law.[17]

## III. THE 1st CAUSE OF ACTION ALSO FAILS BECAUSE OFFICERS BROWN, TU, AND SMITH HAVE QUALIFIED IMMUNITY ON THE DETENTION AND ARREST CLAIMS

Qualified immunity shields a police officer from liability "if a reasonable officer *could have* believed that probable cause existed to arrest." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (emphasis added). Police officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity. *Id.* The rule of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law;" defendants can have a reasonable, but mistaken, belief about the *facts* or about what the *law* requires in any given situation. *Saucier v. Katz,* 533 U.S. 194, 202, 206 (2001) quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added).

Whether the undisputed facts *could* support a reasonable belief that probable cause existed is a *question of law* to be determined by the court. *Hunter*, *supra; Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow v. Fitzgerald,* 457

---

[17] It is undisputed Officer Brown was the lead officer in this matter in that she interviewed Mr. Hayes, interviewed Mr. Moore, and made the decision to take him into protective custody. Officer Smith was not even present when Officer Brown made the decision to take Mr. Moore into protective custody, having left with Mr. Hayes. Therefore, Officer Tu and Officer Smith are not even proper defendants in plaintiff's First Cause of Action for unlawful detention and arrest.

U.S. 800, 816 (1982); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Thus, where sufficient material facts are undisputed, the court must adjudicate the issue of qualified immunity as to probable cause to arrest. *Act/Up!*, *supra*.

Here, it is undisputed Mr. Moore was "mentally disordered," he had threatened Mr. Hayes, and he was paranoid, delusional, and agitated. In such situations, taking the person into protective custody under Section 5150 is "what we expect of conscientious police officers" and "we should not second-guess" that decision. *Sheehan v. City and County of San Francisco* (9th Cir. 2014) 743 F.3d 1211, 1223, cert. granted sub nom. *City and County of San Francisco, Cal. v. Sheehan* (2014) 135 S.Ct. 702, and rev'd in part, cert. dismissed in part sub nom. *City and County of San Francisco, Calif. v. Sheehan* (2015) 135 S.Ct. 1765. Thus, Officers Brown, Tu, and Smith are also entitled to summary judgment on the First Cause of Action under qualified immunity.

## IV. THE 2ND CAUSE OF ACTION FAILS BECAUSE THE OFFICERS USED ONLY MINIMAL FORCE TO OVERCOME MR. MOORE'S RESISTANCE

Plaintiff's Second Cause of Action is for excessive force against seven of the eight officer defendants.

A person does not have the right to physically resist being taken into protective custody under Section 5150. *Luchtel v. Hagemann*, 623 F.3d 975, 981 (9th Cir. 2010). The Ninth Circuit has declined to fashion different use of force rules for "mentally disabled persons and serious criminals." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). A police officer may use reasonable force to make an "arrest, prevent escape, or overcome resistance." Pen. Code § 835a. A police officer "need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or … overcome resistance." *Id*; accord *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Control holds" are among the lowest levels of force available to police officers. *Donovan v. Phillips*, 2015 WL 993324 at *5 (March 4, 2015) (holding use of control hold to take plaintiff to the ground was reasonable as matter of law).

In *Graham v. Connor*, 490 U.S. 386, 396-97 (1989), the Supreme Court held,

The "reasonableness" of a particular use of force must be *judged from the perspective of a reasonable officer* on the scene, rather than with the 20/20 vision of hindsight.

The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

*Id.* (Emphasis added.) The "least amount of needed force" is *not* the legal standard for use of force. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Rather, officers "need only act within that range of conduct we identify as reasonable." [18] *Id.*

Excessive force claims may be decided on summary judgment under the right facts. For instance, in *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001), the plaintiff, who was arrested for interfering with an officer, asserted "(1) she was sprayed with a chemical irritant prior to her arrest; 2) three officers pushed her to the ground to handcuff her and roughly pulled her up to her feet during her arrest; and 3) an officer 'rolled up the windows and turned up the engine in the July heat in order to 'adjust her attitude.' " Once on the ground, an officer "placed his knee on her back." *Id.* at 650. Under these facts, the Ninth Circuit held there was no excessive force as a matter of law. *Id.* at 653. Similarly, in *Luchtel*, 623 F.3d at 980-81, the Ninth Circuit held the officers pinning a delusional person to the floor, which allegedly resulted in breaking her arm, was reasonable as a matter of law given her resistance.

Here, one of the seven officers accused of excessive force, Sgt. Cardoza, did not even touch Mr. Moore. The other six defendant officers used mainly their hands to overcome Mr. Moore's resistance, and never placed their body weight on his head, neck, or chest. The force used by Officer Brown was limited to using her hands to grasp Mr. Moore's right wrist and to pull Mr. Moore's left arm out from under his body, and briefly placing her hands on Mr. Moore's shoulder blades during the struggle while she tried to place his right wrist in a handcuff.

The force used by Officer Tu was limited to using his hands to grasp Mr. Moore's right wrist, and placing his sternum on Moore's right hip while, with his knees on the mattress, he

---

[18] *See Brown v. City and County of San Francisco*, 2014 WL 1364931 at *9 (N.D. Cal. April 7, 2014) (holding that grabbing of decedent's right leg and placing it in leg shackle was not excessive force as a matter of law).

straddled Moore's legs in an attempt to stop him from kicking and bucking.

Officers Smith, Gardner, Mathis, and Kastmiler responded to a call for assistance and did not have the benefit of knowing what had transpired before they arrived. In any event, the force they used was very limited. Officer Smith used his hands to help pull Mr. Moore's left arm out from under his body and to place his left wrist in handcuffs. Officer Gardner used his hands to help apply the left handcuff and to hold onto the lower part of Mr. Moore's legs. Officer Mathis held the lower part of Mr. Moore's legs and applied a Velcro strap around his ankles to prevent him from kicking. Officer Kastmiler used his hands to hold Mr. Moore's arms and placed his shin on one of Mr. Moore's legs.

There is no evidence, e.g. from the Coroner's autopsy or otherwise, that the officers' minimal use of force caused Mr. Moore's death. The autopsy found Mr. Moore died from "acute combined drug intoxication with a contribution from morbid obesity and intrinsic cardiovascular disease." Ex. A. The doctor who performed the autopsy found that Mr. Moore had "toxic levels" of methamphetamine and codeine in his system, that he had an enlarged heart weighing 800 grams ("cardiomegaly"), and that he had an "intramuscular left anterior descending coronary artery." *Id.* at COB 526. There was no evidence of injury or blunt force trauma except for "areas of abrasion and contusion" around Mr. Moore's wrists (from his struggle after he was hand-cuffed) and a small contusion on his right lower leg. *Id.* at COB 531. These minor contusions have no causal nexus with cardiac arrest. The death certificate likewise lists the cause of death as "Acute Combined Drug Intoxication" and "Morbid Obesity; Cardiomegaly." Ex. A-1. Dr. Vilke, a top expert in sudden in-custody deaths, similarly concluded the officers restraining Mr. Moore did not cause his sudden cardiac arrest; rather, it was most likely caused by Mr. Moore's enlarged heart, deformed intramuscular coronary artery, and the amount of drugs in his system. Ex. B

Given that the officers were forced to "make split-second judgments" in a circumstance that was "tense, uncertain, and rapidly evolving," the facts are undisputed that by using their hands to gain control of Mr. Moore in order to handcuff him and place a Velcro strap around his ankles, no officer used excessive force. For these reasons, the Second Cause of Action for excessive force fails as a matter of law.

## V. QUALIFIED IMMUNITY ALSO SHIELDS THE OFFICERS FROM THE EXCESSIVE FORCE CLAIM

Qualified immunity applies to a claim of excessive force, unless the amount of force used was "*clearly* unlawful." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added). The Supreme Court stated in 2011: "We have repeatedly told courts - and the Ninth Circuit in particular (citations omitted) - not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, - U.S. -, 131 S. Ct. 2074, 2084 (2011). Rather, the case law establishing a violation must be fairly specific as to the factual scenario at hand, unless the violation is patently "obvious." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011). The "bar for finding such obviousness is quite high." *Id.*

Plaintiff cannot claim that the six officers' efforts to gain control of Mr. Moore in order to handcuff him were clearly unlawful. The defendant officers "could properly believe that the use of this level of force would not violate a clearly established constitutional right" thereby "entitling the officers to qualified immunity." *Luchtel,* 623 F.3d at 983. For this additional reason, the Second Cause of Action fails.

## VI. THE 3RD CAUSE OF ACTION UNDER THE SUBSTANTIVE DUE PROCESS CLAUSE FAILS BECAUSE THERE IS NO EVIDENCE ANY OFFICER PURPOSEFULLY INTENDED TO HARM MR. MOORE

In the Third Cause of Action, plaintiff claims a deprivation of a familial relationship under the Fourteenth Amendment's Substantive Due Process Clause. As acknowledged in the SAC, the standard for liability under the Substantive Due Process Clause is unlawful conduct that "shocks the conscience." SAC ¶¶ 52-54; *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Further, in cases such as this one that involve a "rapidly escalating" confrontation, to meet the "shocks the conscience standard," plaintiff must establish the officers acted "with a *purpose to harm* … for reasons unrelated to legitimate law enforcement objectives." *Id.* (emphasis in original); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014); *Green v. County of Riverside*, 238 Cal.App.4th 1363, 1373 (2015).

Here, there is no evidence any officer acted with intent to harm Mr. Moore and for a reason unrelated to taking him into custody. Plaintiff alleges the officers intended to harm Mr.

Moore simply because they "arrested" him "pursuant to an unverified warrant."  SAC ¶ 54(a).

Not only is this conclusory and illogical, but it is undisputed that Officer Brown intended to take

Mr. Moore into protective custody under Section 5150 to *help him* get the treatment he needed.

Further, her reason for mentioning the warrant was related to her "legitimate law enforcement

objective" of taking Mr. Moore into custody.[19]  *Gonzalez*, 747 F.3d at 797.

There is also no evidence to support plaintiff's allegations that the officers were "ignoring

[his] mental health needs and departmental directives on how to interact" with Mr. Moore.  SAC

¶ 54 (b-d). On the contrary, Officer Brown properly recognized Mr. Moore needed help and tried

to gain his cooperation over a 15 to 20-minute period before resorting to grasping his wrist.  As

such, summary judgment should be granted as to the Third Cause of Action.

**VII.  PLAINTIFF'S 4TH CAUSE OF ACTION AGAINST THE CITY UNDER *MONELL* FAILS FOR LACK OF AN UNDERLYING ACTIONABLE CLAIM AND LACK OF EVIDENCE**

A *Monell* claim for against a city an unconstitutional practice or policy cannot be stated

without an underlying claim of a constitutional violation by an officer.  *City of Los Angeles v.*

*Heller*, 475 U.S. 796, 799 (1986).  As explained above, plaintiff's claims of unlawful detention,

unlawful arrest, and excessive force all fail as a matter of law.

Even if plaintiff could support an underlying constitutional claim here, the Supreme Court

has repeatedly emphasized that the unconstitutional acts of a police officer cannot, standing

alone, lead to municipal liability; there is no *respondeat superior* liability under Section 1983.

*Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403

(1997).  Rather, when the basis of a Section 1983 claim (a *Monell* claim) is an implied policy of

nonfeasance toward training or supervision, liability can only be established in "limited

circumstances" where officers "so often violate constitutional rights that the need for further

training must have been plainly obvious to the city policy makers, who, nevertheless, are

---

[19]  Plaintiff alleges the officers "knew that Decedent MOORE was not the person named in the warrant." SAC ¶25.  In fact, the warrant that Officer Smith mentioned to Officer Brown *was* for Mr. Moore, although his birth year had been improperly entered.  Brown Decl. ¶ 7 and Ex. C.   In any event, this has no relevance to the issue of whether there was intent to harm Mr. Moore.

‘deliberately indifferent’ to the need." *Board of the County Commissioners of Bryan County, Oklahoma*, 520 U.S. at 407 citing *City of Canton*, 489 U.S. 378, 387, and 397.

Here, there is no evidence the City was on notice that any of the defendant officers "so often" violated the rights of citizens that the need for further training was "plainly obvious" and yet policymakers were "deliberately indifferent" to the need. Therefore, the Fourth Cause of Action against the City also fails for lack of evidence.

## VIII. THE 6TH CAUSE OF ACTION FOR A WRONGFUL DEATH FAILS BECAUSE THERE IS NO EVIDENCE OF NEGLIGENCE, AND THE OFFICERS HAVE IMMUNITY UNDER PENAL CODE SECTION 835A AND 847(B), AND WELFARE AND INSTITUTIONS CODE SECTION 5278

In the Sixth Cause of Action, plaintiff alleges "wrongful death" against all eight officer defendants based on their alleged "negligent conduct" in taking Mr. Moore into custody. SAC ¶¶ 62-66. The standard governing detention is reasonable suspicion. The standard for taking a person into protective custody or arresting the person is probable cause, as explained above. There is nothing in state negligence law that alters these standards. Since these standards are met as a matter of law here, no negligence claim can be based on the detention of Mr. Moore, or arresting him or taking him into protective custody. Further, Welfare and Institutions Code "§ 5278 immunizes the police officers from the *decision to detain ...* under § 5150." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1234 (9th Cir. 2014) (overruled on other grounds). For this additional reason, Section 5278 bars a wrongful death negligence claim based on Officer Brown's decision to take Mr. Moore into custody under Section 5150. *Id.*

Similarly, Penal Code section 847(b) states: "There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer … for false arrest … under any of the following circumstances: (1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." While there do not appear to be any state cases confirming that Section 847(b) provides immunity for a lawful arrest *as well as* an arrest reasonably believed to be lawful, the federal cases recognize this distinction. *Blankenhorn v. City of Orange*, 485 F.3d 463, 486 (9th Cir. 2007); *Henry v. Bank of Am. Corp.*, 522 Fed.Appx 406, 408 (9th Cir. 2013); *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1165 (N.D. Cal. 2009)

("officers are not liable for false imprisonment arising out of any arrest where the arrest was lawful or the officer had reasonable cause to believe it was lawful"). Since the rules of statutory construction disfavor a finding of surplusage (*Metcalf v. County of San Joaquin*, 42 Cal.4th 1121, 1135 (2008)), the phrase "or … had reasonable cause to believe was lawful" should be given its plain meaning, namely, an officer has no civil liability for an arrest that the officer reasonably believes was lawful, even if the arrest was unlawful. Therefore, immunity under Section 847(b) applies when there is *arguable* probable cause, just as with qualified immunity as to a federal claim of unlawful arrest. For this reason, Section 847(b) also bars a claim of "negligent" arrest.

As for the use of force, as explained above, under *In re Gregory S*, Officer Brown and Officer Tu were entitled to grasp Mr. Moore's wrists during a detention. Under Penal Code section 835a, the officers were entitled to use reasonable force to "overcome resistance." Therefore, there is no evidence of any unauthorized use of force. Further, as to causation, there is no evidence here that the officers' use of force caused any injury to Mr. Moore. Rather, it is undisputed the cause of death was cardiac arrest, a diseased heart, and a toxic level of street drugs. Thus, the Sixth Cause of Action fails because there is no evidence of a negligent use of force, which in turn, caused Mr. Moore's death.

## IX. THE 7TH CAUSE OF ACTION UNDER CIVIL CODE SECTION 51.7 FAILS FOR LACK OF EVIDENCE OF VIOLENCE ARISING FROM DISCRIMINATION

Plaintiff's Seventh Cause of Action against seven of the officers is for an alleged violation of Civil Code section 51.7. Section 51.7 provides all persons "have the right to be free from any violence, or intimidation by threat of violence, committed against their person or property *because* of their race, color, religion [etc.]." Plaintiff's Section 51.7 claim fails for two reasons. First, an officer's authorized use of a reasonable force cannot be considered "violence." Second, there is no evidence that any of the officers tried to restrain Mr. Moore "because of" his transgender status. Sgt. Phillips, one of the defendants on this claim, did not use any force at all against Mr. Moore.

## X. PLAINTIFF'S 8TH CAUSE OF ACTION UNDER CIVIL CODE SECTION 52.1 FAILS FOR LACK OF EVIDENCE OF A CONSTITUTIONAL VIOLATION AND LACK OF COERCION

Civil Code section 52.1 (the "Bane Act") prohibits a person from interfering, or attempting to interfere, "by threats, intimidation, or coercion," with the exercise or enjoyment of the constitutional rights of another person. Section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1994). "[T]he elements of the excessive force claim under § 52.1 are the same as under § 1983." *Cameron v. Craig*, 713 F.3d 1012, 1022 (9th Cir. 2013). A simple detention or arrest is not enough to establish a violation of Section 52.1. Rather, "a wrongful detention that is 'accompanied by the requisite threats, intimidation, or coercion' – 'coercion independent from the coercion inherent in the wrongful detention itself' that is 'deliberate or spiteful' – is a violation of the Bane Act." *Bender v. County of Los Angeles*, 217 Cal. App. 4th 968, 978 (2013); *Luong v. City and County of San Francisco*, 2012 WL 5869561 (N.D. Cal. 2012) (granting summary judgment where plaintiff failed to provide evidence of independent coercion outside of the constitutional claims).

Here, the evidence is undisputed that Officer Brown lawfully attempted to take Moore into protective custody and only reasonable force was used by the six other officers accused of excessive force. Plaintiff's Section 52.1 claim fails for the same reasons the detention, arrest, and force claims fail.

## XI. PLAINTIFF'S 10TH CAUSE OF ACTION FOR BATTERY FAILS FOR THE SAME REASONS AS HIS EXCESSIVE FORCE CLAIM FAILS

A plaintiff has the burden to establish an officer used unreasonable force to assert a claim for battery. *Saman v. Robbins*, 173 F.3d 1150, 1157 n. 6 (9th Cir. 1999). Plaintiff's battery claim fails because, as discussed above, the officers' use of force was reasonable, and therefore, it is not actionable as a battery. *Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1274 (1998); *Reynolds v. County of San Diego*, 858 F. Supp. 1064, 1069 (S.D. Cal. 1994).

## XII. PLAINTIFF'S 11TH CAUSE OF ACTION UNDER THE ADA CLAIM FAILS FOR FOUR REASONS

First, to establish disability discrimination under Title II of the ADA, a plaintiff must show: "(1) he 'is an individual with a disability;' (2) he 'is otherwise qualified to participate in or

receive the benefit of some public entity's services, programs, or activities;' (3) he 'was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;' and (4) 'such exclusion, denial of benefits, or discrimination was by reason of [his] disability.'" *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007). However, under the ADA, the phrase "individual with a disability" does *not* include a person who is engaging in illegal drug use. 42 U.S.C. § 12210. Here, Mr. Hayes' statements and the Coroner's report establish Mr. Moore was high on illegal drugs to the point of delirium as he threatened Mr. Hayes over a demand for yet more drugs. This is what precipitated the call for police assistance. Therefore, under Section 12210, Mr. Moore was not an individual with a disability under the ADA for this police response.

Second, even assuming Mr. Moore was a person with a disability recognized under the ADA, there are only two types of ADA claims applicable to police actions in the field: (1) wrongful arrest, "where police wrongly arrest someone with a disability because they misperceived the effects of that disability as criminal activity," and (2) failure "to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City and County of San Francisco*, 793 F.3d 1211, 1232 (9th Cir. 2015). The first category is not applicable here because Officer Brown did not misperceive the effects of Mr. Moore's alleged disability as criminal activity. On the contrary, Officer Brown tried to help Mr. Moore by taking him to the hospital for *medical* attention. Further, the arrest warrant was a court order and had nothing to do with misperceiving the effects of an alleged disability.

In the second category, plaintiff bears the initial burden of producing evidence of *the existence of* a reasonable accommodation. *Id*. at 1233 (emphasis added). Here, plaintiff testified he does "not know" what accommodation Mr. Moore would need to be taken into custody or when police responded to calls involving Mr. Moore. Ex. L (A. Moore Depo. 41:5-24; 42:2-15). Plaintiff's counsel may argue Officer Brown should have called the City's Mobile Crisis Team or members of the police department's Crisis Intervention Team. However, it was after midnight and no such personnel were on duty. Brown Decl. ¶ 2. In any event, Officer Brown spent 15 to 20 minutes evaluating Mr. Moore and trying to persuade him to submit to custody. Given the

length of time Officer Brown utilized trying to *accommodate* Mr. Moore's unwillingness to submit to police custody, there is no evidence of failure to accommodate him.

Third, a person is not "denied the benefits of a service, program or activity" when his own actions prevent the delivery of the services. *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In *Hainze*, the court found the plaintiff caused his own exclusion from the county's mental health training when he attempted to assault an officer. *Id.*; *see also Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007). Likewise, the court found the ADA "does not apply to an officer's on-the-street responses to reported disturbances . . . prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze,* 207 F.3d at 801. Here, Officer Brown was entitled to handcuff Mr. Moore once she determined that she needed to take him into protective custody under Section 5150 for officer safety and his own safety.

Fourth, no ADA violation for use of force arises, if the force was reasonable under the Fourth Amendment. *Bates v. Chesterfield County*, 216 F.3d 367, 368, 373 (4th Cir. 2000). The officers in *Bates* used more force than in the instant case to subdue an autistic man, and yet the court found the "use of force was objectively reasonable." *Id.* at 371. "Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual." *Id.* at 372. As in *Bates*, once Mr. Moore resisted the officers, they were entitled to use reasonable force to overcome his resistance without violating the ADA. The unfortunate fact that Mr. Moore died after the struggle he precipitated due to his pre-existing heart condition and toxic levels of methamphetamine in his system has no bearing on the reasonableness of the officers' response. For the above four reasons, plaintiff's ADA claim fails.

## **CONCLUSION**

For the above reasons, defendants request the Court grant them summary judgment.

Dated: June 20, 2016                    Respectfully submitted:

ZACH COWAN, City Attorney
LYNNE S. BOURGAULT, Deputy City Attorney
By:          /s/
     LYNNE S. BOURGAULT
     Attorneys for Defendants