**JOHN L. BURRIS, Esq., SBN 69888**
**ADANTE D. POINTER, Esq., SBN 236229**
**LATEEF H. GRAY, Esq., SBN 250055**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882
John.Burris@johnburrislaw.com
Adante.Pointer@johnburrislaw.com
Lateef.Gray@johnburrislaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR MOORE, individually and as successor in interest of XAVIER MOORE, <br><br> Plaintiff, <br> v. <br><br> CITY OF BERKELEY, a municipal corporation; GWENDOLWYN BROWN, KENNETH TU, BRANDON SMITH, BRIAN MATHIS, TIMOTHY GARDNER, NIKOS KASTMILER, AMBER PHILIPS and BENJAMIN CARDOZA, individually and in their official capacities as Police Officers for the CITY OF BERKELEY and DOES 1-50, inclusive; individually and in their official capacities as POLICE OFFICERS for the CITY OF BERKELEY, <br><br> Defendants. | Case No.: 3:14-cv-00669-CRB <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: Friday, August 5, 2016 <br> Time: 10:00 a.m. <br> Ctrm: 6, 17th Floor <br><br> **Honorable Charles R. Breyer** |

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... iii

Introduction ......................................................................................................................... 1

Statement of Facts .............................................................................................................. 1

Argument ............................................................................................................................. 7

I. Legal Standard on Summary Judgment ........................................................................ 7

II. The Defendant Officers Unlawfully Arrested Decedent ............................................ 8

A. The Officers Did Not Have Probable Cause to Support the Unconfirmed Warrant ............... 8

B. The Officers Did Not Have Probable Cause to Detain Decedent Pursuant to Welfare and

Institution Code § 5150, Because Decedent Moore Was Not a Threat to Others, a Threat to

Himself or Gravely Disabled ............................................................................................. 10

C. Officers Did Not Have Probable Cause to Arrest Moore under Penal Code § 148 .............. 11

III. The Officers Used Unreasonable Force During the Arrest ..................................... 13

IV. The Defendant Officers Are not Entitled to Qualified Immunity for Any of their Fourth

Amendment Violations ...................................................................................................... 17

V. Plaintiff's Fourteenth Amendment Claim Must Go Forward .................................. 18

VI. Plaintiff's *Monell* Claim Must Go Forward .............................................................. 20

VII. The Defendant Officers Do not Have Immunity from Plaintiff's State Law Claims .......... 21

VIII. Plaintiff's § 52.1 Claim Must Go Forward ............................................................ 23

IX. Plaintiff's Battery Claim Must Go Forward ............................................................. 24

X. Plaintiff's ADA Claim Must Go Forward ................................................................. 24

Conclusion .......................................................................................................................... 26

**Statutes**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 7

*Austin B. v. Escondido Union School Dist.,* 149 Cal.App.4[th] 860 (2007) ................................. 23

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) .................................................. 17

*Boyd v. Benton County*, 374 F.3d 773 (9th Cir.2004) ................................................................. 17

*Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) ......................................................................... 17

*City of Canton v. Harris*, 489 U.S. 378 (1989) .......................................................................... 20

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084 (N.D. Cal. 2005) ......................................................................................................................................... 23

Federal Rule of Civil Procedure 56(a) ......................................................................................... 7

*Freeman v. Arpaio*, 125 F.3d 723 (9th Cir. 1997) ........................................................................ 7

*Gregory v. Cnty. of Maui*, 523 F.3d 1103 (9th Cir. 2008) ........................................................... 8

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ...................................................... 7

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996) ............................................................................ 7

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ......................................................... 20

*Long v. County of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006) ............................................... 20

*Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................... 7

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365 (9th Cir. 1998) ............................ 19

*Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008) ..................................................................... 19

*Santos v. Gates*, 287 F.3d 846 (9th Cir.2002) ..................................................................... 8, 13

*Scott v. Henrich*, 39 F.3d 912 (9th Cir.1994) ............................................................................. 8

*Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010) .................................................................. 19

**Cases**

*Abston v. City of Merced*, 2011 WL 2118517 (E.D. Cal. 2011) ............................................... 18

*Allen v. City of Portland,* 73 F.3d 232 (9th Cir. 1996) ................................................................ 9

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001) ........................... 12

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................................................. 9

*Bias v. Moynihan,* 508 F.3d 1212 (9th Cir. 2007)............................................... 11, 21

*Blankenhorn v. City of Orange,* 485 F.3d 463 (9th Cir. 2007) .................................. 12

California Civil Code § 52.1 ...................................................................................... 23

*City of Simi Valley v. Superior Ct.*, 111 Cal.App.4th 1077 (2003) ........................... 23

*Conservatorship of Jones*, 208 Cal App 3d 292 (1989)............................................ 11

*Cotterill v. SF City and County*, 2009 WL 3398369 (N.D. Cal. 2009)..................... 11

*Cunningham v. Gates,* 229 F.3d 1271 (9th Cir. 2000).......................................... 10, 17

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) .............................................. 14

*Devenpeck v. Alford*, 543 U.S. 146 (2009)............................................................... 12

*Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052 (9th Cir. 2003) ................. 15

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528 (9th Cir. 2010) .............................. 13

*Estate of Villarreal ex rel. Villarreal v. Cooper*, 929 F.Supp.2d 1063 (2013) ......................... 20

*Ewing v. City of Stockton,* 588 F.3d 1218 (9th Cir. 2009) ......................................... 9

Federal Rule of Civil Procedure 56(a) ........................................................................ 7

Federal Rule of Civil Procedure 56(e) ........................................................................ 7

*Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011) ................................... 13, 14

*Graham v. Connor*, 490 U.S. 386 (1989)..............................................................13, 14

*In re Gregory S.*, 112 Cal.App.3d 771 (1980) ........................................................... 12

*John v. City of El Monte,* 515 F.3d 936 (9th Cir. 2008).............................................. 8

*Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159 (9th Cir. 2013)................. 12

*Luchtel v. Hageman,* 623 F.3d 975 (9th Cir. 2010) ................................................... 18

*Miller v. Clark Cnty.*, 340 F.3d 959 (9th Cir. 2003) ................................................. 14

*O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056 (9th Cir. 2007)............................... 25

*Pearson v. Callahan,* 555 U.S. 223 (2009) ............................................................... 17

*People v. Triplett,* 144 Cal.App.3d 283 (1983) ......................................................... 11

*Ramirez v. County of Los Angeles*, 397 F. Supp 2d. 1208 (2005) ............................ 23

*Rivera v. County of Los Angeles*, 745 F.3d 384 (9th Cir. 2014) ................................. 8

*Saman v. Robbins*, 173 F. 3d 1150 (9th Cir. 1999) ....................................................................... 24

*Sheehan v. City and County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014) ......................... 24

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) ............................................................. 13, 14

*Thompson v. Cnty. of Los Angeles*, 142 Cal.App.4th 154 (2006) ................................................ 23

*United States v. Koon,* 34 F.3d 1416 (9th Cir. 1994) ............................................................. 10, 17

*Waller ex re. Estate of Hunt v. City of Danville*, 556 F.3d 171 (4th Cir. 2009) ......................... 24

**California Statutes**

Penal Code § 148 ...................................................................................................................... 12, 13

Penal Code § 847(b) ........................................................................................................................ 22

Welfare & Insitutions. Code § 5008 ............................................................................................... 11

Welfare & Institutions § 5278 ........................................................................................................ 21

Welfare and Institution Code § 5150 ....................................................................................... passim

## INTRODUCTION

This action arises out of the February 13, 2013, unlawful death of Decedent Xavier Moore at the hands of several Defendant City of Berkeley Police Officers. The Defendant Officers contacted Decedent at his apartment to determine whether they should detain him pursuant to a California Welfare & Institutions § 5150 hold. During the course of their investigation, the Defendant Officers determined instead to arrest Decedent based on an unverified, out-of-county warrant for a person who did not match Decedent on its face. When Decedent protested having a warrant for his arrest, several officers used their combined body weight and a too-small WRAP device to restrain him. Tragically, the Defendant Officers physically restrained Decedent until he died.

Plaintiff Arthur Moore, Decedent's father, brought this action against Defendant City and Officers alleging violations of the Fourth and Fourteenth Amendments and attendant state law claims, arising out of Decedent's wrongful death. Defendants move for summary judgment on all of Plaintiff's claims asserting that Plaintiff does not have requisite evidence to prove his claims.[1] Many of the facts and testimony Defendants rely on are disputed or require the Court to make credibility determinations or draw inferences in their favor. As such, these issues are not properly decided by this Court on summary judgment.

Plaintiff's Opposition to Defendants' Motion for Summary Judgment is based on the arguments made below, on the Declaration of Adanté Pointer (hereinafter the "Pointer Declaration"), filed herewith and all exhibits attached thereto, on the Court's file in this matter, and on such oral and/or documentary evidence presented at the hearing of this motion.

## STATEMENT OF FACTS

On February 12, 2013, at midnight, Defendant Officers Gwendolyn Brown, Kenneth Tu and Brandon Smith responded to a call from BPD dispatch about a verbal dispute between

---

[1] Upon information and belief that one of the Defendant Officers referred to Decedent, a transgender female, as "it," Plaintiff alleged discrimination pursuant to California Civil Code § 51.7. However, none of the Officers admitted to making this slur; so Plaintiff withdraws this claim.

roommates at an apartment at 2116 Allston Way, in Berkeley. (See Deposition Testimony of Gwendolyn Brown at 19:24-20:17; Kenneth Tu at 26:8-12; Brandon Smith at 20:3-9, attached to the Pointer Declaration as Exhibits A-C). Officer Brown responded as the lead officer. (Tu Depo 26:8-12; Smith Depo 20:3-9). Dispatch broadcasted that the reporting party, John Hayes, had been kicked out by his roommate, Xavier Moore, who was schizophrenic, off his medication, possibly 5150, and had been drinking and doing drugs. (Brown Depo 20:20-21:3).

Officers Brown and Tu arrived on the scene at the same time. (Brown Depo 22:17-19). While en route, Officer Smith ran Hayes and the Decedent's names for warrants on his patrol car computer. (Smith Depo 23:7-12). Smith learned that there was a warrant out of San Francisco for "Xavier Moore" who was born in 1952. (Smith Depo 25:5-26:5; See Internal Affairs Statement of Brandon Smith at 502-514, attached to the Pointer Declaration as Exhibit D). Smith was not certain the SF warrant was for the same "Xavier Moore" that was the subject of the dispatch call. (Smith Depo 25:9-13). When Smith arrived on scene, he discussed the call with Officers Brown and Tu. (Brown Depo 28:15-17; see also, Surveillance Video 1 at 01:24-03:00, attached to the Pointer Declaration as Exhibit E.)

Although Officer Brown denies having any conversation regarding the validity of the arrest warrant for "Xavier Moore", Smith and Tu recall Brown conversing with Smith about the fact the information associated with the "Xavier Moore" on the warrant did not match the Xavier Moore that was the subject of the call they were investigating. (See Declaration of Gwendolyn Brown, ¶4 at Document 58; Smith IA Statement 502-514; Tu Depo 50:6-12). In fact, Smith asked Brown if she knew the age of the Xavier Moore inside the apartment, and Brown replied that Decedent's age was 42. (Smith IA Statement 502-514). The "Xavier Moore" of the SF warrant was approximately 61 years old – almost 20 years older than the "Xavier Moore" inside the apartment. (Smith IA Statement 502-514). Aware of the discrepancy, Officer Smith decided to go back to his car and check again. (Smith IA Statement 502-514; See Surveillance Video #1 03:00-03:30, attached to the Pointer Declaration as Exhibit E). Officer Smith informed Officer Brown that this was the "wrong guy" because the birth date on the warrant and the age of the subject of the call did not match. (Smith IA Statement 502-514; see also, Surveillance Video #2

at 00:00-03:00 attached to the Pointer Declaration as Exhibit F). At his deposition, Officer Tu confirmed that he overheard Officer Smith inform Officer Brown that the birth date on the warrant for "Xavier Moore" did not match the age of the Decedent Xavier Moore *prior* to them making contact with the Decedent. (Tu Depo 50:6-12; 51:22-52:9).

Hayes met the Officers outside of the apartment building and led them to Decedent's apartment. (Brown Depo 22:20-25; 23:21-24:3; 28:3-6). Hayes told the Officers that Decedent threw him out because Hayes refused to provide him with money to buy drugs and repeated the information he reported to dispatch about Decedent's mental status. (Brown Depo 24:23-25:5). Hayes did not inform the Officers that Decedent had attacked or threatened him, that there had been a physical confrontation or that Decedent was suicidal. (Brown Depo 25:16-26:4; 31:16-32:5). Hayes opened the apartment door. (Brown Depo 30:13-16). Officer Brown called out Xavier's name from the doorway. (Brown Depo 37:14-21). Decedent came to the door. (Brown Depo 38:18-20). Hayes stood approximately 20 feet away from the apartment door while Officer Brown conversed with Decedent in the doorway. (Tu Depo 52:21-53:4). Officers Tu and Smith were standing nearby. (Tu Depo 53:6-11; Smith Depo 31:23-32:2).

Officer Brown told the Decedent why they were at his apartment. (Brown Depo 58:2-59:6). Decedent conversed with Officer Brown for approximately fifteen to twenty minutes, during which Decedent made nonsensical statements about the FBI. (Brown Depo 58:2-59:6). However, Decedent never expressed any desire or intent to harm himself or others and he did not make any threats or act aggressively towards anyone. (Brown Depo 60:6-21; 61:5-9).

While Officer Brown conversed with the Decedent, Officer Smith contacted dispatch to run the names "John Hayes" and "Xavier Moore" for a records and warrant check. (Smith IA Statement 411-415). Officer Smith learned from dispatch that there was a warrant for Hayes and informed Officer Brown. (Smith Depo 35:13-17; Brown Depo 63:3-9). Pursuant to her training to confirm the validity of warrants prior to an arrest, Officer Brown asked Officer Smith to confirm Hayes' warrant. (Brown Depo 65:16-24). Officer Smith confirmed the warrant for Hayes by comparing the description of the suspect in the warrant to the Hayes standing in front

of him. (Brown Depo 65:16-18; Smith Depo 37:7-14). Officer Brown directed Officer Smith to arrest Hayes once he confirmed the warrant. (Brown Depo 65:25-66:5).

However, Officer Smith was never able to confirm a warrant for Decedent Xavier Moore. (Smith Depo 40:1-25). In fact, when Officer Smith ran the records and warrant check for the name "Xavier Moore", dispatch could not find a warrant, just a caution code. (Smith IA Statement 433-462). Officer Smith then informed Officer Brown that dispatch only came up with a caution code, *not* a warrant for Decedent Moore. (Smith Depo 34:16-22; Smith IA Statement 433-462). Nevertheless, Officer Brown determined to arrest Decedent Moore despite never confirming that he was the actual subject of the SF warrant. (Brown Depo 123:4-11; Smith Depo 41:4-11).

Officer Brown testified that after speaking with Decedent Moore at his doorway, she somehow determined that he was "gravely disabled" and elected to detain him under § 5150 detention criteria. (Brown Depo 100:21-23,102:1-6) In Officer Brown's opinion, Decedent was behaving oddly and making incoherent statements. However, she attributed this behavior to drug use. (Brown Depo 102:21-103:12).

Despite supposedly determining to detain Moore pursuant to § 5150, Officer Brown told Decedent Moore he had a warrant out for his arrest. (Brown Depo 123:4-11; Smith Depo 41:4-11). Decedent denied having a warrant. (Brown Depo 123:16-20). Officer Brown attempted to convince Decedent that he had a warrant for another five to seven minutes. (Brown Depo 125:12-126:4). Officer Brown decided to arrest Decedent on the unconfirmed warrant. (Brown Depo 125:12-126:4). Officer Tu also believed that they were arresting Decedent based on the unconfirmed warrant. (Tu Depo 62:5-14).

For the first time, in her Declaration, Defendant Brown claims that she never intended to arrest Decedent on the unconfirmed warrant and that it was a ruse because Decedent Moore might have been receptive to arrest pursuant to a warrant, as opposed to a 5150 hold. (Brown Declaration ¶4, 12). However, this claim is belied by the fact that Defendant Brown informed Sergeant Phillips that she had arrested Decedent for a warrant. (See Deposition Testimony of Amber Phillips at 43:18-44:1, attached to the Pointer Declaration as Exhibit G). Defendant

Brown made this critical statement *after* Decedent Moore was handcuffed and was lying on the ground— when the need for a ruse had passed. (Phillips Depo 43:18-44:1).

With a nod of her head, Officer Brown signaled Officer Tu to go hands-on with Decedent. (Tu Depo 58:17-59:1; Brown Depo 80:24-81:19). Officer Brown grabbed Decedent's right wrist and Officer Tu grabbed Decedent's left wrist. (Brown Depo 121:14-122:1; Tu Depo 65:2-10). Decedent recoiled at their touch and retreated into his apartment, pulling the officers into the apartment as they held on to him. (Tu Depo 68:12-19; Brown Depo 128:17-19). Officers Brown, Tu and Decedent fell onto a bare mattress inside the apartment. (Brown Depo 131:12-22). Officer Tu, who stands over six feet tall and weighs over 200 pounds, placed his body on top of Decedent. (Brown Depo 42:11-20; Tu Depo 71:16-72:15). Officer Brown, who is approximately 130 pounds, put her weight onto Decedent's back. (Brown Declaration ¶14; Internal Affairs Statement of Gwendolyn Brown at 739-742, attached to Pointer Declaration as Exhibit H). Officer Brown requested officer assistance over the radio. (Brown Depo 132:14-24).

Officer Smith overheard the radio request and returned to the apartment. (Smith Depo 45:24-46:23). Upon entering the apartment, Officer Smith found the Decedent on his stomach with his upper body against the mattress. (Smith Depo 46:24-47:12, 54:21-55:3; Tu Depo 75:11-13). Smith assisted in pulling Decedent's right hand behind his back and handcuffed it, then returned to his patrol car. (Smith Depo 56:1-14; 57:2-8). When Officers Mathis, Gardner and Kastmiler arrived, they found Decedent handcuffed and lying on his stomach with his legs partially off the mattress. (See Deposition Testimony of Brian Mathis at 19:1-12 and Timothy Gardner at 28:2-18, attached to the Pointer Declaration as Exhibits I and J). The mattress was three to four inches thick. (Mathis Depo 22:8-12). Officer Brown was at Decedent's upper torso, while Officer Tu was still on top of Decedent's lower torso. (Mathis Depo 22:21-23:4, 24:6-15). Officer Kastmiler put his knees and weight on Decedent's legs. (See Deposition Testimony of Nikos Kastmiler at 27:3-5, attached to the Pointer Declaration as Exhibit K). Officer Mathis put his weight on Decedent's legs and requested a WRAP device. (Mathis Depo 25:3-10; 25:17-23). At this point, at least four officers had their weight (totaling over 600lbs) on Decedent's body. (Kastmiler Depo 27:3-5; Mathis Depo 22:21-23:4; 24:6-15; 25:3-10)

Sergeant Phillips arrived with Sergeant Cardoza and the WRAP device. (Phillips Depo 33:22-34:3, 35:21-36:4). Sergeant Phillips observed that the Officers had Decedent on his stomach in a prone position. (Phillips Depo 39:8-19). Decedent was bucking, as if struggling to breathe, while Officers were piled on top of him. (Phillips Depo 37:25-38:8). Officer Mathis applied the ankle restraints of the WRAP device onto Decedent. (Mathis Depo 26:24-27:8). The Officers tried to apply the chest portion of the WRAP device but it was too small for Decedent. (Kastmiler Depo 35:2-7; See Internal Affairs Statement of Amber Phillips at 193-195, attached to the Pointer Declaration as Exhibit L).

Shortly after the Officers applied the WRAP device, Decedent stopped struggling to breathe. (Gardner Depo 31:5-8). The Officers were trained to share the responsibility of monitoring the breathing of suspects in WRAP devices. (Brown Depo 155:25-156:24). Contrary to their training, the Officers left Decedent face down on his stomach, on the mattress, with the WRAP device applied for at least a minute before Officer Brown noticed the Decedent had stopped breathing. (Gardner Depo 33:2-20; Brown Depo, 157:17-20; See Internal Affairs Statement of Brian Mathis at 527-537 and 659-667, attached to the Pointer Declaration as Exhibit M). Sergeant Phillips broadcast on the radio that Decedent was not breathing. (Brown Depo 160:22-161:1). The Officers finally repositioned Decedent into a recovery position on his side and Officer Brown briefly found a pulse on him. (Brown Depo 158:10-20). Officer Brown observed Decedent's head and chest start to move again. (Brown Depo 159:24-160:6). Shortly thereafter, Decedent stopped breathing again. (Brown Depo 162:20-163:6). The Officers finally moved Decedent off the mattress, removed his handcuffs and Officer Tu began to perform chest compressions. (Brown Depo 163:20-164:19). Sometime later, Berkeley Fire Department arrived and took over attempting to revive Decedent. (Brown Depo 166:16-20). Tragically, Decedent Moore never recovered and was later pronounced dead on February 13, 2013 at 01:34AM. (See Alameda County Coroner's Report, Document 57-1 at page 2).

According to Plaintiff's expert pathologist, Dr. Werner Spitz, the Decedent had an enlarged heart, which combined with the Officers' compression of his diaphragm through piling on top of him, caused a severe reduction in oxygen getting to his heart. (See Declaration of

Werner Spitz at ¶27-32). The reduction of oxygen caused his heart to go haywire, resulting in his death. (Spitz Declaration ¶32-35). Dr. Spitz opined that although drugs were later found in Decedent's system, the amount of drugs was too low to be fatal, thus ensuring that the mechanism of death was the effect of the Officers' compression of Decedent's diaphragm and his enlarged heart. (Spitz Declaration ¶32-35).

## ARGUMENT

## I. LEGAL STANDARD ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those that may affect the outcome of the case. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id*. (citing Fed.R.Civ.P., Rule 56(e)). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. See *Anderson*, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. See *Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *In re Oracle Corp. Sec. Litig*., 627 F.3d 376, 387 (9th Cir. 2010). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and

is required to draw all inferences in a light most favorable to the nonmoving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

The Ninth Circuit has explained, "[c]ases in which the victim of alleged excessive force has died 'pose a particularly difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story ... is unable to testify.'" *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)). Thus, the court must assess the evidence to determine the credibility of the officers' account of the events. *Gregory,* 523 F.3d at 1107. And, following from these precepts, courts "have denied summary judgment to defendant police officers in cases where 'a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.' " *Gregory*, at 1107 (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir.2002)).

Here, Defendants rely on the interpretations of the evidence that favor their theory of the case in asserting that they are entitled to summary judgment. Plaintiff maintains that nearly every material fact that Defendants rely on is disputed and thereby does not support their motion.

## II. THE DEFENDANT OFFICERS UNLAWFULLY ARRESTED DECEDENT

### A. The Officers Did Not Have Probable Cause to Support the Unconfirmed Warrant

Defendants argue that Defendant Brown lawfully detained and arrested Xavier Moore pursuant to the arrest warrant. Not so.

The Fourth Amendment requires that all arrests, with or without a warrant, be supported by probable cause. *Rivera v. County of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) (holding not unreasonable for police to believe Rivera was the subject of the warrant at the time of arrest because name and date of birth matched exactly but height and weight descriptors did not match exactly). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *John v. City of El Monte,* 515 F.3d 936, 940 (9th Cir. 2008). Courts look to "the totality of the circumstances known to the arresting officers,

to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime." *Id*. The facts and circumstances that are analyzed "are those that were known to the officer at the time of the arrest." *Rosenbaum v. Washoe Cnty,* 663 F.3d 1073, 1076 (9th Cir. 2011). "[P]robable cause to believe that a person has committed any crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Ewing v. City of Stockton,* 588 F.3d 1218, 1230 n. 19 (9th Cir. 2009).

Here, Officer Brown did not have probable cause to arrest Decedent Moore on the out-of-county warrant. It is undisputed that Officer Brown was trained to verify a warrant before bringing someone into custody for said warrant, which she did not do prior to arresting Decedent Moore. In addition, Officer Smith told Officer Brown that this was the "wrong guy" because there was a 20 year age difference between the "Xavier Moore" associated with the warrant and the Xavier Moore standing in front of her. Furthermore, Officer Smith also told Officer Brown that when dispatch ran Decedent Moore's name for wants and warrants, no warrants came back, only a caution code. Moreover, Decedent Moore affirmatively denied having a warrant. Defendants' unsupported assertion that "Xavier" is an uncommon name is untenable given the significant age disparity between the wanted suspect and the Decedent. Given the information the Officers knew at the time of the arrest, they did not have probable cause to arrest Decedent pursuant to the warrant.

Officer Brown's claim that the warrant arrest was a ruse and that she actually made a 5150 detention is disingenuous, because she informed Sergeant Phillips that she brought Xavier Moore into custody pursuant to a warrant, well after the need for a ruse had passed. Officer Brown's ruse representation is also not relevant, because an Officer's subjective intent is generally not relevant to whether a Fourth Amendment violation has occurred. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). Defendants' assertion that they were able to confirm the warrant at a later time is also irrelevant because the Officers are held to the facts and the discrepancies they knew at the time of the arrest, not what they learned later as a result of the illegal arrest. *Allen v. City of Portland,* 73 F.3d 232, 236 (9th Cir. 1996).

Defendants also argue that Officers Smith and Tu are not culpable for the unlawful arrest because Officer Smith was not present at the initial attempt to bring Moore into custody and Officer Tu was not the lead officer. However, these Officers shared in Officer Brown's culpability when they did not intercede to stop the unlawful arrest. *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994) *rev'd in part on other grounds,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Here, Officers Tu and Smith were aware that the warrant did not match Decedent Xavier Moore and that it had not been confirmed. Officer Tu was under the belief that they were arresting Decedent on the warrant. Officer Smith returned to assist in finishing the arrest of Decedent on the invalid warrant even though Officer Smith knew they had the "wrong guy". All three Officers had knowledge that they were making a false arrest and none of them interceded to stop the others, therefore they share the culpability jointly.

### B. The Officers Did Not Have Probable Cause to Detain Decedent Pursuant to Welfare and Institution Code § 5150, Because Decedent Moore Was Not a Threat to Others, a Threat to Himself or Gravely Disabled

California Welfare & Institutions Code § 5150 states, "When a person, *as a result of a mental health disorder*, is a danger to others, or to himself or herself, or gravely disabled," a peace officer may detain that person for medical evaluation. Here, Decedent Moore was not found to be a danger to himself or others, as he never threatened himself or anyone else; no one claimed that he threatened them; and there was no report of any physical altercation between the roommates. Instead, Officer Brown determined that Decedent was "gravely disabled" because he was "delusional." (Brown Depo 102:1-6). However, Officer Brown admitted that Decedent was delusional likely resulting from his intoxication, not as a result of a mental health disorder. (Brown Depo 102:21-103:6). Defendants' reliance on Hayes's representation that he feared for his safety is disingenuous, as Hayes was under arrest and would not be returning to the residence. In addition, while Hayes indicated Decedent Moore had access to kitchen knives, these were the

only semblance of a weapon inside the home. More importantly, Hayes did not report that Decedent Moore had ever brandished or threatened him with a kitchen knife.

Officer Brown claims that Decedent was gravely disabled. For purposes of a § 5150 detention, gravely disabled is defined as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." Cal Welf. & Inst. Code § 5008 (h)(1)(A). A person is not gravely disabled if he or she is capable of surviving safely in freedom with the help of willing and responsible family members, friends or third parties. *Conservatorship of Jones*, 208 Cal App 3d 292 (1989). Here, Decedent was within the shelter and safety of his home with his caretaker and another friend when Officers arrived. Furthermore, the Officers noted that when Decedent appeared at the doorway, he was fully clothed and never made any statements or actions that indicated that he was malnourished. (Brown Depo 39:5-18, 60:6-21). Indeed, the Defendants have failed to point to any specific and articulable facts that would lead a reasonable person to believe that Decedent did not have shelter, was not clothed and was unfed.

Here, according to Defendant Brown, Decedent Moore made nonsensical statements about the FBI, but did not make any threats or act aggressively towards the Officers or anyone else, and did not express a desire or intent to harm himself. Simply rambling about the FBI does not support a determination that Decedent was gravely disabled under § 5150. Courts finding probable cause to support a 5150 detention involve detained persons displaying far more severe symptoms than exhibited here. *See, e.g., People v. Triplett,* 144 Cal.App.3d 283, 288 (1983) (finding probable cause where person was tearful, intoxicated, and displayed "obvious physical signs of a recent suicide attempt"); *Bias v. Moynihan,* 508 F.3d 1212, 1221 (9th Cir. 2007) (finding probable cause under § 5150 where Plaintiff had threatened to kill herself and exhibited "disturbing behavior" and a week later the same responding officer "observed that Ms. Bias's thoughts were disconnected and she was visibly angry and appeared agitated"); *Cotterill v. SF City and County*, 2009 WL 3398369, at *6 (N.D. Cal. 2009) (finding probable cause due to "Plaintiff's screaming and yelling, throwing things in her apartment, breaking her windows,

threatening to call the police on the police, and then suddenly becoming catatonic and non-responsive").

Here, Defendants did not have and cannot point to sufficient facts that would support a determination that Decedent Moore was a danger to himself, others or was gravely disabled as required to make an involuntary detention under Welfare and Institutions Code § 5150.

### C. Officers Did Not Have Probable Cause to Arrest Moore under Penal Code § 148

Defendants assert that Decedent Moore violated Penal Code § 148 by resisting the Defendants' attempts to bring him into custody. However, "[a] suspect cannot be arrested for violating § 148 because he evaded an officer's attempt to arrest him unlawfully." *Johnson v. Bay Area Rapid Transit Dist.,* 724 F.3d 1159, 1178 (9th Cir. 2013); *Blankenhorn v. City of Orange,* 485 F.3d 463, 472 (9th Cir. 2007) (finding officers cannot arrest someone for resisting arrest if they unlawfully arrested a person for the underlying crime); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 920 (9th Cir. 2001) ("If the officers could not lawfully arrest Arpin for the battery, the officers could also not lawfully arrest Arpin for resisting arrest."). The Officers unlawfully made a warrant arrest for which they had no probable cause, making it an illegal arrest.

Alternatively, Defendants rely on the rule from *Devenpeck* that an arrest is lawful if the officer had probable cause for another crime even if the officer made the arrest based on a different charge. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2009). Despite their argument to the contrary, Defendants lacked probable cause for a detention under 5150 as well. The Officers did not even have probable cause to make an arrest for the verbal disturbance. (Brown Depo 72:6-12). As such, Decedent Xavier Moore had a right to evade Defendants' attempt to unlawfully arrest him by retreating into his apartment. Furthermore, Decedent did not violently resist the Officers, he merely retreated into the safety of his home. When as many as four to six officers were on top of him and he was gasping for air, Decedent attempted to buck Officers off of him in order to breathe. Sadly, Decedent did not succeed and died that night due to a lack of oxygen resulting from the Officers' unlawful arrest and unlawful use of force against him. (Spitz Dec. ¶35-36)

Defendants mistakenly rely on *In re Gregory S.*, 112 Cal.App.3d 771 (1980), which is distinguishable. In *Gregory S.,* a deputy sheriff wanted to talk to a minor on his parents' driveway in connection with the investigation of a neighbor's complaint. In response, the minor refused to identify himself, yelled for the officer to get off the property and pulled away and fled when the officer grabbed him. The *Gregory S.* Court addressed whether the minor's refusal to identify himself when being detained by the officer constituted a violation of Penal Code § 148. The Court found "no authority to support the [trial] court's legal conclusion that a person who merely refuses to identify himself or to answer questions *in a context similar to that before us* thereby violates Penal Code §148 or otherwise furnishes ground for arrest." (*Id.*) Thus, the question addressed by the Court of Appeal in *Gregory S.* was whether an individual's refusal to provide certain information while being *detained* would constitute a violation of § 148.

Here, Decedent Moore spoke with Defendant Brown freely, then Defendant Brown decided to arrest him pursuant to an unconfirmed, non-matching warrant out of San Francisco. Defendant Brown then grabbed Decedent Moore. Decedent Moore did not pull away from a lawful detention, but rather he properly resisted an unlawful arrest. "In California, the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer. [Citations omitted.] "If the officer was not performing his or her duties *at the time of the arrest,* the arrest is unlawful and the arrestee cannot be convicted under Penal Code § 148, subdivision (a)." *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005) (emphasis original).

## III. THE OFFICERS USED UNREASONABLE FORCE DURING THE ARREST

When determining whether a particular use of force is "reasonable," courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Garner*, 471 U.S. at 8). The Ninth Circuit applies a three-step process to determine reasonableness in use of force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Id.* (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)). Even when an officer may

have been justified in using some force, "the amount [of force] actually used may be excessive." *Id*. (quoting *Santos v. Gates*, 287 F.3d at 853).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). In *Graham*, the Supreme Court noted that courts should consider such factors as (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. The most important of these factors is whether the suspect posed an immediate threat to the officer's safety or the safety of others. *Smith v. City of Hemet*, 394 F.3d at 702 (en banc). In addition to the *Graham* factors, the Ninth Circuit has considered the availability of alternative methods of responding to the situation and whether warnings were given prior to the use of force. *Smith*, 394 F.3d at 701; *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). In applying this test, the court must keep in mind the perspective of a reasonable officer on the scene and recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The Supreme Court has cautioned against use of the "20/20 vision of hindsight" in evaluating the circumstances facing the officer at the time of the shooting. *Id*. at 396. However, the Ninth Circuit has cautioned that "the prohibition against evaluating officers' actions 'with 20/20 vision of hindsight' cuts both ways" and that in evaluating those circumstances facing an officer, they cannot rely on evidence that the officers were not then aware. *Glenn*, 673 F.3d at 873, fn. 8.

### Level of Intrusion

Defendants' argument that the Officers' use of force was reasonable is premised on the absurd assertion that the Defendant Officers utilized the lowest level of force there is, by merely using their hands to effect a series of completely independent control holds on Decedent Moore.

In fact, the Defendant Officers used a severe level of force against Decedent Moore by heaping their collective weight on him and pinning down all off his limbs as he laid prone. See *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003) (concluding that the defendant officer's alleged use of force was "severe and, under the circumstances, capable of causing death or serious injury," even though the officers did not shoot or beat the plaintiff, because they pressed their weight on the suspect's neck and torso as he lay handcuffed on the ground).

Viewing the facts and drawing all inferences in Plaintiff's favor, the officers' combined actions, of making an illegal arrest and piling on top of Decedent, had the effect of compressing Decedent's chest and abdomen to the point of asphyxiating him. Despite Defendants' contrived attempt to sanitize each individual Officer's involvement and deny that any of them compressed him, basic common sense reveals that the officers' actions—of preventing Decedent from adjusting his position, placing their knees on his shoulder blade and their chests on his hips— affected Decedent as the Defendant Officers pressed down on him with their body weight.

Moreover, Plaintiff's forensic pathologist, Dr. Werner Spitz, opined that Decedent's drug levels were too low to have been fatal. Dr. Spitz went on to opine that it was no coincidence that Decedent suddenly had a heart attack right after four to six officers put their weight upon his body, improperly applied the WRAP device, and left Decedent face down on the mattress for an extended period of time. Dr. Spitz concluded that the mechanism of death is clear, the combined effects of Defendants compressing Decedent's diaphragm and his preexisting enlarged heart caused Decedent to suffer a cardiac arrest, causing him to die.

Officers have been trained to not to leave a person on their stomach after the WRAP device has been applied, because it can interfere with their ability to breathe. (See Berkeley Police Department Informational Bulletin 247, pages 3-4, attached to the Pointer Declaration as Exhibit N). Officers are also trained that they all share a responsibility to monitor a person's breathing while the WRAP device is deployed. (Brown Depo 155:25-156:24) Yet, the Defendant Officers left the Decedent on his stomach for at least a minute before Officer Brown noticed that he had stopped breathing. Furthermore, according to Decedent's parents, Decedent was a long time drug

user and had been morbidly obese for much of his life. Additionally, the autopsy reveals that his heart was enlarged due to his weight (likely another long standing condition). A rational jury could well believe that Xavier Moore would have continued living had he not been violently assaulted by the defendant Officers and improperly left on his stomach unattended while in the WRAP device.

***Balancing of Factors***

The Decedent's underlying crime was minimal, as he allegedly had a disagreement with his roommate and he was intoxicated within the confines of his own home. He did not pose a risk to the safety of the officers because Officer Brown was able to speak with him for 15-20 minutes without mention of any harm or danger. Indeed, the Officers did not even establish that Decedent Moore was a danger to himself or anyone else, as they did not endeavor to perform the § 5150 protocol on him (and instead decided to arrest him pursuant to a warrant they were not sure was issued for him).

Whether the Defendant Officers considered his mental condition into their approach to him presents a material fact question. Defendants claim that Officer Brown considered his mental impairment by speaking with him for 15-20 minutes and choosing to tell him he was arrested pursuant to a warrant to soften the blow, relying on Officer Brown's self-serving version of the Decedent's statements and demeanor. Even crediting Officer Brown's latest representations is problematic. Even if Officer Brown lied to Decedent about performing a warrant arrest, she did so in violation of her training not to threaten mentally ill persons with arrest. (Brown Declaration ¶12; Brown Depo 107:21-108:2). Officer Brown created this ruse explanation for the first time in her Declaration, which contradicts both Officers Tu and Smith's recollections. (Brown Declaration ¶4; Tu Depo 50:6-12; Smith IA Statement 502-514). Therefore, either Officer Brown lied to her supervisor Sergeant Phillips when she told Sergeant Phillips that she had arrested Decedent on a warrant or she is misrepresenting to the court, by way of her declaration, that she used the warrant as a ruse to perform the 5150 detention. (Phillips Depo 43:18-44:1; Brown Declaration ¶12). Either way, these varying representations create a credibility issue that should be determined by a jury.

Defendants also argue that some Defendant Officers are not liable for certain offenses. For example, they assert that Officers Tu and Smith are not liable for the unlawful arrest and that Officer Cardoza is not liable because he did not touch Moore. While Defendant Brown, alone, seems to be responsible for making the decision to unlawfully arrest Moore, all of the named Defendant Officers are liable for their actions or inaction in the excessive force used to effect the arrest. "An officer's liability under § 1983 is predicated on his 'integral participation' in the alleged violation." *Blankenhorn v. City of Orange*, 485 F.3d at 481 n. 12 (quoting *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)). The officer's actions themselves need not rise to the level of a constitutional violation, but the officer must have had some "fundamental involvement" in the conduct that allegedly caused the violation. *Id.* (citing *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)). This concept has particular importance to the subject incident where the death was caused by the combined actions of all involved Officers, as well as the inaction where all of the Officers failed to monitor Decedent's breathing while in the WRAP device and to turn him on his side after it was applied.

Plaintiff maintains that all of the individually named Defendants were present during the subject incident and had an opportunity to prevent the harm Decedent suffered, even if they did not actively participate in the harm. *Cunningham v. Gates,* 229 F.3d at 1289 ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."). "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows." *United States v. Koon,* 34 F.3d at 1447 n. 25. If an Officer fails to intervene when fellow Officers use excessive force, despite not acting to apply the force, he would be responsible for violating the Fourth Amendment. *Id.*

## IV. THE DEFENDANT OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR ANY OF THEIR FOURTH AMENDMENT VIOLATIONS

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Pearson v. Callahan,* 555 U.S. 223, 231 (2009). To determine whether a government official is entitled to qualified immunity, this court must conduct

a two-part analysis. Government officials are denied qualified immunity only if: (1) the facts that a plaintiff has alleged or proved show a violation of a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *See id.* at 232. This court has discretion in deciding which of the two qualified immunity prongs should be addressed first. *See id.* at 242.

Plaintiff has presented material fact questions precluding summary judgment on Plaintiff's unlawful arrest claims: (1) Xavier Moore did not present with the requisite symptoms to reasonably believe that he was gravely disabled or a danger to himself or others; and (2) based on the information the Officers had at the time of the arrest, Officers did not have probable cause to arrest Decedent on the unverified, San Francisco warrant. The cornerstone of Fourth Amendment jurisprudence is that arrests must be based on probable cause, and this constitutional right was clearly violated at the time of the subject incident.

Defendants similarly are not entitled to qualified immunity on Plaintiff's excessive force claims. Defendants citation to *Luchtel v. Hageman,* 623 F.3d 975, 977–78 (9th Cir. 2010), a case where two officers pinned a woman who was under the influence of crack cocaine to the floor and handcuffed her against her continued resistance—is misplaced. The plaintiff in *Luchtel* suffered a dislocated shoulder and torn shoulder ligaments, bruises, swelling, and abrasions from being pinned to the floor. The arrestee in this case, by contrast died from continued body weight on his back and body and their improper application of the Wrap device. In *Drummond,* the Ninth Circuit denied qualified immunity to two officers who "continued to press their weight into [an individual's] neck and torso as he lay handcuffed on the ground and begged for air". The Court determined that "[u]nder similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* 343 F.3d at 1056. The Ninth Circuit concluded that any reasonable officer would have known that such conduct constituted excessive force. *Id.* at 1061–1062; see also, *Abston v. City of Merced*, 2011 WL 2118517, at *12 (E.D. Cal. 2011), aff'd, 506 F. App'x 650 (9th Cir. 2013).

**V. PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM MUST GO FORWARD**

Plaintiff asserts Fourteenth Amendment substantive due process claims because he was deprived of his liberty interest in the companionship and society of his child through official conduct. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.2010). "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citation omitted). In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id*. at 1137(quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation marks omitted)). Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. *Id*. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id*. at 1140.

Here, the Defendant Officers had plenty of time to slow down this encounter and think about their actions. It is undisputed that the restraint of Xavier Moore took several minutes. He was unarmed and was confined to his home, meaning that he had nowhere else to go and had no means to injure anyone. In addition, he did not threaten the Officers or assault them in any way. Officer Brown contrived a warrant that she could not verify and was aware did not match Decedent. Nevertheless, Officers Tu and Brown acted against their training and went hands-on with Decedent. Furthermore, Defendant Officer Tu was aware that Officer Brown had information that the warrant did not match the Decedent and yet did not intervene or protest when Officer Brown instructed him to make the arrest. Furthermore, Officer Smith informed Officer Brown that the officers had the "wrong guy" for the warrant, but did not intervene and even assisted in making the unlawful arrest. As Officers Brown and Tu struggled to unlawfully arrest Decedent Moore on the ground, Decedent began bucking for air. Then Officer Smith returned from his car and got on top of Decedent. Decedent continued to buck for air. Officers Mathis, Gardner and and Kastmiler arrived and put their weight on Decedent, then applied a WRAP device that was too small. Decedent continued to gasp for air until he died. Officers Tu, Brown, Mathis, Kastmiler, Gardner shared a responsibility to monitor Decedent's breathing while the

WRAP device was deployed and to also put Decedent onto his side in a recovery position. Sergeants Cardoza and Phillips were supervising the Officers when Decedent was in the WRAP device and did not advise the officers to make certain that Decedent was breathing properly. There was simply no basis for the Defendant Officers to order the slow painful restraint and to stand by and do nothing when Decedent begged them to get off. A reasonable jury could find that each and every Defendant Officer's conduct was deliberately indifferent, rising to the level of a Fourteenth Amendment violation.

## VI. PLAINTIFF'S *MONELL* CLAIM MUST GO FORWARD

Pursuant to 42 U.S.C. §1983, municipalities are liable for injuries that arise from an official policy or custom that causes constitutional deprivations. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Plaintiffs must show that they: "(1) possessed a constitutional right of which they were deprived; (2) that the City had a policy; (3) that the policy 'amounts to deliberate indifference' to their constitutional rights; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Anderson v. Warner*, 451 F.3d at 1070 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989)). The failure to train or supervise may give rise to a "policy or custom" sufficient to impose liability on these Defendants. *City of Canton*, 489 U.S. at 389- 90. A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *City of Canton*, 489 U.S. at 388; *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).

All of the Defendant Officers involved exhibited either insufficient training in interacting with a mental health person and applying the WRAP device or exhibited a blatant disregard for their training, for which none of them were disciplined. This failure to discipline, despite clear Departmental policy violations, in the face of such dire consequences certainly gives rise to *Monell* liability for Defendant City. See e.g., *Estate of Villarreal ex rel. Villarreal v. Cooper*, 929 F.Supp.2d 1063, 1077 (2013) (denying summary judgment because issues of material fact remain

opining "if a jury were to find that [the defendant officer]'s actions violated [the suspect]'s Fourth Amendment rights, the jury could conceivably accept [the of Chief of Police]'s statements [of affirmation of the defendant officer's conduct] as a ratification of any unconstitutional actions taken by [the defendant officer]."]

**VII. THE DEFENDANT OFFICERS DO NOT HAVE IMMUNITY FROM PLAINTIFF'S STATE LAW CLAIMS**

Defendants argue that Welfare & Institutions § 5278 immunizes the defendant officers' decision to detain Moore under 5150 and bars Plaintiff's wrongful death negligence claim based on Defendant Brown's decision to take Decedent into custody. From the outset, Plaintiff does not allege that Xavier Moore's wrongful death resulted from the unlawful detention and/or arrest, but as a result of the Officers' use of force. Defendants are otherwise mistaken.

Under California Welfare & Institutions Code § 5278, which provides: "Individuals authorized under this part to detain a person for 72–hour treatment and evaluation ... shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."

In *Bias v. Moynihan,* 508 F.3d at 1221 the court held that a police officer was immune under § 5278 from state law claims for assault and battery, false arrest, illegal imprisonment and intentional infliction of emotional distress where the officer had probable cause to take the plaintiff into custody in accordance with § 5150. The scope of § 5278 immunity, however, is not as all-encompassing as the defendants argue. § 5278 immunizes the police officers from the *decision to detain* Decedent under § 5150. § 5278 also immunizes the officers from liability for the *fact of Decedent's detention.* Finally, § 5278 immunizes the officers based on circumstances *inherent* in the involuntary detention. § 5278, however, does not immunize the officers if they were negligent in executing the detention. Any injury Decedent suffered from the officers' failure to exercise ordinary care in taking Decedent into custody would not be an "inherent attribute[ ]" of the detention and therefore would not be subject to § 5278 immunity. *Id. Bias* does not hold to the contrary.

Here, Officers were not even making a 5150 detention, they were making a warrant arrest without probable cause. Therefore, the § 5278 immunity does not even apply. Even if the court

does consider the Officers' warrant arrest as an attempted 5150 detention, the detention performed by the defendant Officers was grossly negligent. Officers are required under Welfare & Institutions Code § 5150 to provide an oral advisement that they were detaining the Decedent. Welf. & Instit. § 5150 (g) (1). However, Officer Brown chose to lie and threaten Decedent with a warrant arrest. She was trained to not threaten persons with mental issues with arrest. Furthermore, the Officers in attempting to detain Decedent placed an inappropriate amount of weight upon his diaphragm, causing a lack of oxygen, which ultimately led to his death. In violation of their training, the Officers did not diligently monitor Decedent's respiration or place Decedent in a recovery position when they applied the WRAP device, which resulted in the Decedent's death.

Similarly no immunity should be afforded to Defendants pursuant to Penal Code § 847(b) because Penal Code § 847(b) (1) only extends immunity, in relevant part, "for false arrest or false imprisonment arising out of any arrest under any of the following circumstances: (1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." Penal Code § 847 (b)(1). This section does not apply here, because the arrest was not lawful, and defendant officers had reasonable cause to believe the arrest was unlawful and illegally contrived; and subdivisions (2) and (3) are simply not at issue in this case.

Defendants argue that Defendant Officers are not liable because Officer Brown had reasonable cause to believe the arrest was lawful. However, Officer Brown had direct knowledge that the warrant did not match the Decedent and failed to confirm the warrant even existed with dispatch. Therefore, the Officers did not have a reasonable cause to believe that the arrest was lawful. In fact, all of the information they had regarding the warrant would lead a reasonable officer to believe that the warrant was not for Decedent and negate any notion that they had probable cause to arrest him. Furthermore, all the information that the Officers received, regarding the mental state of Decedent at the time of the supposed 5150 detention, would lead a reasonable person to believe the Decedent was non-aggressive, non-threatening, had shelter, was fully clothed and well fed. Therefore, the Officers cannot claim immunity under § 5278 or § 847 (b).

**VIII. PLAINTIFF'S § 52.1 CLAIM MUST GO FORWARD**

California Civil Code § 52.1 provides that any individual whose enjoyment of rights secured by the Constitution have been interfered with "by threats, intimidation, or coercion, or attempt to interfere by threats, intimidation, or coercion," may institute and prosecute on his own behalf a civil action for damages. To establish a claim under California Civil Code § 52.1, a plaintiff needs to establish that the defendants "interfered with the plaintiff['s] constitutional rights by the requisite threats, intimidation, or coercion." *Austin B. v. Escondido Union School Dist.,* 149 Cal.App.4[th] 860, 882 (2007). "The essence of [this] claim is that the defendant, by the specified improper means (i.e., "threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something that he or she had the right to do under the law or force the plaintiff to do something that he or she was not required to do under the law." *Id.*

This Court should find, as many courts have, that the coercion inherent in the use of excessive force constitutes a violation of the Bane Act. See, e.g., *Thompson v. Cnty. of Los Angeles*, 142 Cal.App.4th 154, 172-73 (2006); *City of Simi Valley v. Superior Ct.*, 111 Cal.App.4th 1077, 1082-84 (2003); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dept.*, 387 F.Supp.2d 1084, 1102-1103 (N.D. Cal. 2005) (finding use of law enforcement authority to effectuate a seizure and a search can constitute interference by "threats, interference, or coercion" if the police officer lacked a justification to seize and search a person).

Here, Officer Brown made a warrant arrest without probable cause, against Decedent's constitutional right to be free from arrest without probable cause. Furthermore, Officer Brown had direct knowledge that the warrant was not verified and did not match Decedent. Yet, Officer Brown attempted to coerce Decedent for five to seven minutes that the warrant was valid. When Decedent continued to refuse the validity of the warrant, Officers Brown, Tu and Smith performed the warrant arrest illegally, thus violating § 52.1. See *Ramirez v. County of Los Angeles*, 397 F. Supp 2d. 1208, 1228-29 (2005) ("Detective was not entitled to summary judgment on an arrestee's claim for under CC § 52.1 because the detective's attempts to force the arrestee to abandon his right against self-incrimination by confession caused an interference with the arrestee's constitutional rights.")

Therefore Plaintiff's Bane Act claim must go forward.

## IX. PLAINTIFF'S BATTERY CLAIM MUST GO FORWARD

A plaintiff must establish that an officer used unreasonable force to assert a claim for battery. *Saman v. Robbins*, 173 F. 3d 1150, 1157 n. 6 (9th Cir. 1999). For the same aforementioned reasons, Plaintiff alleges that every bit of force that the Defendant Officers used to perform an unlawful arrest was illegal, excessive and amounts to a battery. Furthermore, the force Officers used to affect that arrest, even if it had been legal, was clearly excessive. Officers wrestled Decedent face down onto a mattress on the floor, where four to six officers held him down by compressing their collective weight down on top of him, further restrained his limbs with a WRAP device, and wailed on his chest in a partial attempt to administer CPR. Decedent continued to buck and demand Officers to get off of him due to the physical injuries they imposed on him. All of these actions form the basis of Plaintiff's battery claim against the Defendant Officers. Moreover, Plaintiff maintains that Decedent suffered actual physical injuries and harm.

## X. PLAINTIFF'S ADA CLAIM MUST GO FORWARD

Recently the Ninth Circuit joined the majority of circuits in finding that the ADA applies to arrests. *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). "Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* (citing *Waller ex re. Estate of Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009).

To state a claim under Title II of the ADA, a plaintiff generally must show: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's services, programs or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or

discrimination was by reason of his disability. *Sheehan*, 743 F.3d at 1232-33, (citing See *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007)).

Here, Plaintiff asserts that: (1) Decedent Moore suffered from a mental disability in that he was a paranoid schizophrenic; (2) Decedent Moore was entitled to receive the benefit of Defendants' training and 5150 protocol in dealing with persons with mental health issues; (3) Decedent Moore was denied the benefits of Defendants' training and 5150 protocol when Officers did not provide an oral advisement as required by § 5150 and threatened Decedent with arrest against officer training; (4) Officer Brown explained in her declaration that the reason that she did not follow the 5150 protocol and threatened Decedent with an illegal warrant arrest was because of Decedent's mental disability.

Defendants argue that Plaintiff's ADA claims must fail for the following reasons: (1) Decedent was on drugs; (2) Officers did not misperceive Decedent's disability as a crime and Plaintiff could not propose a reasonable accommodation for Decedent; (3) Decedent prevented the delivery of the services by resisting arrest; (4) the officers used reasonable force against the Decedent.

Plaintiff asserts the following reply to these four reasons: (1) Simply because Decedent may have been on drugs does not give the Officer's the right to deny Decedent an accommodation when they had direct knowledge of Decedent's disability; (2) Plaintiff does not have to explain a reasonable accommodation when Officers failed to apply their training and legal protocol in dealing with a person with a mental disability; (3) Decedent lawfully resisted an illegal arrest; (4) Officers used excessive force and cannot excuse their failure to accommodate Decedent with an unlawful arrest.

## CONCLUSION

For the above reasons, Plaintiff requests the Court deny Defendants' motion for summary judgment.

Dated: July 5, 2016                          **LAW OFFICES OF JOHN L. BURRIS**

                                             ____/s/_____

                                             Adanté Pointer