IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR MOORE, | No. C14-00669 CRB |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF BERKELEY ET AL., | |
| Defendants. | |

This case arises from the untimely death of Decedent Xavier "Kayla" Moore, a 41 year-old who died shortly after a struggle with Defendant City of Berkeley Police Officers. Although born with male anatomy, Moore considered herself a woman.[1]  Moore was African-American, stood five feet eight inches tall, and weighed approximately 350 pounds. She had a history of paranoid schizophrenia and drug abuse, and had been placed in protective custody several times.

During the early morning hours of February 13, 2013, police officers responded to a call reporting that Moore – in the midst of a psychotic episode and drug binge – had kicked her roommate out of their apartment.  After trying to talk with Moore, the officers decided to take her into custody.  A struggled ensued.  And when it ended, Moore was dead.

Decedent's father, Arthur Moore (Plaintiff), sued the City of Berkeley (the City) and

---

[1] The Court will therefore refer to the Decedent as "Moore" and use female pronouns where appropriate.

each of the eight involved officers. He brought federal constitutional claims under 18 U.S.C. section 1983, federal statutory claims under the Americans with Disabilities Act (ADA), and claims under California law.

The defendants now move for summary judgment.

## I.      BACKGROUND

At this stage, the Court construes the record in Moore's favor. See Glenn v. Washington Cnty., 673 F.3d 864, 870 (9th Cir. 2011).

### A.      9-1-1 Call

Around midnight on February 12, 2013, the Berkeley Police received a call from John Hayes. (dkt. 57 Ex. D Tu Depo. 26:8-12). Hayes explained that his roommate, Moore, had thrown him out because he would not give her money to buy drugs. (dkt. 57 Ex. C Brown Depo. 20:20-21:3; 67:25-68:9). He also said that Moore was in the midst of a psychotic episode, had done drugs all day, and needed to be taken into protective custody again. (Brown Depo. 20:20-21:3; 67:25-68:9).

After hearing this information over the radio, Officers Gwendolyn Brown and Kenneth Tu responded. (Brown Depo. 21:17-19). Officer Smith, who found outstanding arrest warrants for both Hayes and Moore, arrived soon afterwards. (dkt. 57 Ex. E Smith Depo. 23:7-12).[2] Officer Brown had previously responded to a call from Moore's mother asking the police to perform a welfare check on her child, though Moore had not been at home. (Brown Depo. 54:2-56:9). She therefore knew about Moore's history of paranoid schizophrenia and drug abuse that had landed her in protective custody multiple times. (Brown Depo. 53:10-55:6).

### B.      Initial Encounter

Hayes led the officers upstairs to the apartment. (Brown Depo. 22:20-25). Moore came to the door. With the other officers standing a few feet away, Officer Brown told her Hayes had called and asked Moore to explain what was going on. (Brown Depo. 57:21-25;

---

[2] Because of a typographical error, the warrant for Moore mistakenly listed a birth date in 1952, which led to some confusion about whether it was for the Decedent or a different Xavier Moore. (Brown Depo 25:5-26:5); (Tu Depo 50:6-12). It was in fact for the Decedent. Brown Decl. ¶ 7.

United States District Court
For the Northern District of California

58:5-9). Unable to grasp the situation, Moore rambled about "dinosaurs" and being followed by "the FBI." (Brown Depo. 58:13-59:9). They kept talking but Officer Brown could not get Moore "back on track." (Brown Depo. 60:22-61:3). Moore's demeanor switched from bubbly to paranoid to angry to fearful and back again. (Brown Depo. 35:5-17, 37:2-9). After 15-20 minutes, Officer Brown decided to take Moore into custody.[3]

### C. Ensuing Struggle

With a nod of her head, Officer Brown signaled to Officer Tu to handcuff Moore. (Tu Depo. 58:17-59:1). They grabbed Moore's wrists. (Brown Depo. 121:14-122:1). Moore recoiled, and then dragged the officers into the apartment and onto a mattress on the floor. (Tu Depo. 68:12-19). Officer Tu, who stands over six feet tall and weighs over 200 pounds, then put his weight on Moore's lower torso to keep her hips down and control her legs.[4] (Tu Depo. 71:16-72:15). Officer Brown, who weighs 130 pounds, put pressure on Moore's shoulder blades and radioed for backup. (Brown Depo. 151:4-14).

Officer Smith heard the broadcast and rushed back upstairs to help. (Smith Depo. 45:24-46:23). When he got there, Moore was on her stomach, struggling against the officers. (Smith Depo. 47:2-53:12). Officers Smith and Brown then pulled Moore's left arm out from under her body as Officers Mathis, Kastmiler, and Gardner arrived on scene. (Smith Depo. 56:1-13); (dkt. 57 Ex. F Mathis Depo. 19:1-12); (Smith Depo. 57:1-13). Gardner then helped handcuff Moore's left arm, and connected it to a second set of handcuffs that Officer Tu had placed on Moore's right arm, since her torso was too wide for one set. (dkt. 57 Ex. G Gardner Depo. 26:25-27:5; 25:3-10; 29:16-23). Smith then left to check on Hayes in the patrol car. (Smith Depo. 57:1-13). Moore continued kicking, so Officer Kastmiler put his

---

[3] During this conversation, Officer Smith arrested Hayes on the outstanding warrant and took him to the patrol car. (Smith Depo. 35:5-17, 37:2-9, 39:12-40:9).

[4] While Officer Brown and Officer Tu were struggling with Mr. Moore, Officer Brown noticed a man, later identified as Edward Sterling, inside a room near the struggle. (Brown Depo. 134:4-10; 136:1-4). Officer Brown told Sterling to leave and he complied. (Brown Depo. 136:10-21). Neither Officer Brown nor Officer Tu had any information about Sterling allegedly being Moore's "caretaker." Brown Decl. ¶ 15. Plaintiff Arthur Moore had no information about Sterling and had never heard his name. (dkt. 57 Ex. L A. Moore Depo. 18:13-20; 21:19-21; 36:12-20). Elysse Moore testified that no one was Moore's caregiver, and that she had no information Mr. Sterling was allegedly Mr. Moore's caretaker. (dkt. 57 Ex. K E. Moore Depo. 144:10-14; 148:8-149:4).

3

weight on Moore's legs while Officer Mathis tried to hold them down. (dkt. 57 Ex. H Kastmiler Depo. 27:3-5); (Mathis Depo. 25:6-10).

The officers then restrained Moore's ankles with a WRAP device that Sergeant Phillips and Officer Cardoza had standing by, and got Moore onto her side.[5] (Mathis Depo. 26:20-27:13); (Gardner Depo. 32:7-22). She stopped struggling. (dkt. 57 Ex. J Phillips Depo. 37:12-38:3). Officer Brown took charge of monitoring Moore's vitals but, about one minute later, Moore stopped breathing. (Gardner Depo. 31:5-35:4); (Tu Depo. 82:2-22). Officer Brown briefly found a pulse and saw Moore's head and chest move. (Brown Depo. 158:10-20; 159:24-160:6). Sergeant Phillips called for medical assistance while Officer Tu began CPR chest compressions. (Brown Depo. 160:22-164:19). But Moore had stopped breathing for good. (Brown Depo. 162:20-163:6).

### D. Aftermath

Moore was pronounced dead on February 13, 2013 at 1:34AM. Coroner's Rpt. (dkt. 57 Ex. A) at 2. The coroner concluded that Moore died as a result of "acute combined drug intoxication with a contribution from morbid obesity and intrinsic cardiovascular disease." Coroner's Rpt. at 6. Defendants' expert Dr. Gary Vilke also concluded that the officers did not cause or contribute to Moore's death. Vilke Decl. (dkt. 57 Ex. B) at 5.

Plaintiff's expert Dr. Werner Spitz disagreed. Spitz Decl. (dkt. 64) ¶ 20. He observed that the levels of methamphetamine and codeine in Moore's bloodstream were too low for even their combined effect to have been fatal. Spitz Decl. ¶¶ 19-25. As a result, Dr. Spitz concluded that Moore died from oxygen deprivation caused by compression of the diaphragm and a preexisting enlargement of the heart. Spitz Decl. ¶¶ 27-37.

Moore's father sued, bringing federal and state law claims against the officers and the City of Berkeley. The defendants moved for summary judgment.

## II. LEGAL STANDARD

The Court may grant a motion for summary judgment "if the movant shows that there

---

[5] There is no evidence that the officers applied or tried to apply the other portions of the WRAP device elsewhere on Moore's body.

4

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). A dispute is genuine if the admissible evidence on the record "is such that a reasonable jury could return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. Id. at 248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). To determine whether a genuine dispute as to any material fact exists, the court must view the evidence in the light most favorable to the non-moving party. Id. at 255.

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted). Rather, a court may rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." Id. But although a court need only consider materials cited by the parties, it may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

### A.   Section 1983 Claim for Unlawful Arrest Under the Fourth Amendment

The officers assert that they had probable cause to (1) take Moore into protective custody under California Welfare & Institutions Code Section 5150, (2) arrest Moore on an outstanding warrant, and (3) arrest Moore under California Penal Code Section 148 for interfering with law enforcement in the course of their duties. The Court must grant summary judgment if (1) any one of these provided an objectively reasonable basis for the arrest or, at the very least, that (2) no clearly established law informed a reasonable officer that arresting Moore would violate the Fourth Amendment. See Pearson v. Callahan, 555 U.S. 223, 241-42 (2009). Subjective intentions play "no role" here. Whren v. United States, 517 U.S. 806, 813 (1996).

Section 5150 allows the police to take someone into protective custody when they have probable cause to believe that, "as a result of a mental health disorder," the person "is a

danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5150. The officer must therefore "point to specific and articulable facts which, taken together with rational inferences, reasonably warrant" making a Section 5150 arrest. Bias v. Moynihan, 508 F.3d 1212, 1220 (9th Cir. 2007) (citation omitted).

Here, the officers were informed that Moore had a history of paranoid schizophrenia, used drugs all day, attempted to get more drugs and – because Hayes refused to aid in the endeavor – kicked him out in the middle of the night. And while Moore did not verbally express a desire to hurt herself or her roommate, she rambled about dinosaurs, being followed by the FBI, and how Hayes was "always F'ing up" during her 15-20 minute conversation with Officer Brown. (Brown Depo. 59:2-17). To use Plaintiff's own words, Moore "was clearly in the midst of a paranoid schizophrenic mental health crisis." FAC ¶ 21. Those are "specific and articulable facts" that would "reasonably warrant" taking Moore into protective custody. See Bias, 508 F.3d at 1220.

Plaintiff observes that courts "finding probable cause to support a § 5150 detention" often involve "detained persons displaying far more severe symptoms than exhibited here." Opp'n at 11 (citing cases). But those cases do not set a floor for probable cause under Section 5150, let alone place the constitutional question here "beyond debate." See Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). The Court therefore holds that the officers had probable cause to take Moore into protective custody and that, in any event, qualified immunity applies.[6] Accordingly the Court GRANTS summary judgment on Plaintiff's Fourth Amendment claim for an unlawful arrest.

**B.   Section 1983 Claim for Excessive Force Under the Fourth Amendment**

Plaintiff claims that the officers killed Moore by using excessive force. As an initial matter, the officers argue that there is no evidence they caused Moore's death, and so there can be no claim for excessive force. See Reply at 10-11. They are wrong.

Dr. Spitz's opinion that Moore died due to compression of her diaphragm that strained

---

[6] The Court therefore need not decide whether the officers had any other basis for probable cause or whether Officers Tu and Smith are proper defendants on this claim. See Mot. at 14-15 & n. 17.

6

an already-enlarged heart has sufficient support in the record. Even though he did not say specifically what materials he reviewed, Dr. Spitz discusses the coroner's report in considerable detail. See Spitz Decl. ¶¶ 27-40. That report provides the officers' account of what happened. See Coroner's Rpt. at 2. More importantly, the officers' deposition testimony does not establish, as a matter of law, that "they did not use any significant body weight on or near" Moore's diaphragm. See Reply (dkt. 66) at 11. The whole point of independent medical analysis – whether from the coroner, Dr. Spitz, or another qualified expert – is to test whether the officers' account can be believed. And it matters all the more in cases pitting the word of the police against the silence of the dead.

This is such a case. Officer Smith arrested Hayes and took him away just before the struggle started. (Smith Depo. 35:5-17, 37:2-9, 39:12-40:9, 41:12-20). Officer Brown ordered Sterling, Moore's purported caretaker, out of the apartment shortly afterwards. (Brown Depo. 134:4-10; 136:10-21). Only the involved officers saw what happened from then on. So, without body camera footage, the Court must rely on medical analysis and officer testimony alone. Faced with this conflicting evidence, a reasonable jury could find that Moore died because of the struggle.

Nonetheless, the officers may still prevail on summary judgment if they can show either (1) that the force they used was reasonable under the Fourth Amendment despite its heartbreaking consequences, or (2) that no clearly established law informed a reasonable officer that it violated Moore's Fourth Amendment rights. See Glenn, 673 F.3d at 870.

### 1. Constitutional Violation

When considering a Fourth Amendment claim for excessive force, the Court must determine whether the officers' actions were "objectively reasonable in light of the facts and circumstances confronting them." Graham v. Connor, 490 U.S. 386, 397 (1989). Reasonableness should therefore be "judged from the perspective of a reasonable officer on the scene, 'rather than with the 20/20 vision of hindsight,'" Glenn, 673 F.3d at 871 (quoting Graham, 490 U.S. at 396). This test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

7

governmental interests at stake." Id.  To structure Graham balancing, the Ninth Circuit applies a three-step approach.  First, it considers "the type and amount of force inflicted." Glenn, 673 F.3d at 871 (citations omitted).  Second, it evaluates "the government's interest in the use of force."[7]  Id.  Third, it balances "the gravity of the intrusion on the individual against the government's need for that intrusion."  Id.  And when "it is or should be apparent to the officers that the individual involved is emotionally disturbed," that too must be considered.  Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001).

After dragging Officers Brown and Tu to the ground, Moore continued to thrash and kick as the officers tried to handcuff her.  (Tu Depo. 71:16-72:15); (Brown Depo. 151:4-14). All told, it took six officers and an ankle restraint to subdue Moore.  (Tu Depo. 74:2-10); (Brown Depo. 128:17-23); (Smith Depo. 3:3-12); (Mathis Depo. 25:4-12); (Kastmiler Depo. 24:22-24); (Gardner Depo. 28:22-25).  They did not strike or tase Moore during the struggle, and instead pinned her down using their own limbs.  Id.  So unlike Deorle, where the officers fired a lead-filled beanbag round at a mentally ill person's face, the first Graham factor cuts in the officers' favor.  See 272 F.3d at 1275.

But, like Deorle, the officers had a diminished interest in using force because they confronted, not someone who had committed a serious crime, but someone who was mentally ill.  See 272 F.3d at 1282-83.  That said, Moore continued to lash out and kick throughout the struggle, which can have significant consequences.  See, e.g., Abston v. City of Merced, 506 Fed. App'x. 650, 652 (9th Cir. 2013) (memorandum opinion) (decedent kicked officer hard enough to require surgery).  That does not warrant using a gun, but it does warrant restraining Moore's limbs in the way the officers did here.

Finally, officers may use "physical coercion" when taking someone into custody. Graham, 490 U.S. at 238.  That is especially true when a person resists arrest.  Plaintiff maintains that, rather than resisting arrest, Moore was "bucking for air."  Opp'n at 19.  But

---

[7] Courts focus on three factors to assess the government's interest in the force used, namely (a) "whether the suspect poses an immediate threat to the safety of the officers or others," (b) "the severity of the crime at issue," and (c) "whether he [or she] is actively resisting arrest or attempting to evade arrest."  Glenn, 673 F.3d at 872 (quoting Graham, 490 U.S. at 396).

8

that could only have been true later in the struggle.  The moment the officers tried to arrest her, Moore yanked two officers to the floor, kicked, and screamed.  (Brown Depo 130:25-134:22); (Tu Depo. 80:4-12).  So even if Moore started bucking for air at some point, nothing in the record suggests how the officers could have discerned when thrashing against arrest became bucking for air.  And though Moore's weight suggested a higher risk of health problems, the officers had little choice but to restrain her once the struggle started.  That being so, the force used – though fatal when combined with an enlarged heart – was reasonable based on what the officers could know at the time.  The Court therefore GRANTS summary judgment on Plaintiff's Fourth Amendment excessive force claim.

### 2.  Qualified Immunity

Even if the force used had violated Moore's Fourth Amendment rights, qualified immunity would shield the officers from liability.  To overcome this defense, clearly established law must have placed the constitutional question "beyond debate."  See al-Kidd, 563 U.S. at 741.  Put another way, the "violative nature of particular conduct" must be clearly established when the alleged constitutional violation happened.  Mullenix v. Luna, 136 S. Ct. 305, 309 (2015) (per curiam).  Here, it was not.

Plaintiff argues that Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003), made clear that the officers' conduct violated the Fourth Amendment.  Opp'n at 18.  But Drummond was a very different case.  There, the officers allegedly "crushed Drummond against the ground" and pressed "their weight on his neck and torso."  Id. at 1061.  And they continued to do so even though Drummond made "repeated cries for air" and offered "no resistance."  Id. at 1061.

Here, by contrast, there is no hint of neck trauma.[8]  See Spitz Decl. ¶¶ 27-37; Coroner's Rpt. at 8-17.  Moore also continued to thrash and kick until the moment the officers managed to apply an ankle restraint.  (Kastmiler Depo. 27:3-5); (Mathis Depo. 25:6-

---

[8] This case is also unlike Abdullahi v. City of Madison, 423 F.3d 763, 766-67 (7th Cir. 2005), where an autopsy revealed damning proof that the decedent's chest and neck had been crushed.  There a "tremendous amount of air had been forced into the tissue surrounding" a collapsed lung, while the decedent's neck had extensive signs of hemorrhaging.  Id.

9

10). She did not cry out for air. And when Moore relented, the officers relented. (Phillips Depo. 37:12-38:3). So even if Moore did not cry out because she could not, this is not a case where officers continued to use force despite having every reason to know that the person was compliant and desperate for air.[9]

Instead, this case resembles Luchtel v. Hagemann, 623 F.3d 975 (9th Cir. 2010), which held it was reasonable to restrain a woman who "did everything she could to keep the officers from handcuffing her," including thrashing and kicking, because "she was afraid the officers were trying to kill her." Id. at 978, 984-85. The officers pinned Luchtel to the ground but, perhaps because she did not have a heart condition, she survived. See id. at 978.

At bottom, this case falls too close to Luchtel and too far from Drummond. Qualified immunity therefore applies to Plaintiff's Fourth Amendment excessive force claim.

### C. Substantive Due Process & Monell Claims

Given that the officers' did not use unreasonable force under the Fourth Amendment, Plaintiff's substantive due process and Monell claims fall away.[10] To be liable under a substantive due process theory, the officers' conduct must have been more than unreasonable; it must shock the conscience. Porter v. Osborn, 546 F.3d 1131, 1136 (9th Cir. 2008). And, for the City to be liable under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), it must still have caused a "deprivation" of federal rights.[11] See 18 U.S.C. § 1983. Neither claim can stand without an underlying constitutional violation, so the Court GRANTS summary judgment on both claims.

---

[9] Abston v. City of Merced, 506 Fed. App'x. 650 (9th Cir. 2013) (memorandum opinion), also does not control, and not just because it is unpublished. There it remained disputed whether the officers continued to use force after the decedent stopped resisting. Id. at 651-53. The same cannot be said here.

[10] To the extent an unconstitutional arrest could have given rise to substantive due process or Monell claims here, those too fall away because the officers had probable cause to take Moore into protective custody.

[11] Besides alleging that the City deprived Moore of her Fourth Amendment rights, the complaint could be read to include a Section 1983 claim for a deprivation of statutory rights under the ADA. See FAC ¶¶ 56-61. In any event, the ADA's comprehensive remedial scheme leaves no room for a separate Section 1983 remedy. See Vinson v. Thomas, 288 F.3d 1145,1155-56 (9th Cir. 2002).

10

### D. Americans with Disabilities Act (ADA) Claims

Under Title II of the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. So to prevail on his ADA claim, Plaintiff must first show that Moore (1) had a disability and (2) was "qualified" under the statute's criteria. See O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir. 2007). If Moore satisfies both prongs, Plaintiff must then show that Moore was (3) denied benefits or services by a public entity because of her disability. See id. Under recent Ninth Circuit precedent, the City will be liable if the officers either (a) wrongly arrested Moore because they mistook the effects of her disability for a crime, or (b) caused her excessive injury or indignity by failing to reasonably accommodate her disability during the arrest.[12] Sheehan, 743 F.3d at 1232. Plaintiff appears to assert both theories. See FAC ¶¶ 77-79.

#### 1. Qualified Individual With A Disability

The City argues that Moore was "not an individual with a disability" because that term does not include someone who "is currently engaging in the illegal use of drugs" if "the covered entity acts on the basis of such use." See Mot. at 24; 42 U.S.C. § 12210(a). The City's argument, then, hinges on whether it acted "on the basis" of Moore's drug use – and not her mental illness.[13] So while the officers' subjective motivations play no role in the Court's Fourth Amendment analysis, Whren, 517 U.S. at 813, they control here.

Those motivations remain in dispute. Plaintiff argues that Officer Brown decided to arrest Moore because of the outstanding warrant, not her mental condition. Opp'n at 9. The City counters that Officer Brown "tried to help" Moore "by taking him to the hospital for medical attention," Mot. at 24 (emphasis omitted), since Moore was "increasingly delusional, paranoid, and agitated, and appeared to be high on drugs," Mot. at 14 (emphasis added). It is

---

[12] Even though the Ninth Circuit decided Sheehan after the events at issue here, Plaintiff – as he must – brings the ADA claim against the City alone, so qualified immunity does not apply. See Owen v. City of Independence, 445 U.S. 622, 650 (1980).

[13] Plaintiff does not assert that obesity is a disability under the ADA. See Opp'n at 25.

11

similarly unclear whether the officers used force "on the basis" of Moore's drug use, paranoid state, considerable size, or all three. Accordingly, the Court DENIES summary judgment on whether Moore was a qualified individual with a disability under the ADA.

### 2. Denial of Public Services

Plaintiff asserts two theories for relief under ADA: that the officers (a) wrongly arrested Moore because they mistook the effects of her disability for a crime, and (b) did not reasonably accommodate her disability during the arrest. See Sheehan, 743 F.3d at 1232.

#### (a) Mistaken Decision to Arrest

Deciding whether officers "misperceived the effects of a disability as illegal conduct" necessarily involves determining what motivated the arrest. See Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999). Sometimes this is straightforward. See, e.g., Lewis v. Truitt, 960 F.Supp. 175 (S.D. Ind. 1997) (police mistake deaf man's inability to follow their commands for deliberate resistance); Jackson v. Town of Sanford, 1994 WL 589617 (D. Maine) (police mistake effects of a stroke as public intoxication).

Not so here. The officers may have decided to arrest Moore due to her mental condition, outstanding warrant, or interference with law enforcement in the course of their duties. See Mot. at 13-15. If the latter, a reasonable jury could find that the Moore's apparent resistance stemmed from her mental condition, not a desire to obstruct the officers. That, as well as what motivated the arrest, remain disputed material facts. The Court therefore DENIES summary judgment on Plaintiff's first theory for relief under the ADA.

#### (b) Reasonable Accommodation During Arrest

To prevail on his second theory for relief, Plaintiff "bears the initial burden of producing evidence" that the officers could have reasonably accommodated Moore's mental illness while making the arrest but did not. Sheehan, 743 F.3d at 1233. And although the City may prevail if it shows that the accommodation "would fundamentally alter the nature" of the service allegedly denied, the reasonableness of an accommodation is "ordinarily" a question of fact. Id. (internal quotation marks omitted).

Plaintiff is wrong to maintain that he "does not have to explain a reasonable

accommodation" because the officers "failed to apply their training" on how to deal with a mentally ill person. Compare Opp'n at 25, with Sheehan, 743 F.3d at 1233. But Plaintiff could have just as easily argued that following their training – which presumably counsels against going "hands-on" with people terrified that "the FBI" is after them – would be accommodation enough. A reasonable jury could agree, so the Court DENIES summary judgment here as well.

### E. State Law Claims

Because Plaintiff's ADA claims have made it past summary judgment, the Court retains supplemental jurisdiction over his state law claims. See 28 U.S.C. §§ 1331, 1367. In California, state law claims for wrongful death and battery at the hands of the police rise and fall with federal Section 1983 claims. See Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1274-75 (1992); Susag v. City of Lake Forest, 94 Cal. App. 4th 1401, 1412-1413 (2002). The same is true for a Bane Act claim, which requires a civil rights violation "by threat, intimidation, or coercion." See Cal. Civ. Code § 52.1. So because the arrest and use of force did not violate Moore's Fourth Amendment rights, all three claims fall away. Accordingly, the Court GRANTS summary judgment on Plaintiff's state law claims.

## IV. CONCLUSION

Every loss of life hurts, but not every loss of life violates the Fourth Amendment. As hard as that may be to accept, it is the law. For that and the foregoing reasons, the Court GRANTS in part and DENIES in part the defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: October 14, 2016

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE