**JOHN L. BURRIS, Esq., SBN 69888**
**ADANTE D. POINTER, Esq., SBN 236229**
**LATEEF H. GRAY, ESQ., SBN 250055**
**MELISSA C. NOLD, Esq. SBN 301378**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200 Facsimile: (510) 839-3882
John.Burris@johnburrislaw.com
Adante.Pointer@johnburrislaw.com
Melissa.Nold@johnburrislaw.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR MOORE, individually and as successor in interest of XAVIER MOORE,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF BERKELEY, a municipal corporation; GWENDOLWYN BROWN, KENNETH TU, BRANDON SMITH, BRIAN MATHIS, TIMOTHY GARDNER, NIKOS KASTMILER, AMBER PHILIPS and BENJAMIN CARDOZA, individually and in their official capacities as Police Officers for the CITY OF BERKELEY and DOES 1-50, inclusive; individually and in their official capacities as POLICE OFFICERS for the CITY OF BERKELEY,<br><br>    Defendants. | Case No. 3:14-cv-00669-CRB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Honorable Judge Charles Breyer |

1

### INTRODUCTION

Plaintiff hereby submits this Brief in Opposition to dismissal of the Americans with Disability Act cause of action he brings against the City of Berkeley for the injuries his child Xavier "Kayla" Moore sustained while being detained and then arrested. Plaintiff contends the Berkeley Police Officers violated their Department's policies and professional training as well as the law when they failed to provide even a single accommodation to Kayla. Instead, the officers set in motion an ill-conceived plan which predictably led to Kayla being unnecessarily injured and ultimately dying. Plaintiff further contends that based upon the unequivocal strength of the record he should be permitted to move for Summary Judgment/Adjudication of his ADA claim as a matter of law.

On October 18, 2017, the parties attended the Pretrial Conference in this matter. At the hearing, Defendant City of Berkeley incredulously argued that Plaintiff Arthur Moore had not identified any reasonable accommodations its Officers could have provided to Decedent Kayla Moore despite several such accommodations being described in Plaintiff's Pre-Trial Brief.  In turn, the Court notified Plaintiff it was construing Defendant's Pre-Trial Brief as a Second Motion for Summary Judgment/Adjudication on Plaintiff Arthur Moore's surviving Americans with Disabilities Act (hereinafter A.D.A.) claim.

To that end, the Court issued an Order which required Plaintiff to explain (1) what actions the officers should have taken that they did not take and (2) why the officers' failure to take these proposed actions amounted to a failure to provide a reasonable accommodation. Dckt 118, Lines 9-14. Further, the Order asked the Plaintiff to identify what facts support his claim that the officers arrested Decedent Kayla Moore because of her disability. Dckt 118, Lines 1-8.

Plaintiff submits this Brief in Opposition to Defendants' Motion for Summary Judgment on his A.D.A. Claim. Plaintiff further moves for Partial Summary Judgment on Plaintiff's A.D.A. claim against Defendant City of Berkeley, because no reasonable juror could conclude anything other than the City of Berkeley officers failed to provide Decedent Kayla Moore reasonable accommodation by reason of her disability.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………………… 2

TABLE OF CONTENTS…………………………………………………………...3

TABLE OF AUTHORITIES………………………………………………………4

PROCEDURAL OVERVIEW……………………………………………………5

STATEMENT OF FACTS …………………………………………………………7

ARGUMENT………………………………………………………………………15

CONCLUSION……………………………………………………………………31

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 248 (1986)……………………………………………......…15

*Keenan v. Allan*,
    91 F.3d 1275, 1279 (9th Cir. 1996)……………………………………..15

*Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*,
    475 U.S. 574, 587 (1986)………………………………………………15,16

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376, 387 (9th Cir. 2010)……………………………………….15

*Freeman v. Arpaio*,
    125 F.3d 723, 735 (9th Cir. 1997)……………………………………….16

*O'Guinn v. Lovelock Corr. Ctr.*,
    502 F.3d 1056, 1060 (9th Cir. 2007)…………………………………16, 27, 29

*Sheehan v. CCSF*,
    743 F.3d 1211, 1232 (9th Cir. 2014)…………………………………….16-19

*Waller ex rel. Estate of Hunt v. Danville*,
    556 F.3d 171, 174 (4th Cir. 2009)………………………………16-18. 20-21, 28

*Gohier v. Enright*,
    186 F.3d 1216, 1220–21 (10th Cir. 1999)……………………………17, 28

*Vinson v. Thomas*,
    288 F.3d 1145, 1154 (9th Cir.2002)……………………………………..17

*Zukle v. Regents of Univ. of Cal.*,
    166 F.3d 1041, 1047 (9th Cir.1999)……………………………………..17

*EEOC v. UPS Supply Chain Solutions*,
    620 F.3d 1103, 1110 (9th Cir.2010)…..…………………………………18

*Jackson v. Inhabitants of Town of Sanford*,
    No. CIV. 94-12-P-H, 1994 WL 589617, at *1 (D. Me. 1994)……………………28

*Lewis v. Truitt*,
    960 F. Supp. 175, 176 (S.D. Ind. 1997)…………………………………..28

*Ferguson v. City of Phoenix*,
    157 F.3d 668 (9th Cir. 1998)……………………………………….27, 29

*Duvall v. County of Kitsap*,
    250 F.3d 1124 (9th Cir. 2001)……………………………………….27, 29

<u>Rules</u>

Cal. Welf. & Inst. Code 5150……………………………………..5, 8-12, 14, 17-24, 30

Federal Rule of Civil Procedure 56………………………………………….15

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROCEDURAL OVERVIEW**

Pleadings

On February 12, 2014, Plaintiff Arthur Moore filed a Complaint against Defendant City of Berkeley and multiple Defendant Officers, alleging eleven causes of action, including a violation of the Americans with Disabilities Act. See Dckt #1. Plaintiff amended his complaint twice, continually maintaining the ADA claim and allegations that officers failed to accommodate Decedent Kayla Moore's disabling condition of paranoid schizophrenia. See Dckt #18, 31**.** In October 2016, this court dismissed ten of the eleven causes of action in its Order on Defendants' Motion for Summary but denied Summary Judgment on Plaintiff's A.D.A. claim. See Dckt #71.

Pre-Trial Documents

On October 11, 2017, Plaintiffs and Defendants filed their pre-trial documents including the Joint Proposed Pretrial Order, in expectation of going to trial on November 6, 2017. See Dckt #100. In the Joint Pretrial Order, Plaintiff proposed the following four reasonable accommodations available to the officers that they failed to provide when detaining Ms. Moore for a mental health evaluation: See Dckt 100, pages 4-7

1. **To Not Lie to Kayla Moore or Threaten Her With Arrest:** Plaintiff contends the officers knew that a reasonable accommodation when conducting a W&I §5150 detention with a person suffering a mental illness is **not to lie and threaten them with arrest** because this could cause a person with a mental illness to become agitated and aggressive. *See Berkeley Police Department General Order T-19: Americans with Disabilities Act Policy (hereafter referred to as ADA Policy); Cal. Welf. & Inst. Code 5150 (g)(1).*

2. **To Communicate to All Officers On Scene That The Person They Are Contacting Has Mental Disabilities:** Plaintiff contends Officer Brown knew a reasonable accommodation was to inform her partner, Officer Tu that Kayla Moore was in the midst of a schizophrenic episode and was being detained for a W&I §5150 evaluation and to treat Kayla Moore accordingly rather than allow Officer Tu to erroneously believe they were arresting Kayla pursuant to a criminal warrant. *Berkeley Police Department ADA Policy, Cal. Welf. & Inst. Code 5150 and California POST Learning Domain 20 – Use of Force: Communication*

3. **To Take Additional Time to Deal with a Call for Servic**e: Plaintiff contends that Officer Brown knew a reasonable accommodation is that the time spent on a call for service may

5

have to be extended in order to reassure the individual, sort facts, interact with family members and others, and bring the call to successful resolution. *Berkeley Police Department ADA Policy.*

4. **To Use the Least Restraint Necessary:** Plaintiff contends that officers knew a reasonable accommodation for a person with mental, emotional and psychological disability is that officers must make reasonable efforts, where consistent with appropriate precautions, to use the least restraint necessary, and to protect the arrestee from self-injury. *Berkeley Police Department ADA Policy* .

Although the City of Berkeley violated the Federal Rules of Civil Procedure by never disclosing to Plaintiff the Berkeley Police Department's Americans with Disabilities Policy or any training given to Officers in connection with it, Plaintiff managed to identify the aforementioned reasonable accommodations.

Defendant's Willful Suppression of Evidence

Nevertheless, On October 16, 2017, Plaintiff attempted to bring this egregious breach of the discovery rules to the Court's attention by filing his Motion for Sanctions against Defendant City of Berkeley for its failure to disclose its Americans with Disability Act Policy. See Dckt 116. Plaintiff explained in his Motion that he only recently was made aware of the Policy by way of concerned citizen who emailed the policy to him just weeks before trial. The Motion went on to detail how during fact discovery, Plaintiff propounded discovery requests to City which requested the production of such policies and how the City willfully suppressed giving them to Plaintiff. It is important to note that City of Berkeley's Americans with Disabilities Act policy is a policy unique to the City of Berkeley and was previously unknown to Plaintiff. It should be noted that in Plaintiff counsel's extensive experience litigating police misconduct cases, he has never encountered a department specific A.D.A. policy pertaining to making detentions, arrests and/or the use of force. Therefore, Plaintiff could not have anticipated the existence of this policy prior to it being sent to him by a community member. The court has yet to issue a ruling on Plaintiff's Motion for Sanctions.

Pre-Trial Conference & Order

On October 18, 2017, the parties attended the Pre-Trial Conference in this action. During the Pre-Trial Conference, the Court explained to the parties that it was going to interpret Defendant's Pre-Trial Brief as a second Motion for Summary Judgment on Plaintiff's A.D.A. claim.

After the Pre-Trial Conference, the Court issued an Order asking Plaintiff to explain (1) what actions the officers should have taken that they did not in fact take and (2) why the officers' failure to

take these proposed actions amounted to a failure to provide a reasonable accommodation. Dckt 118, Lines 9-14. The Order also asked the Plaintiff to explain what facts support the Plaintiff's claim that the officer's arrested Decedent Kayla Moore because of her disability. Dckt 118, Lines 1-8.

Plaintiff Identifies Five (5) Reasonable Accommodations Supported by the Underlying Record

In accordance with the Court's Order and in Opposition to Defendant's Second Motion for Summary Judgment, Plaintiff sets forth the underlying facts contained in the record to support his contention the officers misperceived the effects of Ms. Moore's disability of schizophrenia for illegal conduct and that there are five proposed actions that amount to reasonable accommodations that officers should have taken that would have prevented and/or diminished the injuries Ms. Moore suffered during the incident.

Each of Plaintiff's five (5) proposed actions amounted to a failure to provide a reasonable accommodations because: (a) each proposed action was readily available and reasonable for officers to implement given the circumstances; (b) each proposed action was proscribed by the Berkeley officers' training and recommended by the Berkeley Police Department's policies; and finally, (c) each proposed action would have prevented Ms. Kayla Moore, who had committed no crimes, from suffering the nightmarish last moments of a brutal, slow death at the hands of eight Berkeley officers that left Plaintiff's daughter dead and half-naked on the floor of her own home.

Finally, Plaintiff includes prior instances, within the record, wherein Defendant City of Berkeley Police Department employees safely and lawfully took Ms. Moore into custody for a comparable mental health hold, by simply following their department's very own policies and procedures, thereby providing Ms. Moore the reasonable accommodations she was entitled to. These prior instances of proper abidance by City of Berkeley Police Department's ADA Policies and procedures resulted in Ms. Moore being taken into custody without incident, which demonstrates that if officers had provided the same or comparable reasonable accommodations during the subject incident, Ms. Moore would not have suffered harm.

## STATEMENT OF FACTS

### 1. Underlying Call for Service

On February 12, 2013 at around midnight, Berkeley Police Officers Brown, Tu and Smith responded to a call of a verbal disturbance at a multi-story apartment building in Berkeley, CA. See Deposition of Gwendolyn Brown (hereafter referred to as "Brown Depo"), 19-22. City of Berkeley

officers learned from dispatch prior to their arrival that Decedent Kayla Moore was suffering from her well documented mental disability of schizophrenia. See Brown Depo, 19-22; Alta Bates Medical Records. Responding officers also learned that Kayla Moore had kicked out her roommate, had not taken her medications for her disability of schizophrenia, had been drinking and doing drugs, and possibly needed to be brought into protective custody for a mental health evaluation pursuant to California Welfare & Institutions Code 5150. Brown Depo, 19-22.

### 2. Berkeley Officers Are Trained to Provide Reasonable Accommodations to Persons with Mental Illnesses

All Berkeley police officers, including the responding officers, are trained on the Berkeley Police Department's ADA policy. ADA Policy, 12. The Berkeley Police Department enacted the policy in 2000 to meet the requirements of Title II of the Americans with Disability Act. ADA Policy, 2. Specifically, Berkeley Police Department's ADA policy includes a section of reasonable accommodations to provide to persons that are suffering from mental, psychological and emotional disabilities during a call for service, including but not limited to:

- (1) use time and patience beyond what is normally required;
- (2) contact friends and family to reassure and calm the person;
- (3) extend time to reassure and sort facts;
- (4) make reasonable efforts to use the least restraint necessary;
- (5) employ medical emergency services for assistance;
- (6) apply the procedures and guidelines enshrined in the California Welfare and Institutions Code 5150. Under Cal. Welf. & Inst. Code 5150, officers are required to explicitly inform the mentally ill person: "You are not under criminal arrest, but I am taking you for an examination by mental health professionals at [insert name of facility]." ADA Policy, 4-5.

In accordance with the BPD ADA Policy, all Berkeley officers, including, Officer Brown, are trained to not threaten mentally ill persons with arrest because it will cause a mentally ill person to become agitated, frightened and potentially aggressive. Brown Depo, 106-109. Additionally, officers are trained to calm a mentally ill person with words and de-escalate the situation. ADA Policy, 4-5; Id. In fact, Officer Brown was trained to *avoid physical contact completely* if no violence or destructive acts have taken place. Brown Depo, 110.

### 3. Officers Brown and Tu Recognized Kayla Moore From Prior Calls for Service

Officer Brown recognized Kayla Moore's name from a prior welfare check she had attempted

8

to conduct on Kayla the month before. Brown Supplemental Declaration (hereafter referred to as Brown Declaration), Docket #60; Brown Depo 53-56. When Officer Brown had responded to the same apartment to conduct the welfare check, Kayla was not present. *Id*. However, Kayla's mother, Elysse Moore, had informed Officer Brown that she had called for the welfare check because she was worried about her daughter's well-being. *Id*. Officer Brown also learned from Elysse Moore that Kayla suffered from depression, had been "5150'd" several times, and struggled with drug addiction. *Id*. Officer Tu also recognized Kayla Moore's name from a prior 5150 mental health evaluation in which the call for service was resolved without taking Kayla into protective custody. Officer Kenneth Tu's Internal Affairs Interview (hereafter referred to as "Tu IA Interview), 1131-1143.

### 4. *Officers Were Investigating Whether a Verbal Disturbance Occurred, Ms. Moore Had an Outstanding Warrant and/or Ms. Moore Needed to Be Detained for a Mental Health Evaluation*

BPD Officers Brown and Tu arrived on scene at the apartment building at approximately 11:56 PM, February 12, 2012, and Officer Smith arrived shortly after. Brown Depo, 19-22, 28. Officer Brown contacted dispatch to have the reporting party and Kayla's purported roommate, John Hayes, meet them outside the apartment building. Brown Depo, 23-25. Mr. Hayes met the officers outside and confirmed information from dispatch: Kayla Moore was suffering from her mental disability of schizophrenia, had not taken her medication, had been drinking and doing drugs and possibly needed to be brought into protective custody for a W&I §5150 mental health evaluation. *Id*. Officers Brown, Tu, and Smith decided to go upstairs to investigate. Brown Depo 23-25, 32.

Mr. Hayes, led officers upstairs to the fifth floor to Kayla's apartment. Brown Depo, 30. Officer Brown directed Mr. Hayes to unlock the apartment door, which he did. Brown Depo, 37-38. Officer Brown, the lead officer, called out to Ms. Moore from the threshold of the door. *Id*. Officer Smith took Mr. Hayes aside and began processing him for a background check. See Deposition of Brandon Smith (hereafter referred to as "Smith Depo"), 31-33, 37. Officer Tu silently stood aside while Officer Brown interacted with Ms. Moore. Smith Depo, 31-33, 37.

The Officers Did Not Observe Any Weapons, Drugs or Evidence Any Violence Had Taken Place

Ms. Moore appeared at the doorway in a tube top and wraparound skirt. Brown Depo, 56-57. Ms. Moore is a readily recognizable African American, transgender woman and obese. *Id*. Officer Brown estimated Ms. Moore to stand at 5'8" and weigh over 300 pounds. *Id*. Officer Brown further observed that Ms. Moore had no weapons, no drug paraphernalia. Brown Depo, 60-62. Additionally, there had been no allegations of a physical altercation nor was there any evidence of a physical

altercation from her look inside the apartment. Brown Depo, 25-26, 30, 60-62.

Officer Brown began to investigate whether there had been: (1) a verbal disturbance, and to confirm whether (2) Ms. Moore had an outstanding warrant and/or (3) needed to be detained for a possible W&I § 5150 hold. Brown Depo, 83. To that end, Officer Brown asked Ms. Moore what was going on. Brown Depo, 58.

Ms. Moore Displayed Obvious Signs of Being Mentally Disabled

Ms. Moore gave an explanation that clearly indicated she was suffering the effects of her disabling condition of schizophrenia. Ms. Moore replied that the FBI was following her. Brown Depo, 58-62. Ms. Moore said she feared for her safety because of the FBI's activities and dinosaurs. Ms. Moore did not believe that the Berkeley officers were real police officers. *Id.* Then Ms. Moore began calling Officer Brown a variety of female names. *Id.* When Officer Brown informed her that she was not those people, Ms. Moore indicated that the female persons were behind Officer Brown and she could see them. *Id.* Ms. Moore informed Officer Brown that she did not feel safe and continued to talk about the invisible females, the FBI and dinosaurs. *Id.* Officer Tu, who stood nearby, overheard Ms. Moore expressing that the FBI was following her and that she did not believe officers were legitimate police officers. Tu IA Interview, 203-206.

However, at no point during the conversation did Ms. Moore threaten harm to anyone or express a desire to harm herself. Brown Depo, 58-62. Officer Brown noted that Ms. Moore was merely being "theatrical" during their conversation. Gwendolyn Brown Internal Affairs Interview (hereafter referred to as "Brown IA Interview"), 359-398. In fact, Officer Brown noted that she did not even feel the need to handcuff Ms. Moore for officer safety reasons. Brown Depo, 61.

From the Outset Officer Brown Ignores her Professional Training to Provide a Reasonable Accommodation

At no time during their 15-minute conversation, did Officer Brown ask Ms. Moore if she was taking her medications nor did she ask whether there were any friends and/or family nearby. Brown Depo, 102. If Officer Brown had asked, she would have learned that Ms. Moore's caregiver, Edward Sterling, was sitting inside the apartment on the couch ready to be a helpful resource. Meanwhile, Officer Smith discovered an outstanding warrant for the reporting party, John Hayes. Smith Depo, 31-33, 37. Officer Brown directed Officer Smith to arrest John Hayes on the outstanding warrant. Brown Depo, 66. Officer Smith arrested Mr. Hayes and led him downstairs. Smith Depo, 41.

**5.   *Officer Brown Determined that Kayla Moore Had Not Committed Any Crimes But Needed to Be Detained for a Mental Health Evaluation Because Ms. Moore Was Mentally Disabled as a Result of Her Schizophrenic Delusions***

Shortly after Officer Smith and John Hayes left, Officer Brown determined that Ms. Moore had committed no crimes since there was no ongoing verbal disturbance and none of the Officers confirmed Ms. Moore had a valid warrant. Brown Depo, 83-84. Nevertheless, Officer Brown determined Ms. Moore was gravely disabled as a result of a mental disorder pursuant to Cal. Welf. & Inst. Code 5150. Brown Depo; 84-85; 88-90; 100-103. Officer Brown based her assessment that Kayla was "gravely disabled" because her schizophrenic delusions made her unable to care for herself. *Id.* However, Officer Brown did *not* find Kayla was a threat to herself or others. *Id.* Accordingly, Officer Brown decided to conduct a 5150 detention, but not an arrest, to hold Ms. Moore at her home until the Berkeley Fire Department came to the scene. *Id.* Officer Brown intended to have Berkeley Fire and Paramedics conduct their own mental health evaluation at Ms. Moore's apartment to decide if Ms. Moore should be transported by BFD to John George Psychiatric Hospital to be held on 48-72 hour hold. *Id.*

Officer Brown Makes a Conscious Decision to Not Follow BPD Policy and her Professional Training

BPD Policy instructs Officers as to what reasonable accommodations they are to provide when they are dealing with a mentally disabled person.  ADA Policy, 4-5. It necessarily follows that since Officer Brown made the determination that Ms. Moore was mentally disabled, she should have begun providing Ms. Moore with reasonable accommodations pursuant to the Berkeley ADA policy and her training. Instead, Officer Brown deviated from her professional training and substituted her own judgment which led to her devising an ill-conceived ruse to trick Ms. Moore into going into custody. Brown Depo 123-127; Brown Declaration, Dckt #60.

Specifically, Officer Brown decided to threaten Ms. Moore with criminal arrest despite her professional training warning her that this tactic would cause Ms. Moore to become agitated, frightened and potentially aggressive. Brown Depo, 106-109. It is important to note, Officer Brown considered making the reasonable accommodations her training called for, which was to inform Ms. Moore that she was *not under criminal arrest* and was in fact being detained for a mental health evaluation. ADA Policy, 4-5; Cal. Welf. & Inst. 5150 (g)(1); Brown Declaration, Dckt #60. However, Officer Brown made a deliberate decision to deviate from her training and not provide a Ms. Moore that reasonable accommodation. Brown Declaration Dckt #60. She made this decision based on her personal, unsupported belief that Ms. Moore would be more amenable to a warrant arrest. *Id.* She did

11

not inform her partner, Officer Tu, of her decision or tactic nor did she consult any supervisors before making the decision to not follow her Department's policy and training. Deposition of Kenneth Tu (hereafter referred to as "Tu Depo"), 61-62. Officer Brown's actions served to violate BPD policy, her professional training and the law which foreseeably led to placing not only Ms. Moore in danger but the officers as well.

> **6.  Officers' Failures to Provide Ms. Moore any Reasonable Accommodations Caused Ms. Moore to Become Frightened and Agitated**

Up to this point, the Officers admit Ms. Moore had been cooperative and exhibited no signs of aggression or threats but that as soon as Officer Brown began threatening Ms. Moore with criminal arrest, Ms. Moore became "very, very agitated" and frightened, exactly as the Officer's professional training had predicted. Brown Depo, 124-126.

Officer Brown elected to Use Physical Force Against Ms. Moore in Violation of BPD's ADA Policy

To Ms. Moore's detriment, Officer Brown did not give up her reckless ruse. *Id.* She proceeded to threaten Ms. Moore with criminal arrest for the next five to seven minutes causing Ms. Moore to become increasingly agitated and frightened. *Id.* Next, Officer Brown decided to use physical force to restrain Ms. Moore. Brown Depo, 80-81. Officer Brown silently signaled to Officer Tu to pounce on Ms. Moore without warning despite their explicit training to avoid physical contact with a mentally ill person unless the person is violent or physically destructive. Brown Depo, 80-81.

Officer Brown *never* communicated to Officer Tu that Ms. Moore was suffering from extreme delusions to the point Officer Brown thought Ms. Moore was gravely disabled. *Id.* Officer Brown *never* told Officer Tu that her talk about the warrant arrest was a *ruse.* Brown Depo, 80-81; Tu Depo, 61-62. Officer Brown *never* told Ms. Moore that they were *not arresting* Ms. Moore but conducting a 5150 *detention. Id.* Officer Brown misled her own fellow officer to believe that Ms. Moore was under arrest for an outstanding warrant, despite circumstances that would have allowed for her to communicate any and all of this critical information to Officer Tu prior to going hands on.

Officers simultaneously and without any warning pounced on Ms. Moore. Frightened, Ms. Moore retreated back into her apartment and said, "No! No! No!." Tu IA Interview, 411-426; Brown Depo, 123. Both officers were aware that Ms. Moore's delusions caused her to believe that they were not real officers and the FBI was after her. Brown Depo, 58; Tu IA Interview, 203-206. The surprise physical attack on Ms. Moore merely confirmed her delusions and caused her further fright. The Officers knew Ms. Moore was unarmed, had been nonviolent and therefore did not pose a threat of harm to herself or officers.  The officers should have simply stopped using force, explained to Ms.

Moore that she was being detained for a mental health evaluation, contacted Berkeley Fire Department and continued to monitor Kayla from the front door while they waited for emergency medical services assistance to arrive. Instead, the Officers resorted to brute force to gain compliance from Ms. Moore whose mental disability prevented her from complying with the Officers.

**7. Against Berkeley Police Department Training on Positional Asphyxiation, Officers Used Their Weight to Compress Ms. Moore's Back Causing Ms. Moore to Suffer the Terror of Slowly Asphyxiating and Exacerbating Her Schizophrenic Delusions that the FBI Was There to Murder Her**

Ms. Moore tripped over a mattress that was on the floor of the apartment as she was hurriedly backed into her apartment causing her and Officers Brown and Tu to fall down. While Kayla Moore was face down on the mattress, Officer Kenneth Tu quickly straddled Ms. Moore's back, while Officer Brown pressed down upon Ms. Moore's shoulder blades. Officer Tu weighs two hundred thirty pounds, stands 6'3" and used all of his weight to compress Kayla Moore into the mattress. Brown Depo, 131-132; Tu IA Interview, 603-609. At or about this time, Officer Brown used her radio to call for backup. Brown Depo, 140.

At no point did the Officers attempt to make any accommodation in their communications with Ms. Moore to calm or reassure her but simply screamed, "Stop resisting!". Brown Depo, 131; Brown IA Interview, 463-522. Officers should have offered Ms. Moore any number of reasonable accommodation to calm her down and de-escalate the situation such as: informing Ms. Moore she was not under arrest, reassuring her that she was safe, or letting her know that they were there to only get her medical treatment. Officer Tu continued to straddle Ms. Moore's back and Officer Brown continued to press down on her shoulder blades until Ms. Moore began to buck for air. Brown IA Interview, 739-742, 815-819, 676-684; Tu IA Interview, 646-660.

BPD Officers are Trained a Person Can be Severely Injured or Killed if They are Improperly Restrained

Both officers were trained by the Berkeley Police Department that obese persons are particularly high-risk candidates for dying from positional asphyxiation. See Berkeley Training and Information Bulletin #234 (hereafter referred to as "Bulletin 234").In fact, Berkeley Police Department Bulletin 234 warns that a vicious cycle occurs when an officer presses down on a person's back causing them to have difficulty breathing. Bulletin 234. In response to the pressure exerted upon their back, the person struggles for air which causes the officer to use more force and press down even more until the person finally suffocates. Bulletin 234.

Despite this explicit training aimed to prevent positional and/or compression asphyxiation, both officers continued their use of force on Ms. Moore's back. Responding officers Mathis, Kastmiler, Smith and Gardner recounted that Ms. Moore was on her stomach struggling for air when they arrived and that each of them grabbed a different part of Ms. Moore body to hold her down. The Officers continued to shout at Ms. Moore to stop resisting. Although Officers Brown and Tu were aware that Ms. Moore's delusional state prevented her from complying and comprehending these type of verbal commands, neither of the officers made any reasonable efforts to communicate to their fellow officers or Ms. Moore that she was not under criminal arrest but merely being detained until BFD arrived to conduct a mental health evaluation.

### 8. Officer Brown Lied to Her On-Duty Supervisor, Sergeant Phillips, About Arresting Ms. Moore for a Warrant Who Had Used Only Verbal Communications and Reasonable Accommodations in a Prior 5150 with Kayla Moore In Order to Persuade Ms. Moore to Voluntarily Go to the Psychiatric Hospital

Sgt. Amber Phillips and Sgt. Ben Cardoza arrived with a WRAP restraint. Brown IA Interview, 834-837. Officer Brown had a conversation with her on duty supervisor, Sgt. Phillips. See Deposition of Sergeant Phillips (hereafter referred to as "Phillips Depo"), 43-44. She continued her previous lie that she had taken Ms. Moore into custody for a warrant. *Id.*

A short time later, Sergeant Phillips realized she recognized Ms. Moore from a prior W&I §5150 evaluation that she, herself had conducted. During that W&I §5150 evaluation, Sergeant Phillips had spent a "considerable amount of time" talking with Ms. Moore. Phillips Depo, 20-22, 25-29. Sgt. Phillips asked Ms. Moore about her medications and her mental health. Ms. Moore did not express a desire to harm herself or others during that incident either. *Id.* She did not become violent or aggressive with Sgt. Phillips. *Id.* And after a long conversation about her medications and the need to see a doctor, Ms. Moore voluntarily agreed to go to the psychiatric hospital for a mental health hold pursuant to Cal. Welf. & Inst. Code 5150. *Id.* Sgt. Phillips called an ambulance and Ms. Moore voluntarily agreed to go with them. *Id.*

Officer Brown led Sgt. Phillips to believe Ms. Moore was being arrested for a warrant. Officer Brown did not inform her on-duty supervisors that Ms. Moore was suffering a schizophrenic episode as she did not believe the officers were real, she was seeing invisible people and was off her medications.  Officer Brown did not tell her supervisors Ms. Moore had not threatened anyone or engaged in any violence *prior* to threatening her with criminal arrest and thereby hid the fact she had intended to merely detain Ms. Moore until BFD arrived to conduct a mental evaluation. If she had told

14

Sgt. Philips these facts, Sgt. Philips would have also understood that Ms. Moore's delusions prevented her from complying with the officers' verbal commands as other arrestees would and that no force should have been used against Ms. Moore since Officer Brown only or intended to detain her until BFD arrived.  Only after Ms. Moore became motionless did Officer Brown notice that Ms. Moore appeared to not be breathing.

> ### 9. *Berkeley Officers Caused Ms. Moore to Suffer a Slow, Violent Death Exacerbated By the Horrors of her Schizophrenic Delusions that No Officers Attempted to Reasonably Accommodate*

When Officers finally rolled Ms. Moore onto her side, Officer Brown thought she might still be breathing.  Brown Depo, 154, 162-164. Approximately, a minute later it was clear that Ms. Moore was laying there half-naked and dead. *Id.* Kayla Moore had struggled to breathe for approximately 4-5 minutes with officers on the ground, slowly suffocating, before officers finally called for the Berkeley Fire Department. **See Berkeley PD CAD.**  Officers began CPR until Berkeley Fire arrived but it was too late. Ms. Moore suffered her last moments in terror: numerous strange officers holding her down, half-naked, while suffering the nightmarish brutality of police and the delusions of her schizophrenia without officers providing her a single reasonable accommodation despite ample time and opportunity.

## ARGUMENT

## I.   IF THE JURY COULD FIND FOR PLAINTIFF, THEN THERE IS A GENUINE QUESTION OF MATERIAL FACT THAT PRECLUDES SUMMARY JUDGMENT IN DEFENDANT'S FAVOR

### 1. LEGAL STANDARD

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56. Material facts are those that may affect the outcome of the case—"irrelevant " or "unnecessary" factual disputes will not be counted. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." Id. (citing FRCP, Rule 56(e)).

In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts

placed before the court must be viewed in a light most favorable to the opposing party. *See Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the nonmoving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

Where the record taken as a whole could lead a rational trier of fact to find for the non-moving party, then there is a "genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587.

## 2. A REASONABLE JUROR COULD FIND THAT BERKELEY OFFICERS FAILED TO PROVIDE A REASONABLE ACCOMODATION AND/OR WRONGFULLY ARRESTED KAYLA MOORE BY REASON OF HER DISABILITY

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to prevail on a Title II ADA claim, Plaintiff must show Decedent Kayla Moore meets four prongs:

1. Ms. Moore is an individual with a disability;
2. Ms. Moore is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;
3. Ms. Moore was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
4. such exclusion, denial of benefits, or discrimination was by reason of [her] disability.

*O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007).

Since it is undisputed that Kayla Moore was (1) an individual with a disability and (2) qualified to participate in or receive the benefit of the Berkeley Police Department's services, programs or activities, Plaintiff addresses the third and fourth prongs of the Title II ADA Claim.

## A. THERE IS EXTENSIVE EVIDENCE THE OFFICERS COULD HAVE PROVIDED A REASONABLE ACCOMMODATION TO KAYLA MOORE

In order to prove the third prong of the Title II ADA test, Plaintiff must show that the officers committed one of the two actions:

(1) **failure to provide reasonable accommodation**, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees; and/or

(2) **a wrongful arrest**, where police wrongly arrest someone with a disability because they

16

misperceive the effects of that disability as criminal activity. [emphasis added.] *See Sheehan v. CCSF*, 743 F.3d 1211, 1232 (9th Cir. 2014) (overturned on other grounds); *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009); *Gohier v. Enright*, 186 F.3d 1216, 1220–21 (10th Cir. 1999).

### i. Defendant City Failed to Provide A Reasonable Accommodation for Kayla Moore

In order to prove that a public entity failed to provide a reasonable accommodation under 28 C.F.R. § 35.130(b)(7), Plaintiff must produce evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir.2002). Here, Plaintiff produces and enumerates substantial evidence in the record that at least five different reasonable accommodations existed at the time of the incident, which were purposely designed by the Berkeley Police Department's policies and training to comply with Title II of the ADA.

i.   Berkeley officers should not threaten mentally ill persons with arrest because it causes them to become agitated frightened and potentially aggressive. **See Brown Depo, 106-110.**

ii.  Berkeley officers should have informed Ms. Moore that she was *not under criminal arrest* but being detained for a mental health evaluation. **See ADA Policy, 4-5; Brown Depo 106-110; Cal. Welf & Inst. 5150 (g)(1).**

iii. Berkeley officers should have respected Ms. Moore's comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation. **See Sheehan, supra; Brown Depo, 106-110; ADA Policy 4-5.**

iv.  Berkeley officers should have implemented reasonable accommodations throughout the detention and communicated to arriving officers that Ms. Moore was suffering from delusions as a result of her mental disability. **See POST Learning Domain 20; Sheehan, supra; ADA Policy 4-5; Brown Depo, 106-110.**

v.   Berkeley Officer Tu should have dismounted from Ms. Moore once she was bucking for air and on her stomach. **See Bulletin 234; Spitz Rule 26 Report.**

### ii. Defendants Cannot Rebut the Proposed Accommodations Because they are Incorporated into Berkeley Police Department Training and Policies

A public entity may defeat a reasonable accommodation claim by showing "that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1047 (9th Cir.1999). Defendants will argue that the five reasonable accommodations enumerated and described above would fundamentally alter the nature of police services, but each of these reasonable accommodations were directly drawn from Berkley Police Department's own training and ADA Policy. In fact, Berkeley Police Department issued its General Order on Title II of the Americans with Disabilities in order to train all Berkeley officers on the "appropriate response to both non-arrest and arrest situations

involving people with disabilities." See ADA Policy, page 12.

Therefore, not only has Plaintiff met his initial burden of producing evidence of the existence of reasonable accommodations but has dismissed any possibilities of rebuttal from Defendants. Nevertheless, Defendants will continue to disingenuously argue that that the accommodations would be *un*reasonable to provide under these circumstances, but the reasonableness of an accommodation is a question of fact for the jury to decide. *Sheehan*, 743 F.3d at 1233

## B. WHETHER AN ACCOMMODATION IS REASONABLE IS A QUESTION OF FACT FOR THE JURY

Plaintiff anticipates that Defendants will argue that the five proposed reasonable accommodations were *not* reasonable under the circumstances, but "the reasonableness of an accommodation is ordinarily **a question of fact**" for the jury. *Sheehan*, 743 F.3d at 1233; *see also EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir.2010).

Case law that involves Title II ADA Claims against police officers for failure to provide reasonable accommodations to mentally ill persons during a detention and/or arrest is relatively sparse but quickly evolving. Nevertheless, there are two cases directly on point that define the contours of the "reasonableness" of an accommodation: *Sheehan v. CCSF*, 743 F.3d 1211 (9th Cir. 2014) provides the bare **minimum** "reasonableness" of the officer's efforts to accommodate a mentally ill person; whereas, *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009) provides a **maximum** of "reasonableness" of the officer's efforts to accommodate a mentally ill person.

### i.    *Plaintiff Substantially Meets the Minimum Standard Articulated in Sheehan Because Kayla Moore Was Nonviolent and Cooperative*

Plaintiff thinks it is instructive the Ninth Circuit denied summary judgment to Defendant City and County of San Francisco for failing to respect a schizophrenic woman's comfort zone and engage in non-threatening communications during a W&I §5150 mental health detention in a far riskier set of circumstances than the case at bar. *Sheehan*, 743 F.3d at 1233.

In *Sheehan,* Plaintiff Terry Sheehan, a schizophrenic woman, was suffering from delusions and off her medication. *Id* at 1215. At the time, Sheehan lived in a group home and an employee contacted the police to take Sheehan into protective custody for a mental health evaluation pursuant to Welf. & Inst. Code 5150. *Id.* The employee had made a determination the Sheehan was both gravely disabled and a threat to others because she threatened to stab the employee. *Id.* Shortly thereafter, two officers arrived to investigate. *Id.* When the officers entered Sheehan's room, she drew a knife and charged at them. *Id.* The officers retreated and closed the door. *Id.* The officers called for backup, but did not wait. *Id.* Instead they forced the door open a second time, when Sheehan allegedly charged them with

a knife again and the officers shot her five to six times. *Id* at 1216.

Sheehan asserted that the Defendant City and County of San Francisco failed to provide a reasonable accommodation in violation of Title II of the ADA when the officers forced their way back into her room without taking her mental illness into account. *Id.* at 1233. Similar to here, Sheehan's asserted reasonable accommodation was that the officers should have **respected her comfort zone, engaged in non-threatening communications and used the passage of time to defuse the situation rather than precipitating a deadly confrontation**. *Id*. Although this district court had dismissed Sheehan's ADA claim at Summary Judgment, the 9th Circuit reversed. *Id.* Although the 9th Circuit acknowledged that "the officers were forced to make split-second decisions," the court concluded that "[a] reasonable jury nevertheless could find that the situation had been defused sufficiently, following the initial retreat from Sheehan's room, to afford the officers an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that Sheehan asserts were necessary." *Id.*

Similar to *Sheehan*, Plaintiff alleges Berkeley officers failed to employ any de-escalation techniques, respect Ms. Moore's comfort zone, engage in non-threatening communications and use the passage of time to defuse the situation rather than precipitating a deadly confrontation.

Unlike *Sheehan*, Ms. Moore was not violent, not armed, not aggressive and had peacefully interacted with officer for an entire 15 minutes before Officer Brown recklessly escalated the situation. There was not the urgency of potential violence or harm that existed in *Sheehan* from which the officers claimed they could not wait to re-enter the room. Here, Ms. Moore was unarmed, not aggressive, essentially cooperative. She was not a threat to the officers or herself. In fact, Officers decided to detain Ms. Moore for a mental health evaluation because she was unable to care for herself not because she was armed and threatening harm.

None of the high-risk factors found in *Sheehan* existed so officers had even more reason and opportunity to engage in non-threatening communication and use the passage of time to defuse the situation. Officers spent 5-7 minutes during the W&I § 5150 detention trying to convince Ms. Moore she had a warrant. When their ruse failed, they did not take any steps to provide the abundant reasonable accommodations available to them. Instead, the officers silently coordinated to grab Ms. Moore without warning, even though they had already caused her significant fright and agitation. They could have defused that agitation by spending a few more minutes explaining to Ms. Moore that they were going to get her medical treatment, or asked whether there were friends and/or family nearby, called their on-duty supervisor to the scene, summoned Berkeley Fire Department to assist in the

mental health evaluation prior to going hands on, or even simply told Ms. Moore that they were going to handcuff her. Officers performed none of these reasonable accommodations despite having ample time and opportunity to do so.

>    ii.    **Defendants Failed to Meet the Maximum Standard in Waller Because Berkeley Officers Did Not Provide Any Reasonable Accommodation Described in Waller Despite the Fact Kayla Moore Was Nonviolent, Cooperative and They Had Ample Opportunity**

In *Waller v. Enright*, the court determined that the reasonableness of an accommodation can be interpreted as a question of law only if Defendants clearly demonstrate the unreasonableness of available accommodations. *Supra, Waller* 556 F.3d 171.

In *Waller*, officers responded to a call that Rennie Hunt, had taken his live-in girlfriend Virginia Evans, hostage. *Id* at 173. The 9-1-1 call described Mr. Hunt as a "mental patient" that had been "in and out of the hospital." *Id.* When three officers arrived at Ms. Evan's house to investigate, Mr. Hunt would not let them inside and the officers could not confirm Ms. Evan's safety but suspected Mr. Hunt suffered from a mental illness. *Id.* The officers immediately began implementing *reasonable accommodations. Id.* The three officers contacted their on-duty supervisor, Captain Stowe, who then came to the scene. *Id.* When Captain Stowe asked Mr. Hunt to let him in, Mr. Hunt replied, "If you come in, I got something for you."  *Id.* Captain Stowe returned to the department and conferred with his superior, Major Elliot. *Id.* The two supervisors ran a criminal history check to learn more information about Mr. Hunt. *Id.* Major Elliot instructed Captain Stowe to contact Lieutenant Wyatt, a hostage negotiator for the police department, to help. *Id.* When Lt. Wyatt arrived on scene two hours had already elapsed from the original call. *Id.* Lt. Wyatt tried to convince Mr. Hunt to open the door, but Mr. Hunt yelled, "I'm going to blow your goddamn head off." Lt. Wyatt desisted negotiations and contacted the Emergency Response Team which forced its way into the house. *Id.* Mr. Hunt charged the officers swinging a scythe with one hand and carrying a knife in another so three officers shot Mr. Hunt. *Id.* Ultimately the Fourth Circuit Court affirmed the District Court's decision to grant summary judgment for the Defendants because given the circumstances the officers had met any possible reasonable accommodations given the hostage situation. *Id* at 176.

Unlike in *Waller¸* here officers did not attempt any reasonable accommodations. Officer Brown did not contact any supervisors after she made a determination that Ms. Moore was mentally disabled and needed to conduct a 5150 detention. Officers did not spend more than five to seven minutes speaking with Ms. Moore once they made a determination she suffered from a disability and began

20

conducting the 5150 detention for a mental health evaluation, whereas above they spent over two hours coaxing Mr. Hunt from his house.

Again unlike in *Waller*, the Berkeley officers did not do any additional research or ask for any additional help in dealing with Ms. Moore whereas above the officers asked for research on Mr. Hunt and the advice of additional personnel.  In *Waller,* even the supervising officers implemented reasonable accommodations before taking any steps towards a use of force, here the officers never gave supervising officers an opportunity to advise them. In *Waller*, the officers and supervising officers engaged in all of the reasonable accommodations in a high-risk hostage situation, whereas the officers here provided none of these reasonable accommodations (extending time, contacting supervising officers, conducting background research, calling additional personnel to the scene) to Decedent Kayla Moore in a low-risk, nonviolent situation even though they had more time, opportunity and reason to implement them.

Here, Berkeley officers did not have any exigent circumstances in which they were forced to make split-second decisions. Quite to the contrary, time was an easily accessible tool in Defendants repertoire, which they failed to take advantage of. Officers failed provide a single reasonable accommodation available to them. In fact, Officer Brown *explicitly* considered the reasonable accommodation of not threatening a mentally ill person with arrest but she *deliberately chose* not to implement it. Officer Brown should have noticed that her lie about the arrest warrant had failed. Officer Brown should have taken at least another 10 minutes talking with Ms. Moore, explaining that she was only taking her to the hospital and that she was not under arrest. Instead Officer Brown substituted her personal judgment for her training, the result was as her training hoped to prevent: a mentally ill person turned from cooperative to agitated and frightened which escalated into a deadly struggle that ended with Ms. Moore half-naked and dead in her own home.

Furthermore, if Officer Brown had taken just five more minute to use her lapel radio and called in over dispatch regarding taking Ms. Moore into protective custody, she would have learned that her on-duty supervisor, Sgt Phillips, defused a previous § 5150 situation with Ms. Moore by speaking to her and convinced her to voluntarily go to the hospital. If either officer had provided any of Plaintiff's 5 proposed reasonable accommodation that were readily available to them, then Ms. Moore would likely be alive today.

This incident demonstrates what Berkeley's ADA Policy and ADA legislation in general hope to prevent. There is a vicious cycle that occurs between a mentally disabled person and officers when officers fail to provide reasonable accommodations. The mentally ill persons become more agitated

and more frightened, because of their disability. In response, officers use more force and take less time to consider reasonable accommodations and alternatives. In this case, the result was that the officers asphyxiated Ms. Moore on the floor of her home when any one of the following 5 reasonable accommodations would have prevented it.

### C. BERKELEY OFFICERS SHOULD HAVE PROVIDED ANY ONE OF PLAINTIFF'S FIVE PROPOSED REASONABLE ACCCOMMODATIONS BECAUSE IT WOULD HAVE PREVENTED THE HARM, HUMILIATION AND DEATH OF KAYLA MOORE

#### i. *Berkeley officers should not have threatened Ms. Moore with arrest because it caused her to become agitated frightened and potentially aggressive*

First and foremost, Plaintiff's first proposed reasonable accommodation is that officers should have followed Berkeley Police Department policy and training by not threatening Ms. Moore with criminal arrest.

Officers failed to take this proposed action when Officer Brown lied to Ms. Moore and told her that she was being arrested for an outstanding warrant. Officer Brown had been specifically trained not to threaten a mentally ill person with arrest because it will cause the person additional fright, stress and aggression. Nevertheless, Officer Brown admitted in her declaration that she thought it was a better idea to contravene policy and common sense, and substitute her own personal judgment over her police department training. And as the training had predicted, once Officer Brown unnecessary and inexplicably threatened Ms. Moore with arrest, Ms. Moore became agitated and frightened which led Officer Brown physically attack Ms. Moore in order to detain her.

Officer Brown should have simply followed her training and never threatened Ms. Moore with criminal arrest.

#### ii. *Berkeley Officers Should Have Informed Ms. Moore That She Was Being Detained for a Mental Health Evaluation*

Plaintiff's second proposed reasonable accommodation is that officers should have followed Berkeley Police Department policy and California Welf. & Inst. Code 5150 procedures and informed Ms. Moore that she was being detained for a mental health evaluation.

The Statute states that the person performing the 5150 should tell the mentally disabled person verbatim, "You are not under criminal arrest, but I am taking you for an examination by mental health professionals at [insert name of facility]." Calif. Welf. & Ins § 5150(g)(1); Berkeley Police Department's ADA policy mandates officers to remain familiar with Cal. Welf. & Inst. Code § 5150

procedures. (See ADA Policy, page 5).

Berkeley officers failed to take this proposed action when Officer Brown made a deliberate decision *not* to tell Ms. Moore she was being detained for a mental health evaluation but for an outstanding warrant.

Plaintiff's second proposed reasonable accommodation would ***not*** have required Officer Brown to do anything dangerous, unreasonable or extraordinary. In fact, this reasonable accommodation would have required Officer Brown to do ***absolutely nothing*** more than what she was trained and required by policy to do. In every manner possible, Officer Brown's actions acted as a counter-accommodation by denying Ms. Moore the benefit of the Americans with Disabilities Act, City of Berkeley policies and her professional training. For this reason alone, Plaintiff should be permitted to submit this available reasonable accommodation to the jury.

> ### iii. *Berkeley Officers Should Have Respected Ms. Moore's Comfort Zone, Engaged in Non-Threatening Communications and Used the Passage of Time to Defuse the Situation Rather Than Precipitating a Deadly Confrontation*

Plaintiff's third proposed reasonable accommodation is that officers should have respected Ms. Moore's comfort zone, engaged in non-threatening communication and used the passage of time to defuse the situation.

Officers failed to take this proposed action when officers pounced on Ms. Moore without warning after only 5-7 minutes of trying to persuade her she was under a fabricated criminal arrest. The failure to take this proposed action amounts to a failure to provide a reasonable accommodation because officers are trained to be patient, communicate, contact friends and family, to help reassure mentally ill persons and to extend time beyond normal. **ADA Policy, page 4-5; Brown Depo, ; POST Learning Domain 20.** Officers are also trained to avoid physical contact with a mentally ill person unless they are violent or committing destructive acts. **Brown Depo, 110.**

Although officers may have spent approximately 15-20 minutes with Ms. Moore, they spent the bulk of that time investigating potential crimes and her mental state. During that time, Officer Brown observed that Ms. Moore was unarmed, not aggressive, not a threat to herself or others and had committed no crimes. In fact, Officer Brown did not feel the need to even place Ms. Moore in handcuffs for officer safety reasons during her investigation. Ultimately, Officer Brown determined that Ms. Moore was mentally disabled as a result of her schizophrenic delusions and she could not care for herself.

Officer Brown decided to detain Ms. Moore for a mental health evaluation. However, Officer

Brown did not intend make a custodial arrest under 5150 and transport Ms. Moore herself. Officer Brown planned to handcuff Ms. Moore and call the Berkeley Fire Department to the apartment to conduct the mental health evaluation in order to determine if Ms. Moore needed to be transported to John George Psychiatric Hospital for a psychiatric hold.

Berkeley officers are trained to extend time for mentally disabled persons and particularly for a 5150 detention. **See ADA Policy; Deposition of Sergeant Jennifer Tate (hereafter referred to as "Tate Depo"), 42-43.** There was no exigency to handcuff Ms. Moore or engage in a physical confrontation since she was cooperative and nonviolent. Officers should have used their ADA training and began providing Ms. Moore reasonable accommodations.

Ms. Moore did not become agitated or frightened until Officer Brown began trying to convince her of a warrant. Once Officer Brown noticed her ruse had failed causing Ms. Moore to become agitated, she should have begun using nonthreatening communication with Ms. Moore and the passage of time to defuse the situation instead of turning to a surprise physical attack on Ms. Moore that escalated this incident into a deadly struggle. Officer Brown should have simply reassured Ms. Moore that she was only being detained for a mental health evaluation and not under criminal arrest.

Officers Brown should have engaged Ms. Moore in a conversation about her medications and mental health as her supervisor, Sgt. Phillips, had done in a prior 5150. This would have helped to dispel Ms. Moore's fear about the warrant and guided her back to reality.

Officer Brown should have simply allowed more time to pass and asked Ms. Moore if she had any friends and/or family nearby. Officer Brown would have learned that Kayla Moore's caregiver, Edward Sterling III, was in the room. Officer Brown could have utilized him as a resource to calm Ms. Moore down and convince him to voluntarily submit to a 5150 detention and mental health evaluation.

Officer Brown should have taken the extra time to communicate to Officer Tu that Ms. Moore was mentally disabled so that he could assist in providing reasonable accommodations for the 5150 detention instead Officer Brown continued to mislead Officer Tu.  This would have allowed officers to both engage in nonthreatening communications and share their prior knowledge of Ms. Moore with each other.

Officers are equipped with radios on their lapels. Since both officers knew that Ms. Moore had prior mental health detentions and a history of a mental illness, they should have communicated with their supervisors and fellow officers. They would have learned that Sgt. Phillips, their on-duty supervisors, had performed a 5150 evaluation on Ms. Moore the year before that she distinctly recalled. In that 5150, the responding officers had spent a considerable amount of time with Ms.

Moore before Sgt Phillips arrived. Sgt Phillips engaged Ms. Moore in a conversation about her mental health and medications. Eventually Sgt. Phillips persuaded Ms. Moore to voluntarily go to the psychiatric hospital without ever escalating the situation into a physical confrontation. Officers could have applied these tactics and defused this situation properly in accordance with their professional training.

In fact, officers were trained to avoid physical contact altogether with a mentally ill person unless the individual is violent or destructive. Here, Ms. Moore was cooperative, engaging in peaceful conversation with officers and nonthreatening. Officers knew that she was suffering from schizophrenic delusions that would be exacerbated if they made a surprise physical attack and had specific Department training that mandated they not make physical contact. Officers should have respected Ms. Moore comfort zone and simply called Berkeley Fire Department to the scene to make the mental health evaluation and provided the aforementioned reasonable accommodations to Ms. Moore while they waited. The roommate, John Hayes, had been arrested and removed so officers could have even simply shut the apartment door and waited for Berkeley Fire Department.

If officers had provided any one of these proposed actions in accordance with their departments training and policies, Ms. Moore would never have become agitated and frightened. Nothing would have escalated and the situation would have resolved with Berkeley Fire Department convincing Ms. Moore to voluntarily go to the psychiatric hospital or allow her stay in her apartment. Instead officers needlessly forced a physical confrontation when they had every reason and opportunity to provide Ms. Moore with the reasonable accommodations the Berkeley Police Department intended to prevent exactly the deadly confrontation these officers precipitated.

### iv.    Officers should have implemented reasonable accommodations throughout the detention and communicated to arriving officers that Ms. Moore was suffering from delusions as a result of her mental disability

Plaintiff's fourth proposed reasonable accommodation is that Berkeley Officers Brown and Tu should have provided Ms. Moore with reasonable accommodations throughout the detention and informed arriving officers that Ms. Moore was mentally disabled, suffering extreme delusions such that she was incapable of recognizing them as police officers and complying with their orders.

Officers Brown and Tu failed to make this proposed accommodation when Officers Brown and Tu did not inform a single responding officer and/or supervisor on scene Ms. Moore was schizophrenic, suffering delusions and did not recognize them as legitimate police officers. This amounted to a failure to provide a reasonable accommodation because officers had opportunity and

time to communicate with one another during the struggle. This was critical information that the arriving officers desperately needed in order to facilitate better compliance from Ms. Moore and communicate with her.

Although the four minute struggle lasted long enough for officers to take numerous steps: for officers to double handcuff Ms. Moore; for supervisors Sgt. Phillip and Sgt Cardoza to arrive with a WRAP device; for officer to place the ankle strap of the WRAP device on her; for officers to figure out the chest portion of the WRAP device did not fit, there was absolutely no point during the fracas that Officer Brown and/or Officer Tu communicate to the other officers that Ms. Moore was mentally disabled, suffering a schizophrenic episode and unable recognize them as real police officers and thereby comply with their orders. As a result, the officers all used force and verbal commands that did no take into account Ms. Moore's disability.  They simply grappled with her and screamed "stop resisting."

Had the responding officers learned that Ms. Moore was suffering from schizophrenia, they could have begun implementing reasonable accommodations, which would have changed the outcome. For example, officers would have reassured Ms. Moore that she was not under criminal arrest and simply going to John George Hospital for a mental health evaluation. Officers would have used the least restraint necessary and not placed Ms. Moore in handcuffs. Or once she had calmed down the first time, removed the handcuffs altogether. Instead officers simply held down her ankles, arms and legs while telling her to "stop" or "don't resist" which was not effective with Ms. Moore who continued to buck for air and suffer from delusions until she died.

> ### v.    Officer Tu should have dismounted from Ms. Moore once she was bucking for air and on her stomach

Plaintiff's fifth reasonable accommodation is that Officer Tu should have immediately dismounted from Ms. Moore's back once she began bucking for air. Officer Tu failed to take this proposed action when he straddled Ms. Moore's back for several minutes during the struggle while she begged for air. This amounted to a failure to provide a reasonable accommodation because Berkeley police officers are trained that positional asphyxia occurs when officers apply pressure to the back of a person that is lying on their stomach. **See BPD Bulletin 234.**

Berkeley Training and Informational Bulletin #234 explains that a "vicious cycle of suspect resistance and officer restraint" occurs when an officers applies pressure to an individual's back because it causes an individual to have difficulty breathing. **See BPD Bulletin 234.** In turn, the individual struggles for air and the officer applies more compression to subdue the individual until the

individual asphyxiates.  **See BPD Bulletin 234.**

Officers are further admonished that individuals that are "obese and/or have large bellies are high risk candidates for sudden death due to positional asphyxia." **See BPD Bulletin 234.** Ms. Moore outward appearance put the Officers on notice she was a high-risk candidate for suffering a death by positional asphyxia as she was morbidly obese. Tragically, she did in fact die from positional asphyxia according to Plaintiff's expert Dr. Spitz. **See Spitz Rule 26 Report.**

Officer Tu and Officer Brown applied force in a manner that this training forbid them: Officer Tu straddled Ms. Moore's back placing all of his 230 pounds onto her back while Officer Brown pressed down on Ms. Moore's shoulder blades. Further, both officers recognized that Ms. Moore was obese with a very large belly, nevertheless they continued to compress her chest against the mattress and floor. Her disability prevented her from understanding and complying with their verbal orders as other arrestees would during the detention but nevertheless officers continued to hold her against the floor.  The failure of officers to follow their training and provide this reasonable accommodation proximately caused the terror and death of Ms. Moore's slow asphyxiation.

Plaintiff's proposed reasonable accommodations serve as viable alternatives the officers should have employed and in fact did not do. Each failure to employ the proposed accommodation amounts to a forfeited opportunity to bring the incident to a peaceful resolution by getting Ms. Moore the care she needed and deserved.

Plaintiff has produced evidence of the Berkeley Police Department's actual Title II ADA policy that supports all of Plaintiff's five proposed reasonable accommodations such that a reasonable jury could find that any or all of those accommodations were available and reasonable.

### D.  BERKELEY OFFICERS FAILED TO PROVIDE A REASONABLE ACCOMODATION BY REASON OF KAYLA MOORE'S DISABILITY BECAUSE THEY WERE TRAINED TO PROVIDE THESE REASONABLE ACCOMODATION, HAD AMPLE TIME AND OPPORTUNITY TO PROVIDE THEM, AND CHOSE NOT TO PROVIDE THEM

In order to prove the fourth prong of a Title II ADA Claim, Plaintiff must show that the Defendants intentionally discriminated against Ms. Moore by reason of her disability." O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir.2007).

Intentional discrimination on the part of the defendant is analyzed under a deliberate indifference standard. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *Duvall v. County of Kitsap*, 250 F.3d 1124 (9th Cir. 2001).  To show deliberate indifference the plaintiff must prove that there was a reasonable accommodation available and the officer's decision not to provide the reasonable accommodation involved an element of deliberateness. *Duval, supra,* at 1139.

27

Here, Plaintiff has extensively cited the availability of these reasonable accommodations given the Berkeley Police Department's training and policy on Title II of the ADA includes each one of the proffered reasonable accommodations. Furthermore, Kayla Moore was nonviolent, unarmed, had committed no crimes and being cooperative while standing in the doorway of her own home.  If she was guilty of anything it was being unable to comply with the Officers' orders due to her disability.

Therefore, Berkeley officers had ample time, opportunity and reason to provide each and every one of these reasonable accommodations as mandated by their own Department. However, they chose not to. And in the case of Officer Brown, she explicitly described considering to provide Ms. Moore two reasonable accommodations: (1) not threaten Ms. Moore with arrest; and, (2) inform Ms. Moore that she was being detained for a mental health evaluation. However, Officer Brown explained in her declaration to this Court that she made a deliberate decision not to provide them.

Therefore, Berkeley officers failed to provide Ms. Moore any reasonable accommodations by reason of her disability.

## II.   BERKELEY OFFICERS MISPERCEIVED THE EFFECTS OF MS. MOORE'S DISABILITY AS ILLEGAL CONDUCT

### A.   OFFICERS MISPERCEIVED THE EFFECTS OF MS. MOORE'S SCHIZOPHRENIC DELUSIONS AS CRIMINAL RESISTANCE TO AN ARREST WARRANT

In the alternative, Plaintiff has ample evidence to prove Berkeley officers misperceived the effects of Ms. Moore's disability of schizophrenia as illegal conduct. *See Waller*, 556 F.3d at 174; *Gohier*, 186 F.3d at 1220–21; Jackson v. Inhabitants of Town of Sanford, No. CIV. 94-12-P-H, 1994 WL 589617, at *1 (D. Me. Sept. 23, 1994).

In *Lewis*, officers were attempting to communicate with a deaf man, Plaintiff Charles Lewis, in regards to a custody dispute that involved Plaintiff's son.  Lewis v. Truitt, 960 F. Supp. 175, 176 (S.D. Ind. 1997). Plaintiff's friends tried to explain to officers that Plaintiff was deaf and the best way to communicate was by writing their questions on a piece of paper. *Id.* Officers refused to believe Plaintiff was deaf or write down any of their questions. *Id.* Officer continued to attempt to question him anyhow. *Id.* When officers found that Plaintiff Lewis was not complying, the officers threw Plaintiff Lewis to the floor by his hair, handcuffed him, placed him under arrest and kicked him. *Id.* Since Plaintiff had alleged Defendants knew Charles Lewis was deaf but refused to take steps to communicate with him and then arrested him because he did not respond to them appropriately, the court denied Defendants summary judgment on Plaintiff Lewis' ADA Claim. *Id.* at 178.

Similarly here, officers knew that Ms. Moore suffered from paranoid schizophrenia and the corresponding effects of her disability are delusions, paranoia and hallucinations. In fact, both officers heard Ms. Moore expressing her delusions to the effect that she did not believe that they were real police officers. When officers told Ms. Moore she needed to come to the police station for an outstanding warrant, Ms. Moore explained that she wanted to clear things up with the FBI on her phone first. Officers disregarded the effects of her disability and treated her as if she was not suffering from schizophrenia at all.

Officers silently coordinated to pounce on Ms. Moore without warning. Predictably, once officer grabbed her wrists, Ms. Moore retreated in fright believing in her delusion that these were not legitimate officers. Officers began to shout "stop resisting" and jumped on top of her even though they knew perfectly well that Ms. Moore's mental disability prevented her from being able to comply or comprehend their verbal commands.

In particular, Officer Tu refused to believe Ms. Moore was suffering from schizophrenia and its effects, which were delusions that the officers were not real police officers. Officers knew that she could not comply with their verbal commands and when Ms. Moore failed to comply, they treated her retreat as criminal resistance and obstruction of his police objective to perform a warrant arrest. At 6'3" and 230 pounds, Officer Tu used all of his weight to straddle and press down on Ms. Moore while his partner officer pressed on her shoulder blades. Other officers arrived and continued to yell "stop resisting" their warrant arrest, even though Ms. Moore's retreat a mere effect of her delusions, not criminal resistance, and she could not comply. Nevertheless, officers continued to use force to overcome this misperceived criminal resistance until she finally asphyxiated and died. Therefore, a reasonable jury could find that officers used the amount of physical force they did on Ms. Moore because they misperceived the effects of her schizophrenia as criminal resistance to an officer performing a warrant arrest.

### B. OFFICERS MISPERCEPTION OF MS. MOORE DISABILITY AMOUNTED TO INTENTIONAL DISCRIMINATION BECAUSE OFFICERS KNEW SHE WAS SUFFERING SCHIZOPHRENIC DELUSIONS AND CHOSE TO DISREGARD THE EFFECTS IT HAD ON MS. MOORE

In order to prove the fourth prong of a Title II ADA Claim, Plaintiff must show that the Defendants intentionally discriminated against Ms. Moore by reason of her disability." O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir.2007).

Intentional discrimination on the part of the defendant is analyzed under a deliberate indifference standard. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998); *Duvall v. County of*

*Kitsap*, 250 F.3d 1124 (9th Cir. 2001).  To show deliberate indifference, Plaintiff must show that there was an element of deliberateness involved in an officer's disregard for the effects of Ms. Moore's schizophrenia. *Duval, supra,* at 1139.

Here, Officer Brown and Officer Tu heard Ms. Moore expressing that she did not believe they were legitimate police officers and that the FBI was after her. Additionally, Officer Brown listened to Ms. Moore state that she was seeing dinosaurs and people that were invisible. Both officers were well aware that Ms. Moore was in the midst of a schizophrenic episode and could not respond to their verbal and physical commands as other arrestees. However, once both officers grabbed Ms. Moore and she retreated into her room screaming clearly frightened that they were not legitimate police officers. Both officers screamed "stop resisting." Officer Tu, particularly, viewed Ms. Moore's resistance as a criminal resistance to a warrant arrest even though she had committed no crimes. Officer Tu used the most force of all the officers and did so deliberately disregarding the fact Ms. Moore was unable to comply with his commands.

III. **THE COURT SHOULD GRANT PLAINTIFF LEAVE TO FILE FOR PARTIAL SUMMARY ADJUDICATION ON HIS TITLE II ADA CLAIM BECAUSE NO REASONABLE JUROR COULD FIND FOR DEFENDANT AND DEFENDANT'S DISCOVERY MALFEASANCE ROBBED PLAINTIFF OF THEIR OPPORTUNITY TO FILE A DISPOSITIVE MOTION**

This Court appears to have rightfully accepted that Decedent Kayla Moore met the first two of the four prongs required to prove Plaintiff's II ADA claim: (1) Ms. Moore had a disability of schizophrenia; and (2) Ms. Moore was entitled to police services under Berkeley Police Department's Title II ADA policy. And, Plaintiff has demonstrated that a reasonable juror could find that Defendant City of Berkeley failed to provide a reasonable accommodation and/or wrongly arrest Decedent Kayla Moore by reason of her disability. In doing so, Plaintiff has also proved that a reasonable juror could *only conclude* that Berkeley officers failed to provide a reasonable accommodation by reason of Ms. Moore's disability.

Officer Brown explained that she knew that a reasonable accommodation for Ms. Moore existed to not threaten mentally ill persons with arrest because it would cause them to become agitated, frightened and potentially aggressive. Officer Brown admitted that she knew that a reasonable accommodation when conducting W&I §5150 detentions was to inform the person that they were not under criminal arrest but being detained for a mental health evaluation. Officer Brown explained, in her own words, that she made a deliberate decision to violate her training and substitute her personal judgment because she baselessly "believed that Mr. Moore would be more receptive to being taken into custody if I told him he had a warrant that needed to be cleared up." **Brown Declaration, Dckt**

**#60.** Instead, as her training predicted, Ms. Moore "started getting very, very agitated" which led Officer Brown to signal for Officer Tu to pounce on Ms. Moore. Therefore, the nexus of all of Ms. Moore's injuries is Officer Brown's failure to provide two reasonable accommodations that she has already admitted to knowing were reasonable accommodations and deliberately did not provide.

Furthermore, Defendant City of Berkeley robbed Plaintiff of the opportunity to make a Motion for Partial Summary Adjudication on his ADA Claim, because the Defendant never disclosed the City of Berkeley Police Department's ADA policy. Once Plaintiff possessed this policy, it became clear that officers were trained to provide specific reasonable accommodations to mentally ill persons in compliance with Title II of the ADA, and their failure to do so was a *per se* violation of Kayla Moore's rights under the ADA.

Therefore, this Court should grant Plaintiff leave to file partial summary adjudication on Plaintiff's ADA claim against Defendant City of Berkeley so that the Defendant City of Berkeley will not benefit from their discovery malfeasance.

## CONCLUSION

For all the reasons stated above, this Court should DENY Summary Judgment to Defendant City of Berkeley on Plaintiff's ADA Claim. And for all the reasons above, this Court should grant Plaintiff leave to file for partial summary adjudication on Plaintiff's Title II ADA claim against Defendant City of Berkeley.


Respectfully submitted,


Dated:  November 17, 2017                    **The Law Offices of John L. Burris**


                                             */s/ Adanté D. Pointer*
                                             Adanté D. Pointer
                                             Attorney for Plaintiff