IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARTHUR MOORE,
          Plaintiff,

   v.

CITY OF BERKELEY, et al.,
          Defendants.

Case No.  14-cv-00669-CRB

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 104]; VACATING EARLIER SUMMARY JUDGMENT ORDER [DKT. 71] IN PART**

     This case arises from the untimely death of Xavier "Kayla" Moore during an arrest by Berkeley police.[1]  Following Ms. Moore's death, her father, Arthur Moore ("Mr. Moore" or "Plaintiff"), sued the City of Berkeley ("the City") and each of the eight officers present at the scene of Ms. Moore's death.  Mr. Moore brought federal claims under 18 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), along with claims under California law.  This Court granted the City's motion for summary judgment on everything but Mr. Moore's ADA claims.  SJ Order (dkt. 71).  Initially, it found triable issues on both of Mr. Moore's ADA theories: that the officers mistakenly arrested Ms. Moore because they mistook the effects of her disability for a crime, and that they did not reasonably accommodate her disability during the arrest.  See Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014), rev'd in part, cert. dismissed in part sub nom. City & Cty. of San Francisco, Cal. v. Sheehan, —U.S.—, 135 S. Ct. 1765 (2015).

     However, in reviewing the parties' pre-trial briefing, the Court became concerned

---

[1] While Ms. Moore was born with male anatomy, she considered herself a woman.  This order will therefore refer to the decedent as "Ms. Moore" and use female pronouns.

about Mr. Moore's ability to put forth sufficient facts at trial for a jury to find in his favor on the ADA claims.  He did not explain in his pre-trial briefing which facts support his theory that the officers arrested Ms. Moore because of her disability.  Nor did he clearly articulate how the officers failed to reasonably accommodate Ms. Moore in arresting her. Accordingly, the Court construed the City's motion to require Mr. Moore to clarify the factual basis for his legal theories as a renewed motion for summary judgment on the remaining ADA claim, and requested further briefing.  The Court also gave Mr. Moore the opportunity to submit additional declarations regarding the City's ADA policy, though he apparently did not do so.  Having carefully reviewed the parties' briefs, the Court concludes that no reasonable juror could find that Mr. Moore has met his burden of proving that the City failed to reasonably accommodate Ms. Moore, or that it effected a discriminatory arrest.  Accordingly, the Court GRANTS the City's motion for summary judgment and enters judgment on all claims.

## I.     BACKGROUND

The following facts are taken more or less verbatim from the Court's summary judgment order of Oct. 14, 2016.  The Court repeats them here because they are critical to understanding the issues in play.  Though the parties characterize the events differently, the facts are largely undisputed.  Pertinent factual disputes are described in more detail in the discussion section.

### A.     9-1-1 Call

Around midnight on Feb. 12, 2013, Berkeley Police received a call from John Hayes.  Tu Depo. (dkt. 57 ex. D) 21:16–22:15.  Hayes, Ms. Moore's roommate, explained that Ms. Moore had kicked him out of their shared apartment because Hayes had refused to give her money to buy drugs.  Brown Depo. (dkt. 57 ex. C) 20:20–21:3, 67:25–68:9. Hayes also said that Ms. Moore was in the midst of a psychotic episode, had done drugs all day, and needed to be taken into protective custody.  Brown Depo. 20:20–21:3, 67:25–

68:9.

After hearing this information over the radio, Officers Gwendolyn Brown and Kenneth Tu responded. Brown Depo. 22:11–19. Officer Brandon Smith, who found outstanding arrest warrants for both Hayes and Ms. Moore, arrived shortly thereafter. Smith Depo. (dkt. 57 ex. E) 23:7–12, 25:6–8. Officer Brown had previously responded to a call from Ms. Moore's mother asking the police to perform a welfare check on her child, though Ms. Moore was not home when Officer Brown arrived. Brown Depo. 54:2–56:9. Officer Brown therefore knew about Ms. Moore's history of paranoid schizophrenia and drug abuse, which had landed Ms. Moore in protective custody a number of times. Brown Depo. 53:10–55:6.

### B.     Initial Encounter

Hayes led the officers upstairs to the apartment. Brown Depo. 30:9–17. Ms. Moore came to the door. With the other officers standing a few feet away, Officer Brown, standing at the threshold to the apartment, told Ms. Moore that Hayes had called, and asked her to explain what was going on. Brown Depo. 57:21–25; 58:5–9. Unable to grasp the situation, Ms. Moore spoke of "dinosaurs" and being followed by "the FBI." Brown Depo. 58:13–24. Though she kept talking to Ms. Moore, Officer Brown could not get her "back on track." Brown Depo. 58:25–59:6. Ms. Moore's demeanor switched from bubbly to paranoid to angry to fearful and back again. Brown Depo. 103:7–12. After 15 to 20 minutes of conversation, Officer Brown decided to take Ms. Moore into custody. Brown Depo. 59:9.

### C.     Ensuing Struggle

Officer Brown signaled Officer Tu to handcuff Ms. Moore. Tu Depo. 58:17–59:1. The officers then grabbed Ms. Moore's wrists. Brown Depo. 121:14–122:1. Ms. Moore recoiled, dragging the officers into the apartment and onto a mattress on the floor. Tu Depo. 68:12–19. Officer Tu, who stands over six feet tall and weighs over 200 pounds, then put his weight on Ms. Moore's lower torso to keep her hips down and control her legs. Tu Depo. 71:16–72:15. Officer Brown, who weighs 130 pounds, put pressure on

3

Ms. Moore's shoulder blades and radioed for backup. Brown Depo. 151:4–14. Ms. Moore weighed approximately 350 pounds. Coroner's Report (dkt. 57-1) at 2. While Officer Brown and Officer Tu were struggling with Ms. Moore, Officer Brown noticed a man, later identified as Edward Sterling, inside another room in the apartment. Brown Depo. 134:4–10; 136:1–4. Officer Brown told Sterling to leave, and he complied. Brown Depo. 136:10–21.

Officer Smith heard Officer Brown's radio broadcast and rushed back upstairs to help. Smith Depo. 45:18–46:23. When he got there, Ms. Moore was on her stomach, struggling against the officers. Smith Depo. 47:2–53:12. Officers Smith and Brown then pulled Ms. Moore's left arm out from under her body as Officers Brian Mathis, Nikos Kastmiler, and Timothy Gardner arrived on scene. Smith Depo. 56:1-13, 57:1-13; Mathis Depo. (dkt. 57 ex. F) 19:1–12. Officer Gardner helped handcuff Ms. Moore's left arm, connecting the first set of handcuffs to a second set of handcuffs that Officer Tu had placed on Ms. Moore's right arm because her torso was too wide for one set. Gardner Depo. (dkt. 57 ex. G) 25:3–10, 26:25–27:5, 29:16–23. Officer Smith then left to check on Hayes in the patrol car. Smith Depo. 57:1–13. Ms. Moore continued kicking, so Officer Kastmiler put his weight on Ms. Moore's legs while Officer Mathis tried to hold them down. Kastmiler Depo. (dkt. 57 ex. H) 27:3–5; Mathis Depo. 25:6–10.

The officers then restrained Ms. Moore's ankles with a WRAP device[2] that Sgt. Amber Phillips and Officer Benjamin Cardoza had standing by, and maneuvered Ms. Moore onto her side. Mathis Depo. 26:20–27:13; Gardner Depo. 32:7–22. Ms. Moore stopped struggling. Phillips Depo. (dkt. 57 ex. J) 49:14–20; Gardner Depo. 31:5–7. Officer Brown began to monitor Ms. Moore's vitals. Ms. Moore stopped breathing about one minute after Officer Brown started monitoring. Gardner Depo. 33:2–35:4; Tu Depo. 82:14–22. Officer Brown briefly found a pulse and saw Ms. Moore's head and chest

---

[2] The WRAP is a device that restricts one's movement, similar to a straightjacket. "WRAP" is a proprietary term; though capitalized, it does not appear to be an acronym. See Safe Restraints, http://saferestraints.com (last visited Feb. 21, 2018).

4

move.  Brown Depo. 158:10–20; 159:24–160:5.  Sgt. Phillips called for medical assistance while Officer Tu began CPR chest compressions.  Brown Depo. 163:25–164:19.  But Ms. Moore had stopped breathing for good.  Brown Depo. 162:20–163:6.

### D.    Aftermath

Ms. Moore was pronounced dead on at 1:34 a.m. on Feb. 13, 2013.  Coroner's Rpt. (dkt. 57 ex. A) at 2.  The coroner concluded that Ms. Moore had died of "acute combined drug intoxication with a contribution from morbid obesity and intrinsic cardiovascular disease."  Coroner's Rpt. at 6.  Defendants' expert Dr. Gary Vilke also concluded that the officers had not caused or contributed to Ms. Moore's death.  Vilke Decl. (dkt. 57 ex. B) at 5.

Plaintiff's expert, Dr. Werner Spitz, disagreed.  Spitz Decl. (dkt. 64) ¶ 20.  Dr. Spitz opined that the levels of methamphetamine and codeine in Ms. Moore's bloodstream were too low for even their combined effect to have been fatal.  Spitz Decl. ¶¶ 19–25.  As a result, Dr. Spitz concluded that Ms. Moore had died from oxygen deprivation caused by a combination of compression of the diaphragm and a preexisting enlargement of the heart. Spitz Decl. ¶¶ 27–37.

## II.    LEGAL STANDARD

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  A dispute is genuine if the admissible evidence in the record "is such that a reasonable jury could return a verdict" for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Meanwhile, a fact is material if it could affect the outcome of the suit under governing law.  Id.

To determine whether a genuine dispute as to any material fact exists, the court must view the evidence in the light most favorable to the non-moving party.  Id. at 255.

However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968).

## III.    DISCUSSION

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. So to prevail on his ADA claim, Mr. Moore must first show that his daughter had a disability and was "qualified" under the statute's criteria. See O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir. 2007). The Court in its earlier order found that a reasonable jury could find that Ms. Moore was indeed a qualified individual with a disability—namely, schizophrenia. See SJ Order at 11–12. It sees no need to revisit this determination.

Accordingly, the only issue that remains on Mr. Moore's ADA claim is whether the City denied Ms. Moore benefits or services by reason of her disability. See id. Under Ninth Circuit precedent, the City is liable if the officers either (a) arrested Ms. Moore due to her disability (rather than due to any illegal conduct), or (b) caused her excessive injury or indignity by failing to reasonably accommodate her disability in the moments leading up to and following her arrest. See Sheehan, 743 F.3d at 1232. Plaintiff asserts both theories. See FAC (dkt. 18) ¶¶ 77–79. The Court assesses whether he has raised a genuine dispute of material fact on either issue such that a reasonable jury could find in his favor.

## A.    Discriminatory Arrest Claim

Plaintiff's first ADA theory comes under what the Ninth Circuit has labeled a "wrongful arrest" claim.  See Sheehan, 743 F.3d at 1232.  It may also be described as a "discriminatory arrest" claim.  See Gorman v. Bartch, 152 F.3d 907, 913 (8th Cir. 1998).  The claim is not merely that the arrest was wrongful—i.e., that officers lacked probable cause to arrest an individual—but rather that officers unreasonably "misperceived the effects of a disability as illegal conduct."  See Gohier v. Enright, 186 F.3d 1216, 1220 (10th Cir. 1999).

The Court has already held that the officers had probable cause to detain Ms. Moore on a § 5150 hold, and Plaintiff does not ask the Court to revisit this holding.  See SJ Order at 5–6.  The City also contends that the officers had probable cause to arrest Ms. Moore on the outstanding warrant.  See SJ Order at 6 n.6.  Plaintiff, however, claims that, once officers began to try to arrest Ms. Moore and she began to resist, they developed the subjective purpose to arrest her for interfering with law enforcement pursuant to California Penal Code § 148 (i.e., resisting arrest), not on the outstanding warrant or on a § 5150 hold.  Opp. (dkt. 122) at 30.  Plaintiff further argues that the behavior the officers interpreted as resisting arrest was in fact a manifestation of Ms. Moore's schizophrenia, and that it was unreasonable of the officers to not realize this fact.

In its earlier summary judgment order, the Court held that Plaintiff had raised a triable issue on this claim, reasoning as follows:

> The officers may have decided to arrest Moore due to her mental condition [on a § 5150 hold], outstanding warrant, or interference with law enforcement in the course of their duties. [Citation omitted.]  If the latter, a reasonable jury could find that . . . Moore's apparent resistance stemmed from her mental condition, not a desire to obstruct the officers.  That, as well as what motivated the arrest, remain disputed material facts.

SJ Order at 12.

Upon further consideration, the Court believes that the disputed issues on this claim do not warrant a jury determination.  The decision to arrest Ms. Moore was made before the officers physically came into contact with her, a fact not in dispute.  See Opp. at 30.

Thus, the initial rationale for the arrest was not her resistance to the restraint. Meanwhile, it is simply implausible that the officers developed the exclusive purpose to arrest Ms. Moore under § 148 after they seized her. Instead, the undisputed facts establish that Officer Brown maintained the purpose to arrest her on a § 5150 hold, as well as on an outstanding arrest warrant. Accordingly, as a matter of law, the decision to arrest was not discriminatory. Though determinations regarding state of mind "are generally factual issues inappropriate for resolution by summary judgment," Braxton-Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985), "if the factual context renders respondents' claim implausible . . . respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary," Matsushita, 475 U.S. at 587; see also Coverdell v. Dep't of Soc. & Health Servs., State of Wash., 834 F.2d 758, 769 (9th Cir. 1987). Here, Plaintiff has provided no evidence to support his discriminatory arrest theory.

### B.    Reasonable Accommodation Claim

Plaintiff next contends that the City violated the ADA by failing to reasonably accommodate Ms. Moore's disability. In response to the City's earlier motion for summary judgment, Mr. Moore asserted, incorrectly, that he "[did] not have to explain a reasonable accommodation" because the officers "failed to apply their training" on how to deal with a mentally ill person. Initial SJ Opp. (dkt. 62) at 25. The Court nevertheless denied the City summary judgment on this claim, reasoning:

> [Mr. Moore] could have just as easily argued that following their training—which presumably counsels against going "hands-on" with people terrified that "the FBI" is after them— would be accommodation enough. A reasonable jury could agree. . . .

SJ Order at 13.

Upon further consideration, the Court believes that this issue requires more analysis. In addition, Mr. Moore has since put forth several other possible accommodations. The Court will accordingly engage in a more thorough analysis of the various accommodations that have been offered in order to determine if a jury could find one or more to be reasonable.

### 1.    Legal standard

In the context of an arrest, a reasonable accommodation claim is available "where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." Waller ex rel. Estate of Hunt v. Danville, VA, 556 F.3d 171, 174 (4th Cir. 2009). However, officers need not make an accommodation where it would "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (2016).

In order to raise a triable issue of fact as to whether the officers failed to provide a reasonable accommodation in the context of an arrest, a plaintiff must make two showings:

First, he must "produc[e] evidence of the existence of a reasonable accommodation." Sheehan, 743 F.3d at 1233. That is, he must establish that the accommodation would have actually helped the detainee; that the accommodation appeared feasible on its face, given the circumstances and what officers knew or should have known at the time; and that the benefits of providing the accommodation outweighed the burdens of doing so. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401–02 (2002) (citing Reed v. LePage Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001)); Trujillo v. Rio Arriba Cty. ex rel. Rio Arriba Cty. Sherriff's Dep't., 319 F.R.D. 571, 637–38 (D. N.M. 2016).

Second, the plaintiff must establish that there is a basis in the record from which a reasonable juror could conclude that the officers failed to offer an equivalent accommodation. In other words, he must show that the action the officers actually took was not reasonable in light of the circumstances of the arrest, including what the officers knew or should have known regarding the arrestee's disability. See Bates ex rel. Johns v. Chesterfield Cty., Va., 216 F.3d 367, 373 (4th Cir. 2000) (reasonableness assessment accounts for detainee's personal characteristics, including any "known or evident disability"). An officer does not fail to reasonably accommodate when he selects one of two equally attractive options. See Waller, 556 F.3d at 175–76; see also Van Gorder v.

Grand Trunk W. R.R., 509 F.3d 265, 270–71 (6th Cir. 2007).  Otherwise, plaintiffs would always be able to withstand summary judgment, because there is "always something more or different that could have been done."  Waller, 556 F.3d at 176.

### 2. Proposed accommodations

With this framework in mind, the Court turns to the accommodations proposed by Mr. Moore in this case.  He argues that the officers should have:

(1)    Not "threaten[ed]" to arrest Ms. Moore (opp. at 17), and told Ms. Moore she was being arrested for a mental health evaluation, not on a warrant;

(2)    "Engage[d] Ms. Ms. Moore in a conversation about her medications and mental health" (opp. at 24);

(3)    "Ask[ed] Ms. Moore if she had any friends and/or family nearby" (opp. at 24);

(4)    Asked other officers if they had had any prior interactions with Ms. Moore (opp. at 24);

(5)    Communicated to Officer Tu and the late-arriving officers that Ms. Moore was suffering from schizophrenic delusions (opp. at 25);

(6)    Waited until Ms. Moore was no longer delusional: "[O]fficers could have even simply shut the apartment door and waited for the Berkeley Fire Department" (opp. at 25);

(7)    Officer Tu should have "dismounted" from Ms. Moore rather than put all his weight on her, thereby (allegedly) asphyxiating her (opp. at 26).

Plaintiff offers each of these proposed accommodations as an alternative to the use of force.  Had the officers employed any one of them, Plaintiff argues, a violent struggle would not have ensued.

The standard for summary judgment requires a bit more fleshing out at this point. The burden of production of evidence rests on the moving party at the summary judgment stage—here, the City.  Celotex, 477 U.S. at 331 (Brennan, J., dissenting); see also Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  However, the manner in which the moving party must discharge that burden depends on which party

will bear the burden of persuasion at trial.  <u>Celotex</u>, 477 U.S. at 331.  In cases brought under ADA Title II, the burden of persuasion on the issue of whether the defendant provided a reasonable accommodation rests on the plaintiff.  <u>See</u> <u>Crowder v. Kitagawa</u>, 81 F.3d 1480, 1485–86 (9th Cir. 1996).  This means that the party moving for summary judgment—again, here, the City—can "make a prima facie showing that it is entitled to summary judgment" by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim," or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element" of its claim.  <u>Celotex</u>, 477 U.S. at 331 (1986) (Brennan, J., dissenting).  Mere "conclusory allegations" by the nonmoving party are thus "insufficient to withstand a motion for summary judgment."  <u>Steinle v. Warren</u>, 765 F.2d 95, 100 (7th Cir. 1985).  However, the nonmoving party may rebut by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."  <u>Celotex</u>, 477 U.S. at 332.

It is fairly clear how this standard applies when it comes to determining factual issues such as whether a particular person was present in a store at a certain time.  <u>See, e.g.</u>, <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 156–61 (1970).  It is somewhat trickier to determine how the standard applies when the factual dispute centers on the question of whether a party has acted reasonably.  Reasonableness determinations require sifting through a "factbound morass," <u>Scott v. Harris</u>, 550 U.S. 372, 383 (2007), and are thus "usually . . . for the jury to decide," 10A Charles A. Wright et al., <u>Federal Practice & Procedure</u> § 2729 (4th ed. 2017).  However, where it is the plaintiff's burden to establish unreasonableness, a defendant is entitled to summary judgment where the plaintiff points to "no evidence of unreasonable activity."  <u>Id.</u> § 2732.2.  As the Supreme Court has held in the Fourth Amendment context, "At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party <u>to the extent supportable by the record</u>," whether a seizure is reasonable "is a pure question of law."  <u>Scott</u>, 550 U.S. at 381 n.8.

A bare assertion that the defendant acted unreasonably does not suffice to get the

11

issue to a jury. Rather, a plaintiff must establish that he will be able to present evidence at trial tending to show unreasonableness. To be sure, this evidence might come in the form of defense witnesses' own assertions. See, e.g., De Los Santos v. Scindia Steam Nav. Co., 598 F.2d 480, 489–90 (9th Cir. 1979), aff'd and remanded, 451 U.S. 156 (1981). But where those assertions do not give rise to an inference of unreasonableness, the plaintiff must put forth other evidentiary materials that specifically relate to the situation at hand. It is not enough, for instance, for a plaintiff suing his employer after developing carpal-tunnel syndrome to put forth evidence that the syndrome is generally linked to occupational stress. Doty v. Illinois Cent. R. Co., 162 F.3d 460, 462 (7th Cir. 1998). "Without some link to [the plaintiff's] particular workplace or the particular types of tools that he was required to use," this evidence "is far too general to permit a jury to conclude that [the plaintiff's] particular workplace was unsafe." Id. at 462–63.

Save for a report by Dr. Spitz, Plaintiff's cause-of-death expert, the only materials Plaintiff cites in his brief are documents generated by the City of Berkeley, documents regarding standards of conduct for law enforcement, and depositions of police officers. The Court granted Plaintiff an extension of time in which to file a brief in opposition to the renewed motion for summary judgment so that he would be able to prepare a supplemental affidavit by his police-practices expert regarding how the officers' actions failed to comply with the City's ADA policy for police officers. See Order Setting Briefing Schedule (dkt. 118). However, Plaintiff elected not to take advantage of this opportunity. This is not necessarily fatal to Plaintiff's case. It does, however, mean that any disputes as to material facts that Plaintiff seeks to raise will have to arise from the officers' own version of events.

### a. "Threatening" to arrest Ms. Moore

First, Plaintiff asserts that the officers "threatened" to arrest Ms. Moore on an outstanding warrant, lying to her about the "true" basis for her arrest—the § 5150 hold. Opp. at 22. He maintains that this caused her to become "agitated and frightened." Opp. at 22. Had officers instead told Ms. Moore that she was being detained for a mental health evaluation, Plaintiff insists, she would have gone willingly. Opp. at 22–23.

A factual clarification is in order.  There is no genuine dispute of fact that the officers believed they had independent probable cause to arrest Ms. Moore on an outstanding warrant.  And indeed, Officer Brown planned to both detain Ms. Moore on a psychiatric hold pursuant to § 5150, <u>and</u> arrest her on the warrant.  Brown Depo. 80:20–22.

What Plaintiff is contending, then, is that it would have been a reasonable accommodation to not mention the outstanding warrant to Ms. Moore.  This argument fails at the first step of the analysis: refusing to inform an arrestee of a valid basis for her arrest would not be reasonable.  On the contrary, it would be in plain tension with the logic of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), which requires officers to advise arrestees of their rights.  As a matter of law, the benefits of providing transparency to arrestees about the reason for an arrest outweighs the potential harms that might arise from such a practice due to a particular arrestee's sensitivities.

Alternatively, one might understand Plaintiff to be arguing that Officer Brown's words or tone of voice were unduly harsh.  Plaintiff argues that Officer Brown did not follow a police department policy which notes that officers dealing with those with mental disabilities should exercise "time and patience beyond that usually provided," extending a service call "in order to reassure the individual, sort facts, interact with family members and others, and bring the call to successful resolution."  Berkeley Police Department General Order T-19 (issued Jan. 1, 2000), https://www.cityofberkeley.info/Police/Home/Berkeley_Police_General_Orders.aspx.  But this policy is simply too general to establish whether or not the officers' actions in this particular case were reasonable.  <u>See</u> <u>Doty</u>, 162 F.3d at 462–63.  It does not say how much time officers should spend with arrestees who suffer from disabilities, or how officers should deal with people who suffer from schizophrenia in particular.  In any event, Plaintiff points to <u>no</u> evidence that Officer Brown's tone or words were threatening.  On the contrary, Officer Brown states that she told Ms. Moore she "had a warrant, and we needed to go down to the station to clear it up," adding: "Look, Xavier, it's not a big deal.  Let's just get this taken care of.  If it's not—if it's not a warrant, no big deal, but let's just

get it taken care of." Brown Depo. 123:9–11, 126:1–4. Officer Tu supported this version of events, saying that Officer Brown spent "quite a while" "trying repeatedly to calm [Ms. Moore] down." Tu Depo. 61:20–62:25.

As a third and final alternative, one might understand Plaintiff to be arguing that the ADA required Officer Brown to inform Ms. Moore that she was detaining her pursuant to § 5150, in addition to arresting her on the outstanding warrant. Indeed, Plaintiff insists that California law required her to do so. Violation of a statute that contemplates the problem at hand may be evidence of unreasonableness. See Restatement (Second) of Torts § 286 (Am. Law Inst. 1965). But the statutory provision Plaintiff cites for the proposition that Officer Brown unreasonably failed to advise Ms. Moore that she was being detained for a mental health evaluation, Cal. Welf. & Inst. Code § 5150(g)(1), is inapposite. Section 5150(g)(1) requires officers to advise those they detain that they are "not under criminal arrest" but instead are being taken "for an examination by mental health professionals," who will inform them of their rights. Id. Plaintiff argues that this provision is aimed at reassuring the arrestee. But Plaintiff points to nothing but the statutory language that supports this interpretation. On the contrary, the requirement is likely intended to advise the arrestee of her legal rights—but Plaintiff is not arguing that Officer Brown unreasonably failed to inform Ms. Moore of her rights.

There is a more fundamental reason that the advisement required by § 5150(g)(1) does not apply to the situation at hand: the officers were not actually required to give it. The advisement need only be given when the person "is first taken into custody." Cal. Welf. & Inst. Code § 5150(g)(1). Because Ms. Moore was never actually taken into custody, the officers did not violate § 5150(g)(1).

In addition, Plaintiff has not put forth any evidence from which a juror could conclude that Officer Brown should have known that Ms. Moore would have been less inflamed at being informed of the § 5150 hold than of the outstanding warrant. To the contrary, Officer Brown's experience is that people who are fifty-one-fifty'ed frequently become angry when told they are being put on a psychiatric hold. Brown Amended Decl.

14

(dkt. 60) ¶ 12.  In the absence of any evidence to the contrary—and Plaintiff presents none—there is nothing to indicate that informing Ms. Moore of the § 5150 would have helped the situation.

In any event, Plaintiff has not satisfied the second step in the analysis.  That is, he has not established that there is a basis in the record from which a reasonable juror could conclude that officers did not offer an equivalent accommodation.  He presents no evidence to support his contention that Ms. Moore was any more inflamed at being told that police were arresting her on an outstanding warrant than she would have been had they told her they were detaining her pursuant to § 5150.  He does not, for instance, cite affidavits from Ms. Moore's family members or friends to this effect.  Accordingly, Plaintiff has not met his "initial burden of producing evidence of the existence of a reasonable accommodation."  Sheehan, 743 F.3d at 1233.

### b.  Asking Ms. Moore about her medications and mental health

Plaintiff next argues that it was unreasonable of Officer Brown not to ask Ms. Moore about her medications and her mental health.  Doing so, Plaintiff says, "would have helped to dispel Ms. Moore's fear about the warrant and guided her back to reality."  Opp. at 24.  However, Plaintiff has not established that this accommodation was feasible: he points to nothing that would suggest Officer Brown had a basis for knowing that asking Ms. Moore about her medications would have helped the situation.  Nor has he established that the accommodation would have actually helped Ms. Moore: the record contains no factual basis for the assertion that asking Ms. Moore about her medications and mental health in the course of Office Brown's 15-to-20-minute conversation with her would have had a calming effect on her.  Accordingly, Plaintiff has failed to produce evidence of the existence of a reasonable accommodation on this point.

### c.  Asking Ms. Moore whether she had family or friends nearby

Plaintiff next argues that it would have been a reasonable accommodation for Officer Brown to ask Ms. Moore if she had friends or family nearby.  Plaintiff states that,

had Officer Brown asked, Ms. Moore would have told her that Edward Sterling—whom Plaintiff asserts was Ms. Moore's caretaker—was in Ms. Moore's apartment while the officers were talking to her. The officers could have summoned Sterling, who would have helped calm Ms. Moore down.

But there are several weak links in this chain of reasoning. First, Plaintiff has not rebutted the City's contention that he has provided no evidence tending to establish that Officer Brown did not, in fact, ask Ms. Moore whether she had friends or family nearby. Plaintiff cites page 101 of Officer Brown's deposition for this point, but that page contains no statement by Officer Brown to the effect that she did not ask Ms. Moore about friends and family. See Brown Depo. 101. Second, Plaintiff points to nothing in the record suggesting that Sterling was, in fact, Brown's caretaker. Indeed, Mr. Moore stated in a deposition that he had never heard Sterling's name and had no information about him. A. Moore Depo. (dkt. 57 ex. L) 18:13–20; 21:19–21; 36:12–20. Meanwhile, Elysse Moore, Ms. Moore's mother, testified that Ms. Moore had no caretaker, and that Sterling was a "leech" who was "living off" her and holding her and Arthur Moore "for ransom." E. Moore Depo. (dkt. 123 ex. A) 171:1–6. This is hardly evidence that summoning Sterling would have helped matters.

Next, there is no basis from which a juror could have concluded that Officer Brown should have known that summoning Sterling would have helped. Officer Brown was not in a position to know anything about Sterling—she wasn't even aware of his presence until after the officers initiated the arrest. Brown Amended Decl. ¶ 15. Plaintiff points out that Officer Brown could have asked Ms. Moore if she had friends or family nearby, but he similarly does nothing to establish that Officer Brown had any basis for knowing how Ms. Moore would have responded to such a question, or that asking the question would have led to the identification of Sterling.

Finally, as the City points out in its brief, whatever help Sterling had provided Ms. Moore on Feb. 12 was apparently ineffective, necessitating the officers' involvement in the first place. Recent history, in other words, contradicted the notion that summoning him

16

would have helped.  All of these factors indicate that summoning Sterling would not have been a reasonable accommodation.

### d. Asking other officers about previous interactions with Ms. Moore

In a similar vein, Plaintiff asserts that Officer Brown should have asked other officers about their prior interactions with Ms. Moore.  Had Officer Brown done so, she might have learned that Sgt. Phillips had previously detained Ms. Moore on a § 5150 hold that ended with Ms. Moore voluntarily agreeing to go to a psychiatric hospital.  Opp. at 24–25.

Plaintiff does not assert that Officer Brown knew or should have known about Sgt. Phillips' prior interaction with Ms. Moore.  So he is apparently urging the Court to permit a jury to find that officers act unreasonably whenever they fail to consult with colleagues about possible prior experiences with the subjects of potential mental-health holds, whether or not they know of specific interactions that individual has had with the police. They would apparently be required to solicit their colleagues every time they responded to a call.  It may be a reasonable accommodation to call in a specialist in certain situations. See Waller, 556 F.3d at 176 (holding that defendants satisfied duty of reasonable accommodation by calling in hostage negotiator in hostage situation).  But on this record, jurors are in no position to second-guess an officer's choice regarding whether to solicit general advice from other officers.  Absent any specific indication that doing so would be helpful, the burdens of requiring officers to consult with the entire police force about their prior experiences whenever they respond to a call outweigh the benefits of doing so, as a matter of law.  Plaintiff has not put forth any evidence, such as expert testimony, indicating that consulting other officers would have been advisable in this situation.  See Doty, 162 F.3d at 462–63.  Officer Brown's failure to solicit advice from other officers was therefore not unreasonable.

### e. Communicating Ms. Moore's condition to Officer Tu and late-arriving officers

Plaintiff's next argument is that Officer Brown should have communicated to Officer Tu and the late-arriving officers that she was planning to detain Ms. Moore on a § 5150 hold. Opp. at 25–26. As to Officer Tu, Plaintiff's argument fails because he does not explain how the situation would have played out differently had Officer Tu possessed this information. It was Officer Brown, not Officer Tu, who orchestrated the officers' engagement of Ms. Moore. See Tu Depo. 58:17–59:1; Brown Depo. 121:14–122:1. In any case, Officer Tu states he knew that Ms. Moore was possibly "experiencing mental health issues" when he responded to the call. Tu Depo. 63:19–24; 53:18–24.

With respect to the other officers, Plaintiff states that the officers would have used less force had they known that Ms. Moore was suffering from schizophrenia. Specifically, they would have "used the least restraint necessary and not placed Ms. Moore in handcuffs." Opp. at 26. But Plaintiff does not dispute that Ms. Moore resisted the officers, whatever the cause. Plaintiff points to no evidence suggesting that the officers' use of force would have been any different had they known that Ms. Moore was suffering from schizophrenia. Indeed, the evidence in the record is to the contrary: Officer Brown avers that it is routine practice to handcuff individuals being detained pursuant to § 5150. Brown Amend. Decl. ¶ 13.

Plaintiff has therefore failed to establish the existence of a reasonable accommodation on this score: he has pointed to nothing in the record indicating that informing the other officers that Officer Brown was planning to detain Ms. Moore on a § 5150 hold would have been helpful to Ms. Moore. To the extent Plaintiff is arguing that officers should not have attempted to arrest Ms. Moore at all, that contention is addressed in the next section.

### f. Allowing the passage of time to defuse the situation and not making physical contact

Plaintiff next argues that Officer Brown failed to reasonably accommodate Ms. Moore by not spending more time conversing with her prior to initiating the arrest.

Plaintiff states that "[t]here was no exigency to handcuff Ms. Moore or engage in a physical confrontation since she was cooperative and nonviolent." Opp. at 24. Plaintiff adds that, "In fact, officers were trained to avoid physical contact altogether with a mentally ill person unless the individual is violent or destructive." Opp. at 25. Finally, he suggests that, instead of arresting Ms. Moore, Officer Brown could have "simply shut the apartment door and waited for the Berkeley Fire Department." Opp. at 25.

First, it is necessary to clarify the undisputed facts. Plaintiff's assertion that officers were trained to avoid physical contact with mentally ill people is apparently drawn from the following colloquy during Officer Brown's deposition:

> Q: . . . [Y]ou were trained that when making field contacts with persons with mental illness that you are to, if possible, avoid physical contact if no violence or destructive acts have taken place?
>
> A: Yes.

Brown Depo. 110. Plaintiff interprets Officer Brown's answer to mean that officers are trained to not arrest people with mental illnesses who have not committed any violent or destructive acts. However, this interpretation is highly implausible in light of the existence of § 5150, which authorizes officers to detain a person for a psychiatric hold if she "is a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5150(a). Section 5150 is not premised on a "violent or destructive act" having <u>already taken place</u>. Here, the officers had probable cause to arrest Ms. Moore under § 5150. SJ Order at 6. In Plaintiff's own words, Ms. Moore "was clearly in the midst of a paranoid schizophrenic mental health crisis"—an assessment that was shared by Ms. Moore's roommate and the police officers who observed her. <u>See</u> FAC ¶ 21

Plaintiff's interpretation of Officer Brown's testimony is also contradicted by Officer Brown's own declaration, in which she states: "For safety reasons, it is both routine practice at the Berkeley Police Department and my regular practice to handcuff anyone that I am detaining under Section 5150." Brown Amended Decl. ¶ 13. Accordingly, Plaintiff has failed to establish a genuine dispute of material fact as to

whether the Berkeley police department trains officers not to arrest mentally ill individuals who have not yet committed violent or destructive acts.

Plaintiff's suggestion that Officer Brown could have waited for the fire department to intervene also lacks a factual basis. Plaintiff insists that Officer Brown was planning to wait for the fire department to arrive to conduct a mental health evaluation of Ms. Moore, but this was not the case. In fact, Officer Brown was only waiting for the fire department to conduct a <u>medical</u> evaluation. Brown Depo. 101:5–8. Accordingly, there is nothing in the record, aside from Plaintiff's bare assertion, to suggest either that the officers were planning to wait for the fire department to take over, or that they should have done so. This is not sufficient to raise a material factual issue as to whether it would have been a reasonable accommodation to wait for the fire department.

We are left with the argument that the officers should have accommodated Ms. Moore by either waiting indefinitely for her to calm down, or declining to make an arrest at all. The assertion that the officers should have waited longer before trying to take Ms. Moore into custody has some basis in the case law. <u>See</u> <u>Sheehan</u>, 743 F.3d at 1232–33. In <u>Sheehan</u>, police had been called to a group home for the mentally ill to perform a § 5150 hold on the plaintiff, Teresa Sheehan. <u>Id.</u> at 1217. According to the undisputed facts, when the officers opened the door to Sheehan's room, she grabbed a knife and threatened to kill them. <u>Id.</u> at 1218–19. They retreated and closed the door, leaving Sheehan alone in the room. <u>Id.</u> at 1219. Officers called for backup. <u>Id.</u> However, before backup arrived, they "decided to forcibly reenter Sheehan's room." <u>Id.</u> A confrontation ensued during which Sheehan was shot five or six times. <u>Id.</u> at 1219–20.

The Ninth Circuit panel reversed the lower court's grant of summary judgment for the defendant, holding that a reasonable jury could find that officers had failed to take Sheehan's mental illness into account in forcing the second entry.[3] <u>Id.</u> at 1233.

---

[3] The Supreme Court granted certiorari on the issue of the ADA's application to arrests, but dismissed the petition as improvidently granted when the City of San Francisco changed course and declined to contest the Ninth Circuit's holding on that point. <u>Sheehan</u>, 135 S. Ct. at 1778–80 (Scalia, J., concurring in part and dissenting in part).

20

Specifically, the court held that "[a] reasonable jury . . . could find that the situation had been defused sufficiently, following the initial retreat from Sheehan's room, to afford the officers an opportunity to wait for backup and to employ less confrontational tactics. . . ." Id.

The situation here was quite different from the one in Sheehan, however. In Sheehan, there was an objectively high likelihood that deadly force would be required. Moreover, there was evidence that waiting would have posed no additional risk of injury to Sheehan or others. "Of significance, all of the information known to the officers suggested that Sheehan wanted only to be left alone in her home. . . . Although she had acted in a threatening manner, she had done so only to those who had entered her home without her permission." Id. at 1227. Accordingly, "[t]he officers' decision to force an entry was in effect a decision to cause a violent—and potentially deadly—confrontation with a mentally ill person without a countervailing need." Id. (emphasis added).

Here, in contrast, there wasn't anything to indicate that deadly force would likely be required when the officers initiated the arrest. (Nor did the officers here use deadly force. See SJ Order at 8–9.) In addition, as the City points out, the situation could have gotten worse: What if Ms. Moore had fallen unconscious due to a drug overdose while the officers waited for her to calm down? What if Ms. Moore had become violent before the officers initiated the arrest? Crucially, as this Court has already indicated, Plaintiff has put forth no evidence from which a reasonable juror could find that there was anything officers could have done to make Ms. Moore calm down. And in any event, the officers did give the situation time to settle: it is uncontroverted that Officer Brown spent 15 to 20 minutes trying to calm Ms. Moore. Brown Depo. 58:25–59:9. Officer Brown stated in her deposition that it was only after establishing that Ms. Moore was not interfacing with reality that she decided to physically detain her. Brown Depo. 101–03. It may be argued that the situation might have turned out differently had Officer Brown waited longer. But there is nothing in the record to indicate that this is the case, and certainly nothing to indicate that Officer Brown had any reason to know that waiting longer would have

1   helped. Again, the only expert testimony Plaintiff cites in his motion in opposition to

2   summary judgment is the report of his cause-of-death expert.

3        This is different from the situation in Sheehan, in which "all of the information

4   known to the officers suggested that" they were the primary cause of Sheehan's agitation,

5   and that removing themselves would likely help calm her. 743 F.3d at 1227. Here,

6   weighing the potential consequences of arresting Ms. Moore against the potential

7   consequences of not doing so, no reasonable juror could conclude that officers should have

8   waited longer instead of taking the course they chose. See Waller, 556 F.3d at 175–76.

9   Plaintiff has failed to put forth a basis from which a reasonable juror could find that the

10  benefits of waiting to arrest Ms. Moore outweighed the risks of taking that course of

11  action.

12       To the extent Plaintiff argues that the officers should not have made an arrest at

13  all—not just that they should have waited longer—his proffered alternative goes beyond

14  what the ADA requires. Fourth Amendment jurisprudence "has long recognized that the

15  right to make an arrest or investigatory stop necessarily carries with it the right to use some

16  degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S.

17  386, 396 (1989). The ADA reasonableness requirement is not to the contrary.

18       Even if it were, the ADA does not require a public entity to modify police or other

19  practices where "making the modifications would fundamentally alter the nature of the

20  service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). Requiring officers to not make

21  an arrest when dealing with a delusional person would indeed "fundamentally alter" the

22  nature of police services. See id. A rule that police may never arrest someone who is

23  operating under a temporary delusion would severely reduce the tools police have to

24  maintain law and order.[4] In particular, it would have the effect of seriously limiting the

25

26  [4] While the record is silent on this issue, the Court takes judicial notice of (1) the close connection between drug use and crime, and (2) the comorbidity of substance-abuse

27  disorders and mental illness. See Nat'l Council on Alcoholism and Drug Dependence, Alcohol, Drugs and Crime (last visited March 19, 2018), https://www.ncadd.org/about-addiction/alcohol-drugs-and-crime; Nat'l Institutes of Health, Nat'l Institute on Drug

28  Abuse, Comorbidity: Addiction and other Mental Disorders (last visited March 19, 2018),

scope of § 5150, infringing on the state's prerogative to enact constitutionally sound criminal laws. See United States v. Mota, 982 F.2d 1384, 1388 (9th Cir.1993) ("[I]n evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest.").

Accordingly, simply not arresting Ms. Moore was not an accommodation the ADA required.

### g. "Dismounting" from Ms. Moore

Finally, Plaintiff argues that Officer Tu should have "dismounted from Ms. Moore's back once [Ms. Moore] began bucking for air." Opp. at 27. Plaintiff asserts that Officer Tu "straddled Ms. Moore's back placing all of his 230 pounds onto her back while Officer Brown pressed down on Ms. Moore's shoulder blades," and that this "proximately caused the terror and death of Ms. Moore's slow asphyxiation." Opp. at 27.

The Court addressed this issue in some detail in its Oct. 14 order in the context of Plaintiff's Fourth Amendment claim for unreasonable use of force. The Court stated:

> The moment the officers tried to arrest her, Ms. Moore yanked two officers to the floor, kicked, and screamed. [Citation omitted.] So even if Ms. Moore started bucking for air at some point, nothing in the record suggests how the officers could have discerned when thrashing against arrest became bucking for air. And though Ms. Moore's weight suggested a higher risk of health problems, the officers had little choice but to restrain her once the struggle started. That being so, the force used—though fatal when combined with an enlarged heart— was reasonable based on what the officers could know at the time.

SJ Order at 9. In addition, Ms. Moore was still kicking at the officers after being handcuffed. Tu Depo. 79–81; Kastmiler Depo. 27. So Plaintiff has not put forth evidence from which a reasonable juror could conclude that his proposed accommodation would have led to a different outcome.

Plaintiff has accordingly failed to rebut the City's position that he has produced no evidence that the officers failed to provide a reasonable accommodation. The City is

1  therefore entitled to summary judgment on the claim that it failed to reasonably

2  accommodate Ms. Moore.

3  **C.      Comparison of ADA and Fourth Amendment Analysis**

4  In its earlier order, the Court granted the City's motion for summary judgment on

5  the issue of whether the officers violated Ms. Moore's right to be free from "unreasonable

6  searches and seizures" under the Fourth Amendment to the United States Constitution,

7  while denying Plaintiff's ADA claim.  SJ Order at 9, 12–13.  At that time, the Court

8  obviously thought there was daylight between the analysis of unreasonableness under the

9  Fourth Amendment, and the analysis of whether a defendant has provided a "reasonable

10  accommodation" under the ADA.  Upon further reflection, however, the Court has

11  concluded that, when it comes to officers' use of force during an arrest, these inquiries are

12  one and the same.

13  Judge Wilkinson of the Fourth Circuit has persuasively argued that the analysis is

14  identical, given that the Fourth Amendment inquiry is tailored to the specific facts and

15  circumstances of each case.  See Bates, 216 F.3d at 371.  In Bates, the plaintiff brought

16  claims under both § 1983 and the ADA, arguing that officers used unreasonable force and

17  failed to accommodate his disability (autism) when they wrestled with him after he began

18  to resist arrest.  Id. at 368–70.  Judge Wilkinson held that the ADA analysis merged with

19  the Fourth Amendment use-of-force analysis:

20  
> We need not undertake an independent ADA inquiry in this
> case because our Fourth Amendment scrutiny has already
21  > accounted for all the situation's circumstances.  For in
> evaluating the validity of an investigatory stop, a court must
22  > consider "'the totality of the circumstances—the whole
> picture.'"  [Citation omitted.]  And in examining a claim of
23  > excessive force, a court must ask whether the officers' conduct
> was "'objectively reasonable' in light of the facts and
24  > circumstances confronting them."  [Citation omitted.]  Just like
> any other relevant personal characteristic—height, strength,
25  > aggressiveness—a detainee's known or evident disability is
> part of the Fourth Amendment circumstantial calculus.
26  
Id. at 371.

27  Ninth Circuit precedent points in the same direction.  In Sheehan, when it came to

28

the officers' second attempt to enter the plaintiff's room, the court denied summary judgment on Sheehan's Fourth Amendment claim and her ADA claim for the same reason: the officers failed to take her mental illness into account when forcing the entry. Assessing the Fourth Amendment claim, the court reasoned:

> [W]e cannot say as a matter of law that the officers continued to carry out the search or seizure in a reasonable manner when they decided to force the second entry, without taking Sheehan's mental illness into account and in an apparent departure from their police officer training.

Sheehan, 743 F.3d at 1225 (9th Cir. 2014). The court's analysis of the ADA claim was much the same:

> A reasonable jury . . . could find that the situation had been defused sufficiently, following the initial retreat from Sheehan's room, to afford the officers an opportunity to wait for backup and to employ less confrontational tactics, including the accommodations that Sheehan asserts were necessary.

Id. at 1233. The court also noted that "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." Id. at 1232. In addition, whether alternatives to the use of force are available is a relevant consideration in the Fourth Amendment analysis, as it is under the ADA. Lowry v. City of San Diego, 858 F.3d 1248, 1259 (9th Cir. 2017); Glenn v. Washington Cty., 673 F.3d 864, 872 (9th Cir. 2011).

Of course, this is not to say that every ADA violation by a police department is necessarily a violation of the Fourth Amendment prohibition on unreasonable searches and seizures. Here, for example, Plaintiff may have claimed that the City failed to establish appropriate procedures to guide police encounters with the mentally disabled. It is also possible to imagine police failing to accommodate a disabled person during a custodial interrogation in a way that would violate the ADA without implicating the Fourth Amendment. But where the question is whether the officers used reasonable force in dealing with a qualified individual with a disability, the analyses appear to be substantially identical: employing unreasonable force is tantamount to a failure to reasonably accommodate. Under both the ADA and the Fourth Amendment, a court must balance

"the nature and quality of the intrusion on the individual's . . . interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983).

The scope of liability analysis is also the same under the Fourth Amendment and Title II of the ADA. As in tort law, a defendant in an ADA case will only be liable for harm that is within the scope of the liability created by the relevant legal violation. See Cty. of Los Angeles, Calif. v. Mendez, —U.S.—, 137 S. Ct. 1539, 1548–49 (2017) (tort-law scope of liability analysis applies to Fourth Amendment excessive force claims under § 1983); Siefken v. Vill. of Arlington Heights, 65 F.3d 664, 666 (7th Cir. 1995) ("but for" causation not sufficient under the ADA); accord Hulihan v. Reg'l Transp. Comm'n of S. Nevada, No. 2:09-CV-01096-ECR, 2012 WL 2060955, at *6 (D. Nev. June 7, 2012), aff'd, 582 F. App'x 727 (9th Cir. 2014); see also Henrietta D. v. Bloomberg, 331 F.3d 261, 278 (2d Cir. 2003).

The question that logically follows from this is whether there is any purpose served, from the perspective of litigation strategy, by bringing an ADA claim that focuses solely on officers' use of force, in addition to a Fourth Amendment claim. The answer is that bringing an ADA claim allows plaintiffs to skirt the doctrine of qualified immunity, because ADA claims are asserted against the agency that employs the officers, not against the officers themselves. See Owen v. City of Independence, 445 U.S. 622, 650 (1980).

## IV. CONCLUSION

Ms. Moore has been widely mourned, and her death has been a rallying cry for reform in the way municipalities handle crisis response for the mentally ill. Nothing in this order is meant to discourage those efforts.

That said, courts can only rely on the evidence the parties put in front of them. See Reed, 244 F.3d at 260 ("The summary judgment decisions of this court have often turned on the surprising failure by one party or the other to proffer any significant evidence in favor of their position.") In this case, the plaintiff has not pointed to any evidence

suggesting that he could meet his burden at trial of establishing that police acted unreasonably. That Ms. Moore died while in police custody, troubling and distressing as that might be, is not, by itself, evidence of unreasonable conduct on the part of the officers.

Accordingly, the City's motion for summary judgment is **GRANTED** in full. The Court's earlier summary judgment order (dkt. 71) is **VACATED** to the extent that it denied the City's motion with respect to Plaintiff's ADA claims.

**IT IS SO ORDERED.**

Dated: March 23, 2018



CHARLES R. BREYER
United States District Judge